UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

BERNARD NATIONAL LOAN INVESTORS, :
LTD.
                                    :
        Plaintiff,
                                    :        Case No. 08-CV-3573
        v.
                                    :
TRADITIONS MANAGEMENT, LLC, AEY,    :        **FIRST AMENDED COMPLAINT**
LLC, and MICHAEL AIKEN
                                    :
        Defendants.
                                    :

------------------------------------ X

Plaintiff Bernard National Loan Investors, Ltd. ("Bernard" or the "Plaintiff"), by and through its counsel, Reed Smith LLP, for its amended complaint against Defendants Traditions Management, LLC ("Traditions"), AEY, LLC ("AEY") and Michael Aiken ("Aiken" and together with Traditions and AEY, the "Defendants"), alleges as follows:

## INTRODUCTION

1.      This action rises out of a $26.5 million secured loan transaction among the parties (the "Loan").   It was a Loan built and perpetuated on the basis of phantom closings, financial chicanery, self dealing by the borrowers, breaches of express and implied covenants in the relevant Loan Documents (as defined below), and other bad faith conduct as more fully set forth below.

2.    Specifically, Defendant Traditions borrowed $26.5 million from Bernard in December 2006 for the purported purpose of funding a real estate venture that specialized in the marketing and sales of new, high-end luxury residential communities.  The Loan was guaranteed by Defendant AEY, an entity controlled in part by Defendant Aiken, a principal and control person of Traditions, and was secured by, among other items, the cash flow from what Traditions represented as being ten existing, lucrative and putatively non-cancelable contracts with real estate developers, as well as all future such contracts.

3.    Aiken presented himself to Bernard as an expert in this specialized field, claiming to have generated $700 million in sales for Traditions' clients, and in excess of $15 million in distributions to Traditions' principals.

4.    Traditions, through Aiken, represented that it would initially amortize the Loan by payment of some $5.432 million (or almost 25% of the total loan principal) through application of brokerage fees that Traditions would receive at the closings of residential units already under contract and definitively scheduled to close by year end 2006, including, among other locations, Kukui'ula; Residences at the Ritz-Carlton, Dallas; Escondido; Highgrange; Makena Bay Club; Ocean Club Residences & Marina; Tower Residences at Ritz-Carlton, Dallas; and

Hill Country Harbor.     These representations were a material inducement to Plaintiff's entering into the Loan.

5.     However, despite the glowing representations which were designed to, and did in fact, induce Plaintiff into making the Loan, it now appears that these closings never existed, Plaintiff received exactly "0" amortization through the end of the 1st quarter 2007 and to date, Traditions has made only $1.6 million in amortization payments (against a targeted amount of $16.9 million).     Further, Traditions has refused to confirm whether any of the closings supposedly scheduled for the 4th quarter of 2006 ever occurred, effectively telling Plaintiff that it is none of its business.

6.     Over and above the issue of fraudulent inducement, Bernard has now learned that these Defendants have been in default since the earliest days of the Loan.  Among other things: (a) Defendants breached the relevant Loan Documents (and engaged in an act of conversion and self dealing) by diverting some $1.5 million in cash generated from revenues payable to Plaintiff in 2007 to the individual benefit of Traditions' principals, (b) Defendants indulged in more than $1.15 million worth of travel, entertainment and meal perks, almost 100% in excess of the budget amount agreed upon by the parties, and (c) Traditions and AEY, through Aiken, have refused to comply with Plaintiff's contractually and

legally grounded requests for access to financial information, even though such information is central to Plaintiff's right and ability to protect its investment.

7.    Unfortunately, Defendants' conduct is consistent with a pattern and practice of financial transgressions by their Principal, Mr. Aiken. Mr. Aiken, it turns out, has been sued in at least three actions since 2001 brought by lenders alleging, among other things, misrepresentations and concealments of material facts, and defaults on loans that total millions of dollars. Each of these actions was brought not long after the relevant loan closing, and each resulted in a substantial judgment adverse to, or a settlement by, Mr. Aiken.

8.    As such, it now appears that Defendants' defaults are part of a pre-existing fraudulent scheme to secure the proceeds of the Loan by misrepresentation, and to divert the proceeds to the individual benefit of the Defendants in violation of the terms of the relevant agreements, giving rise to claims in fraud and conversion, as well as breach of contract.

## THE PARTIES

9.    Bernard is a Cayman Islands company limited by shares with its principal place of business in New York City, New York. Bernard is a specialized investment group in the business of providing commercial loans to qualified commercial entities.

10.    Traditions is a Delaware limited liability company, with its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee.  Traditions is a real estate marketing services firm that specializes in the sales and marketing of new, high-end luxury residences.  Traditions was founded in 2002 by Mark Enderle, Mark Yarborough and Michael Aiken (collectively, the "Principals").  Each of the Principals has an affiliated limited liability company (the "LLCs"), which three LLCs are the members of Traditions, along with AEY.  Those member LLCs are citizens of Delaware and Nevada.

11.    AEY is a Delaware limited liability company with its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee. As is the case with Traditions, AEY is owned and controlled by the Principals. AEY holds all of the preferred interests in Traditions.  Such preferred interests serve, in part, as the collateral of the Loan.

12.    Michael Aiken is a principal of Traditions, and its Manager through his controlled limited liability corporation AEY.  He is an adult individual and a citizen of Tennessee.  As one of the Principals, Aiken has personally undertaken performance of certain loan covenants, and is a signatory of the Loan Documents in his personal capacity and on behalf of Traditions and AEY.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), the citizenship of the parties being diverse and the matters in controversy exceeding the amount of $75,000, exclusive of interest and costs.

14.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a)(2), and pursuant to the provisions of the Loan Documents pursuant to which Defendants consented to suit in this forum.

## FACTS

### i.    The Loan

15.    In the Summer of 2006, Michael Aiken, approached Bernard to solicit financing for Traditions' high end residential brokerage business.  In seeking some $25.5 million, Aiken represented, among other things, that Traditions held 10 exclusive brokerage contracts with real estate developers which would yield those developers over $4 billion in sales, resulting in approximately $134 million in net fee revenue for Traditions and $117 million in EBITDA for Traditions between September 2006 and December 2015.  Aiken also claimed that Traditions was in advanced negotiations on contracts for at least an additional 5 projects which

would provide Traditions with an estimated additional EBITDA of $10 million over two years.

16.     Most centrally, as set forth above, Aiken continuously represented that closings for the sale of some $308 million of residential units under contract were definitively scheduled for the 4th quarter 2006, something which would result in $8.3 million of EBITDA, $7.79 million of cash available for distributions, and $5.432 million of amortization payments to Plaintiff if it extended the requested financing, i.e. almost 25% of the Loan would be amortized within a few months after the Loan was made.

17.     At the closing of the Loan, Aiken reaffirmed that all of the initial unit closings would occur, but that some of these closings would not occur until "early" 2007.  See LPS Agreement, Exhibit E.  Further, all projections in relation to the closings remained unchanged such that, according to Aiken, Plaintiff would receive amortization of a substantial amount of the Loan by early 2007.  Indeed the projections for 2007 provided at closing were identical to the 2007 projections that had been provided to Bernard in September 2006.

18.     In reliance on these and other representations, on or about December 18, 2006, Bernard provided $25.5 million in cash and a $1 million interest reserve to Traditions, as evidenced by a Promissory Note, and pursuant to a Loan

Agreement and Pledge and Security Agreement (the "LPS Agreement") among Bernard, Traditions, AEY, and the Principals. True and correct copies of the Promissory Note and the LPS Agreement are attached hereto as Exhibits A and B respectively. The Loan was secured by, among other items, Traditions' preferred membership interests, and its contract receivables.

19. As a condition to making the Loan, Bernard also required AEY to enter into a Secured Non-Recourse Guaranty, whereby, among other things, AEY agreed to guarantee the Loan irrevocably and unconditionally. A true and correct copy of the Secured Non-Recourse Guaranty is attached hereto as Exhibit C. (Exhibits A-C are collectively, the "Loan Documents").

20. To protect Bernard, the Loan Documents contained representations, warranties and covenants pertaining to the financial condition and conduct of Traditions, AEY, and the Principals, both as of the closing and on an ongoing basis, including:

      (a)    a representation and warranty at Section 4(k) of the LPS Agreement that all of the Existing Contracts (as defined in the LPS Agreement) were in full effect at closing;

      (b)    a covenant at Section 5(l) that neither Defendant AEY nor Defendant Traditions will make any distributions of revenue in any manner inconsistent with the LPS Agreement;

(c)   a covenant at Section 5(m) that neither Traditions nor AEY will establish any reserves not otherwise contemplated in the then-current approved budget;

(d)   a covenant at Section 5(q) of the LPS Agreement that the Principals will not allow Defendant Traditions and/or Defendant AEY to terminate, cancel, transfer, assign, or make any material change in any contracts;

(e)   a covenant at Section 5(s) that the Principals shall not permit Traditions or AEY to knowingly misappropriate any Revenues, nor shall they intentionally cause or permit AEY to make any payment or distribution of Revenues (as defined in the LPS Agreement) in any manner inconsistent with the uses of Revenue set forth in the LPS Agreement; and

(f)   a covenant at Section 5(t) of the LPS Agreement that AEY may not permit Traditions to incur any expense materially in excess of that which is reflected in the Approved Budget (as defined in the LPS Agreement).

21.    In light of the forward looking covenants in the Loan Documents, Bernard reasonably believed that, as lender, it would receive from Defendants financial and other information sufficient to assess compliance therewith, and to assess on an ongoing basis the financial integrity of both the Loan and the borrowers.  In addition, Section 5(c) of the LPS Agreement expressly provides:

> At any time and from time to time, upon the reasonable written request of [Bernard], and at the sole expense of [AEY], [AEY] shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as [Bernard] may reasonably request for the purposes of obtaining, creating, perfecting, validating, or preserving the full benefits of this agreement and of the rights and powers herein granted . . .

See LPS Agreement, § 5(c).

### ii.    **Defendants' Misconduct**

22.    Having made the Loan, based upon Defendants' representations as set forth above, Bernard reasonably believed that it would receive substantial amortization payments that would significantly reduce the Loan amount shortly after the closing, but in any event, no later than the end of the 1st quarter 2007 – these residential closings were to be concluded, if at all, within a few months of their signing, i.e., either they existed or they did not exist. These representations turned out, however, to be false from the start. It now appears that none of these scheduled closings, as represented by Aiken, was real.

23.    In fact, by the end of the 1st quarter 2007, Bernard had received no amortization payments whatsoever from Defendants. This is so despite the fact that Traditions never revised its projected closings or provided Bernard with any plausible information or explanation whatsoever, despite Traditions' obvious knowledge that the closings were not occurring and that its behavior was in stark contrast with its representations.

24.    It now appears that Aiken knew that these representations were false when made, or were made in reckless disregard of the truth. Given the limited life span of residential real estate sales like those at issue here, Defendants must have

known when negotiating the Loan that the subject closings did not exist as represented.

25.     For example, it now turns out that the Hill Country Harbor deal was terminated by the third-party developer in February 2007. Though Defendants must have known that there were problems with this deal well before termination, Defendants never made any timely disclosures to Bernard, but instead at all relevant times represented that the Hill Country Harbor deal had spawned numerous sales of residential units brokered by Defendants that should have previously closed based on Defendants' representations.

26.     Nor did Defendants make any other meaningful disclosures to Bernard. Indeed, Traditions at all relevant times reaffirmed its representation regarding the 4th quarter 2006/1st quarter 2007 closings, and that Bernard would receive payment as promised.

27.     As the Loan entered the second quarter 2007, Aiken gave Bernard a host of excuses as to why it was not receiving amortization payments, but, to induce Traditions to forebear from taking action, he repeatedly represented that all was well with the market and that Traditions' business was actually running better than planned. However, by the end of the 2nd quarter 2007, when Traditions had

made only $200,000 in amortization payments against a targeted $8.425 million, it became apparent that Aiken was lying and that something was very wrong.

28.    Accordingly, in order to validate the benefits of the Loan, Bernard sought from Defendants information that Bernard needed to determine what had happed to the closings supposedly scheduled for the 4th quarter 2006, and which Bernard needed to monitor performance under the Loan, to track and probe performance of Loan covenants, and to ensure itself of the adequacy of its collateral.    However, Defendants consistently refused to provide information sufficient to permit Bernard to assess the situation fully and properly.    Moreover, the limited information actually provided by Traditions was incomplete and contradictory, raising rather than alleviating Bernard's concerns.

29.    For example, prior to the Loan, distributions to Traditions' members (effectively, the Principals) were reported as being $3.6 million through November 2006.  When the Loan was made, however, here is how the application of proceeds was reported in Traditions' audited financial statements for December 31, 2006 and 2005 (the "2006 Financial Statement"), a true and correct copy of which is attached hereto as Exhibit D:

- 12 -

| CASH FLOW FROM FINANCING ACTIVITIES | |
|---|---|
| | **2006** |
| Proceeds from long-term borrowings | 26,500,000 |
| Transfer of loan proceeds to escrow | (1,000,000) |
| Distributions to members | (24,664,975) |
| Financing costs | (145,617) |
| Net Cash Provided (Used) by Financing Activities | 689,408 |

See 2006 Financial Statement, p. 4.

30.    In other words, over ninety cents of every dollar of the Loan proceeds went not to Traditions as operating cash provided by the financing, but directly into the Principals' pockets.  Moreover, the $3.6 million in distributions reported to Plaintiff as of November 2006 appears to have dropped off the chart, i.e., is not reflected on the 2006 Financial Statement – suggesting either that the accountants missed it, or that Traditions either lied to them or lied to Plaintiff about the existence of these distributions to present a false image of a robust and profitable buyer with ample free cash flow, the archetypal ideal borrower.  In any event, the discrepancy, like so many other discrepancies, remains unexplained.

31.    In addition, when Traditions sold a unit, it would receive half of its commission in cash up front, while the remaining half, though earned, was not payable until the completed unit was delivered.  Traditions did not reflect these deferred fees on its income statement.  Instead, it would provide to Plaintiff a report showing at the end of each month the amount of gross earned but unpaid fees it maintained were due.  However, Traditions would not provide this

information on a unit-by-unit basis, nor would it provide a reconciliation showing the changes from the prior period. Thus, if a report for March 31, 2007 showed earned but unpaid fees of $5 million and the report for April 30, 2007 showed $4 million, it did not mean that $1 million in deferred fees had been paid. It could mean that $3 million had been paid but that new sales had generated an additional $2 million in earned but unpaid fees.

32.    The specifics were important, because the fees which were paid were to be applied to the Loan under the LPS Agreement. However, by reason of the accounting treatment employed by Traditions, there was no way to verify whether these payments were being properly applied. Given Traditions' failure to make any meaningful amortization payments, it now appears that the inventory of residential units for sale and brokerage fees earned and not paid represented at closing was inaccurate so as to avoid a downward adjustment of the amount of the Loan, and have been understated throughout the life of the Loan.

33.    Defendants' conduct – their failure to make amortization payments as promised, their providing incomplete and self-contradictory snippets of information and their outright stonewalling of Bernard's reasonable requests for other information – caused Bernard to analyze Defendants' compliance with the terms of the Loan Documents with the limited information available to it. Not

surprisingly, this information revealed that Defendants were in default of the Loan Documents. These known defaults include, but are not limited to, the following:

(a)    Defendants have siphoned $1.5 million from fourth quarter 2007 working capital (the "Excess Distributions"). Either the Excess Distributions resulted from misapplying Revenues in violation of Section 3(d) of the LPS Agreement, which sets forth the procedures and priority for disbursing net Revenues, thereby also breaching covenants of Borrower, Pledger and the Principals (see LPS Agreement §§ 5(s), 10(a)(iii), 10 (a)(iv)), or Defendants have created a prohibited reserve on their books, violating the covenant in Section 5(m), which forbids the establishment of any reserves not contemplated in the Approved Budget. Section 5(s) prohibits Aiken and the other Principals from knowingly misappropriating any Revenues or intentionally causing or permitting Traditions to make distribution of Revenues inconsistent with the terms of Section 3(d). Sections 10(a)(iii) and (iv) make it an event of default to act inconsistently with Section 3(d) or violate the covenant of 5(s);

(b)    In 2007 alone, Defendants enjoyed − at the expense of the bottom line and Plaintiff's security − the benefit of travel, entertainment and meal expenses totaling more than $1.5 million − nearly double the amount permitted in the Approved Budget, in violation of Defendants' covenant pursuant to LPS Agreement § 5(t). Section 5(t) provides that AEY may not permit Traditions to incur any expense materially in excess of that which is reflected in the Approved Budget; and

(c)    Defendants have repeatedly refused Bernard's reasonable requests for documents as is required pursuant to section 5(c) of the LPS Agreement.

34.    Accordingly, Bernard served notices of default on or about April 14, 2008 (the "Notices of Default"). True and correct copies of the Notices of Default are attached hereto as Exhibit E.

35.    Serious as these enumerated defaults were, Traditions' systematic misrepresentations, concealments and manipulations make it clear that the <u>known</u> defaults are necessarily the tip of an otherwise concealed iceberg.  For example, Bernard has learned that while Traditions represented and warranted in section 4(k) of the LPS Agreement that all of the contracts they claimed were in full effect at closing, this was not correct as to two properties – the Capella Residences at Hughes Center and Hill Country Harbor – and thus Traditions is in default of this provisions as well.

36.    Moreover, beyond these known defaults, Defendants have engaged in a pattern of conduct that evidences that they do not intend to perform their contractual obligations in good faith going forward.  For example, although Traditions projected at closing that it had 10 contracts which would yield over $4 billion in real estate sales, Traditions now claims that it is unable to provide Bernard with per project financials, because it does not track the status of its ongoing and future real estate projects.

37.    Curiously, however, at least through 2006, Traditions' auditors were able to obtain this information from the company as set forth in the audited 2006 Financial Statement:

- 16 -

**Project Duration**

At any given time, the Company has a certain number of projects under contract. Each of these projects typically involves a finite number of units to be sold and therefore represents a finite amount of fees to be earned. As of December 31, 2006 and 2005 the following represents the approximate percentage of units *remaining*, by project.

|                            | 2006  | 2005  |
|----------------------------|-------|-------|
| Silverleaf                 | 34%   | 46%   |
| Escondido                  | 35%   | 48%   |
| Crescent – Phase I         | 6%    | 17%   |
| Crescent – Phase II        | 100%  | N/A   |
| Ocean Club                 | 6%    | 55%   |
| Kukui'ula                  | 99%   | 100%  |
| Maluaka (formerly Makena)  | 100%  | 100%  |
| Spring Valley Ranch        | 10%   | N/A   |

See 2006 Financial Statement, p. 10.

38.    Moreover, Traditions' website contains specific information on the percentage of units sold on particular projects and total per project dollar amounts in sales. The information on the internet likewise raises more questions than it answers. If Defendants' claim of ignorance is untrue, then they are intentionally misrepresenting to Bernard its accounting capabilities and attempting to obscure its revenues from Bernard in violation of section 5(s) of the LPS Agreement, governing the treatment of Revenue. If true, Defendants are placing false information in the public domain, and creating a risk of serious deficiencies in internal recordkeeping and publishing false information for public consumption.

39.   In an effort to give Traditions an opportunity to explain itself, to show that it is not in default and that it has not actually or anticipatorily breached the Loan Documents, Bernard, prior to bringing suit, made formal written demand for certain information from Traditions, specifically, the following materials (the "Requested Information"):

- audited financial statements for 2007;
- monthly operating statements for 2007 and 2008;
- report of actual capital expenditures and costs incurred in each quarter of 2007, compared against budget;
- calculation for the following amortization payments:

  | | |
  |---|---|
  | May 1, 2007: | $200,000; |
  | August 21, 2007: | $1,000,000; |
  | January 4, 2008: | $400,000; |

- per property quarterly operating statements for 2007, and 1st quarter 2008;
- status report of the current inventory of units per project;
- detailed accounting of T/M/E expenses for 2007;
- a calculation of the impact on cash flow from changes in earned fee backlog by quarter; and
- documentation/explanation of the 4th quarter 2007 distribution to members of $1.5 million.

40.   Without the requested information, Bernard cannot even determine the extent to which revenues are being generated, and whether those revenues are being applied in accordance with the Loan Documents or being diverted for unlawful purposes – a concern heightened by the discovery of the aforementioned $1.5 million diversion and the misrepresentations concerning the 4th quarter 2006/1st quarter 2007 closings.  In addition, Bernard cannot assess the health of its

collateral or monitor Defendants' compliance with the covenants set forth in the Loan Documents. If those covenants are not being complied with, Bernard will not be able to preserve the full benefits of the Loan Documents nor be reasonably assured of future performance.

41.    Bernard is, therefore, entitled to the Requested Information pursuant to Section 5(c) of the LPS Agreement as well as pursuant to common law rights and protections owed to lenders and to contract parties generally.

42.    Despite numerous discussions and negotiations between the parties, Defendants have failed and refused to supply this information.

43.    Defendants' failure to supply the Requested Information interferes with and impedes Bernard's internal accounting functions, including its calculations of net asset value, which Bernard must make, track, and report, and exposes it to a risk of irreparable harm.

44.    Defendant Aiken's history of involvement over the last six years in at least three claims by other lenders of financial defaults and related misconduct brought almost immediately after closing gives rise to further cause for grave concern to Bernard. For example, in <u>Frontier Bank v. Michael Aiken</u>, No. 01-1139 (Tenn. Ch. December 14, 2001), a case filed just months after the plaintiff issued a loan to Aiken, the court awarded plaintiff a judgment in the amount of $521, 249

based on allegations that Aiken misrepresented and intentionally concealed facts regarding his financial condition in order to induce the plaintiff into issuing him a loan.   Further, the court in <u>Charter Bank & Trust v. Michael M. Aiken</u>, No. BP691P5635 (Ga. April 3, 2002) awarded plaintiff a judgment in the amount of $1,551, 936 based on claims that Aiken defaulted on another loan mere months after issuance.  If not enough, the plaintiff in <u>SunTrust Bank v. Michael Aiken, et al.</u>, No. 01-1069 (Tenn. Ch. January 2, 2002), alleged that Aiken defaulted under the terms of yet another loan.  Aiken settled the case.

45.     Any applicable cure period under the Loan Documents has elapsed without cure by Defendants.

46.     Bernard has performed all of its material obligations under the Loan Documents.

## IN AND FOR A FIRST CLAIM UPON WHICH RELIEF CAN BE GRANTED

### Fraud

### (Asserted Against All Defendants)

47.     Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

48.     By reason of the conduct set forth in Paragraphs set forth above, including but not limited to Paragraphs 15-46, Defendants, acting individually and

in concert, knowingly and willfully made material false and fraudulent statements upon which they intended Bernard to rely, in lending to Defendants $26.5 million.

49.    Bernard was not aware of the falsity of Defendants' representations, since the falsity of the representations was non-obvious and not readily discoverable through reasonable investigation.

50.    Bernard justifiably relied upon Defendants' representations in providing the Loan to Traditions. But for Defendants' material misrepresentations, Bernard would not have done so.

51.    Further, as set forth in, for example, Paragraphs 15-46 above, both prior to and during the course of the Loan, Defendants made knowing, material misrepresentations to Bernard and supplied Bernard with partial, selective information while withholding other information necessary to make the statements therein not misleading, constituting fraud by concealment.

52.    Bernard has been materially damaged as a direct and proximate result of Defendants' fraud, and is entitled to a rescission of the Loan Documents and all damages, including punitive damages, flowing from the fraudulent statements in accordance with the Loan Documents and New York law.

53.    Further, Section 11(f) of the LPS Agreement states that, "Anything herein to the contrary notwithstanding, Principals' liability for the breach, violation or failure of a representation, warranty or covenant under Section 4(k), 5(q), 5(s) or 5(v) hereof shall be limited to $25,500,000 in the aggregate." See LPS Agreement, §11(f).

54.    Accordingly, pursuant to LPS Agreement § 11(f), Defendant Aiken, as a Principal, is also individually liable in the amount of $25.5 million for, among other things, his misrepresentations regarding Traditions' Existing Contracts as prohibited by section 4(k).

### IN AND FOR A SECOND CLAIM UPON WHICH RELIEF CAN BE GRANTED

### Conversion

### (Asserted Against All Defendants)

55.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

56.    Defendants' caused and/or permitted the misappropriation of $1.5 million in excess distributions for the personal benefit of the Principals, including Defendant Aiken, and not for the purpose set forth in the Loan Documents or as agreed by the parties.  This constitutes conversion of those funds.

57.    This conversion has been the direct and proximate cause of material damage to Bernard, and Bernard is accordingly entitled to all damages flowing from the conversion and all other such damages this Court deems just and proper.

58.    As set forth in paragraphs 15-46 hereof, Defendant Aiken is also individually liable for damages arising from the misappropriation of Traditions' Revenues or for causing or permitting Traditions to make any distribution of Revenues inconsistent with approved Revenue uses and priorities and the Approved Budget in violation of Section 5(s) of the LPS Agreement.

### IN AND FOR A THIRD CLAIM UPON WHICH RELIEF CAN BE GRANTED

### Breach of Contract

### (Asserted Against All Defendants)

59.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

60.    By reason of the conduct set forth above, including but not limited to Paragraphs 15-46, Defendants have breached, or have anticipatorily breached, the Loan Documents.

61.    Bernard is entitled to obtain from Defendants all damages flowing from that breach in accordance with the Loan Documents and New York law.

62.     Defendant Aiken is also individually liable for the breaches described herein in an amount up to $25.5 million pursuant to Section 11(f) of the LPS Agreement.

## IN AND FOR A FOURTH CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Specific Performance

### (Asserted Against Defendants Traditions Management, LLC and AEY, LLC)

63.     Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

64.     Section 18 of the LPS Agreement provides, in pertinent part, that Bernard "shall be entitled to bring . . . an action for specific performance or any other appropriate action or proceeding to enable [Bernard] to enforce and realize upon its security interest hereunder." See LPS Agreement, §18.

65.     By reason of the facts set forth above, Bernard is entitled to specific performance of Section 5(c) of the LPS Agreement, pursuant to which Bernard is entitled to the following Requested Information from AEY:

- audited financial statements for 2007;
- monthly operating statements for 2007 and 2008;
- report of actual capital expenditures and costs incurred in each quarter of 2007, compared against budget;
- calculation for the following amortization payments:

> May 1, 2007:           $200,000;
> August 21, 2007:      $1,000,000;
> January 4, 2008:       $400,000;

- per property quarterly operating statements for 2007, and 1st quarter 2008;
- status report of the current inventory of units per project;
- detailed accounting of T/M/E expenses for 2007;
- a calculation of the impact on cash flow from changes in earned fee backlog by quarter; and
- documentation/explanation of the 4th quarter 2007 distribution to members of $1.5 million.

66.    To avoid continued and irreparable harm to Bernard, the other Defendants, which control AEY, should be enjoined and restrained from any conduct that would prohibit or impede AEY's providing this information to Bernard forthwith.

67.    Bernard has no adequate remedy at law.

## IN AND FOR A FIFTH CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Breach of the Duty of Good Faith and Fair Dealing

### (Asserted Against All Defendants)

68.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

69.    Defendants each owe Bernard the duty of good faith and fair dealing that inheres in every contract, and specifically through the Loan Documents.

70.    Defendants' refusal to supply Bernard with the Requested Information is not commercially reasonable and violates the covenant of good faith and fair dealing, and threatens to deprive Bernard of its reasonable expectations under the Loan Documents.

71.    Bernard has been materially damaged by Defendants' violations of the covenant of good faith and fair dealing which, among other things, have prevented Bernard from having the necessary information to assess the health of its collateral, and to monitor Defendants' compliance with the representations, warranties and covenants set forth in the Loan Documents.

72.    Defendants should be required to provide this information to Bernard forthwith and should be held liable for any damages flowing from their failure heretofore to provide the Requested Information in a timely fashion.

## IN AND FOR A SIXTH CLAIM UPON WHICH RELIEF CAN BE GRANTED

### Indemnification

### (Asserted Against Defendant AEY, LLC)

73.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

74.     Bernard is entitled to indemnification from AEY for fees and costs associated with any action brought for failure on the part of AEY to comply with, or perform under, the LPS Agreement. <u>See</u> LPS Agreement, §19(a)(iv).

75.     Section 19(a)(iv) provides that AEY has a duty to indemnify Bernard up to the value of Bernard's interest in the Collateral for losses arising from "any failure on the part of [AEY] to perform or be in compliance with any of the terms of this Agreement." <u>See</u> LPS Agreement, §19(a)(iv).

76.     Bernard is entitled to indemnification from AEY for fees and costs arising from actions regarding the ownership of the LPS Agreement or any interest in the Collateral. <u>See</u> LPSAgreement, §19(a)(i).

77.     Bernard is further entitled to indemnification from AEY for fees and costs relating to the enforcement of the provisions of the LPS Agreement, the Promissory Note, and/or any of the Loan Documents. <u>See</u> LPS Agreement, §19(a)(iii).

78.     To date, Bernard has incurred indemnifiable expenses in excess of $75,000, exclusive of interest and costs, and such damages are continuing.

**WHEREFORE**, Plaintiff Bernard National Loan Investors, Ltd. demands judgment against Defendants Traditions Management, LLC, AEY, LLC, and Michael Aiken as follows:

(a) Damages from all Defendants in accordance with the Loan Documents and New York law as pled herein;

(b) Damages and indemnification from AEY, LLC in accordance with the Loan Documents in an amount to be determined at trial but, in any event, in excess of $75,000;

(c) Specific performance of the Loan Documents from Traditions Management, LLC and AEY, LLC;

(d) Punitive damages in am amount to be determined at trial;

(e) Attorneys' fees, interest and costs from all Defendants; and

(f) Such other relief as the Court may deem just and proper.

Dated:  June 23, 2008

REED SMITH LLP

By: Lance Gotthoffer

Lance Gotthoffer, Esq.
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

Attorneys for Plaintiff
Bernard National Loan Investors, Ltd.

EXHIBIT A

# PROMISSORY NOTE

December _18_ , 2006                                              **New York, New York**
                                                                   **$26,500,000.00**

This **PROMISSORY NOTE** (this "Note") is dated this _18th_ day of December, 2006, made by **TRADITIONS MANAGEMENT, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 (**"Maker"**), to and for the benefit of **BERNARD NATIONAL LOAN INVESTORS, LTD.**, a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th Floor, New York, New York 10151, together with its successors and assigns in such capacity ("**Lender**").

FOR VALUE RECEIVED, subject to the provisions set forth in Section P herein, Maker promises to pay to the order of Lender, at 745 Fifth Avenue, 18th Floor, New York, New York 10151, or such other place as Lender may designate in writing, in the manner provided hereinafter, the principal sum of Twenty-Six Million Five Hundred Thousand and 00/100 Dollars ($26,500,000.00) (the "**Loan**"), on or before the Maturity Date (as such term is defined in that certain Pledge and Security Agreement between Maker and Lender dated as of the date hereof (the "**Pledge Agreement**")) or the date to which the indebtedness evidenced hereby is accelerated pursuant to the terms of this Note and the terms of the other Loan Documents (as hereinafter defined), with interest, in the manner and upon the terms and conditions set forth below. All capitalized terms not expressly defined herein shall have the same meanings as set forth in the Pledge Agreement (as defined below).

A.     **Interest Rate.** Interest shall accrue from the date of disbursement of the Loan on the principal balance thereof remaining from time to time outstanding at the rate ("**Interest Rate**") established below. Unless the Loan is then bearing interest at the Default Rate (as defined below), the Interest Rate shall be equal to nine and 625/1000 (9.625%) percent per annum. Interest shall be payable on the basis of a year consisting of three hundred sixty (360) days and charged for the number of days actually elapsed in each calendar month.

B.     **Principal and Interest Payments.** Subject to the provisions of the Pledge Agreement, commencing on January 1, 2007, and continuing on the first day of each July and January thereafter until the Loan has been repaid in full, interest on the Loan shall be payable semi-annually in arrears on the first day of each January and July ("**Payment Date**") in the amount of all interest accrued and unpaid. The final payment of the entire unpaid principal balance of the Loan and all accrued and unpaid interest, charges, fees, and expenses then due and payable under the Loan Documents, if not sooner paid, shall be due and payable on the Maturity Date.

C.     **Interest Reserve.** Anything herein to the contrary notwithstanding, Maker shall be credited with the then-outstanding balance of the Interest Reserve (as such term is defined in the Pledge Agreement) including, without limitation, accrued and undisbursed interest thereon, at and in connection with the repayment of the Loan, whether such repayment is a prepayment, a payment at maturity, a repayment upon an acceleration of the Loan by reason of the occurrence of an Event of Default, or otherwise.

84173807_5_331596_00024

D.    **Prepayment.**  This Note may be prepaid, in whole or in part, at any time during the term of the Loan, provided Maker provides Lender not less than fifteen (15) days' prior written notice.  Any prepayment of all or part of the Loan shall be applied first to all interest accrued on the Loan through the date of prepayment (in addition to any other amounts as are then due and payable under the Loan Documents) and then to the principal of the Loan.

E.    **Application of Payments.**  Lender shall apply payments in accordance with the express terms of the Pledge Agreement.  Anything herein or therein to the contrary notwithstanding, from and after the occurrence of an "Event of Default" (as such term is defined in the Pledge Agreement), Lender shall have the right unilaterally (and without the consent of Maker) to allocate any and all payments that may be received by or tendered to Lender made by Maker or any other person at any time or from time to time and that relate in any way to the Loan or any other of the obligations then due and payable in any order of priority as Lender in its sole and exclusive discretion shall elect, as follows: (i) to the payment of any costs and expenses of Lender that Maker is responsible for under the Loan Documents; (ii) to accrued but unpaid interest; and (iii) to principal.  Maker (1) irrevocably waives the right to direct the application of payments and collections received by Lender from or on behalf of Maker and/or any other person, and (2) agrees that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections against the Loan or any other obligations then due and payable in such manner as Lender may deem appropriate, notwithstanding any entry by Lender upon any of its books and records.

F.    **Late Charges**.  No late charges shall be charged in respect of payments due under this Note or any other Loan Document.

G.    **Security for Payment**.  The payment of this Note is secured, *inter alia*, by the Pledge Agreement and any other document which evidences, secures or guarantees, all or any portion of the Loan are collectively referred to herein as the "**Loan Documents**".  All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Documents are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and Maker covenants and agrees to keep and perform them or cause them to be kept and performed, strictly in accordance with their terms.

H.    **Defaults and Acceleration.**

(i)    IT IS HEREBY EXPRESSLY AGREED BY MAKER THAT TIME IS OF THE ESSENCE HEREOF.  At any time during the existence of any uncured or continuing Event of Default, at the option of Lender, the entire unpaid principal balance of the Loan with interest accrued thereon and all other sums due by Maker hereunder or under the provisions of the other Loan Documents shall, upon demand become due and payable immediately.

(ii)    After maturity, whether by acceleration, declaration or while any uncured or continuing Event of Default exists, Maker promises to pay interest on the amount of principal due and outstanding hereunder at the rate of five (5.0%) per annum over the Interest Rate that would otherwise be then in effect ("**Default Rate**") and shall be payable upon demand, and all unpaid interest that has accrued under this Note, whether prior or subsequent to the occurrence of the Event of Default, shall be paid at the time of, and as a condition precedent to, the curing of the Event of Default.  The Default Rate, when operative, shall be adjusted based on changes in

2

the Interest Rate.

I.   **Nature of Remedies.**   The remedies of Lender as provided in this Note, the Pledge Agreement and any of the other Loan Documents shall be cumulative and concurrent, and may be pursued singly, successively, or together against only the Collateral and the Receivables.

J.   **Waivers, Consents, Etc.**   Maker and any endorsers, sureties or guarantors hereof and any and all others who are now or may become liable for all or part of the obligations of Maker under this Note (all of the foregoing being collectively referred to herein as **"Obligors"**), agree to be jointly and severally bound hereby and jointly and severally, waive presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest, and protest of this Note and except as expressly provided to the contrary herein, in the other Loan Documents or by any Law, all other notices in connection with the delivery, acceptance, performance, default, or enforcement of this Note.

K.   **Non-Waiver.**   Lender shall not by any act of omission or commission be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender and then only to the extent specifically set forth therein.  A waiver on one event shall not be construed as continuing or as a bar to or waiver of such right or remedy in connection with a subsequent event.

L.   **Business Loan.**   Maker warrants and represents to Lender that Maker shall use the proceeds represented by this Note solely for the uses identified in the Pledge Agreement. Maker further warrants and represents to Lender and covenants with Lender that Maker is not in the business of extending credit for the purpose of purchasing or carrying margin securities (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds represented by this Note will be used to purchase or carry any margin securities or to extend credit to others for the purpose of purchasing or carrying any margin securities.

M.   **Interest Laws.**   It being the intention of Lender and Maker to comply with the laws of the State of New York, it is agreed that notwithstanding any provision to the contrary in this Note, the Pledge Agreement or any of the other Loan Documents, no such provision shall require the payment or permit the collection of any interest ("**Excess Interest**") in excess of the maximum amount of interest permitted by law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the indebtedness evidenced by this Note.  If any Excess Interest is provided for, or is adjudicated to be provided for, in this Note, the Pledge Agreement or any of the other Loan Documents, then in such event:  (a) the provisions of this paragraph shall govern and control; (b) Maker shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Lender may have received hereunder shall be, at Lender's option, (i) applied as a credit against the outstanding principal balance of the Loan or for accrued and unpaid interest thereon (not to exceed the maximum amount permitted by law), (ii) refunded to the payor thereof, or (iii) any combination of the foregoing; (d) the applicable Interest Rate or rates hereunder shall be automatically subject to reduction to the maximum lawful contract rate allowed under the applicable usury laws of the aforesaid State, and this Note, the Pledge Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in such applicable interest rate or rates; and (e) to the extent permitted by Law, Maker shall not have any action against Lender for any damages

3

whatsoever arising out of the payment or collection of any Excess Interest.

N. **Subsequent Holders.** Upon any endorsement, assignment or other transfer of this Note by Lender or by operation of law, the term "Lender" as used herein, shall mean the endorsee, assignee or other transferee or successor to Lender then becoming the holder of this Note; provided, however, that Lender may not endorse, assign or transfer this Note or any interest in the Loan in any manner not permitted under the Pledge Agreement. Lender shall obtain a confidentiality agreement in connection with any such permitted endorsement, assignment or other transfer of this Note in form reasonably satisfactory to Borrower.

O. **Subsequent Obligors.** This Note and all provisions hereof shall be binding on all persons claiming under or through Maker. The terms "Maker" and "Obligors", as used herein, shall include the respective successors, assigns, legal representatives, executors, administrators, devisees, legatees and heirs of Maker.

P. **Limitations on Recourse.** Anything herein or in any of the Loan Documents to the contrary notwithstanding, Lender shall not enforce the liability and obligation of Maker or Pledgor to perform and observe the obligations contained in this Note, the Pledge Agreement or the other Loan Documents by an action or proceeding wherein a money judgment shall be sought against Maker, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon Pledgor's interests in the Collateral and Maker's interest in the Receivables pursuant to the Pledge Agreement, and any judgment in any such action or proceeding shall be enforceable only against Pledgor's interest in the Collateral and Maker's interest in the Receivables pursuant to the Pledge Agreement.

Q. **Note Register; Ownership of Note.** The ownership of an interest in this Note shall be registered on a record of ownership maintained by Maker or its agent in accordance with notices received by Maker of any transfers of the Lender's interest in this Note; provided, however, that Lender may not transfer any of its interest in this Note or the Loan in any manner not permitted under the Pledge Agreement. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the permitted transfer is registered on such record of ownership and the transferee is identified as the owner of an interest in the obligation. Maker shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, this Note on the part of any other person or entity.

R. **Interpretation.** Whenever possible, each provision of this Note and the other Loan Documents shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or any of the other Loan Documents shall be prohibited or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of said documents. As used in this Note, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable, where the context so requires. The headings of sections and paragraphs in this Note are for convenience only and shall not be construed to limit or define the content, scope or intent of the provisions hereof.

4

S.    **Governing Law.**  PURSUANT TO SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BORROWER AGREES THAT THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF NEW YORK.

T.    **Jury Waiver.**  TO THE MAXIMUM EXTENT PERMITTED BY LAW, MAKER AND LENDER EACH HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS NOTE, OR IN ANY WAY CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE DEALINGS OF MAKER AND LENDER WITH RESPECT TO THIS NOTE, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, MAKER AND LENDER EACH HEREBY AGREES THAT ANY SUCH ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT MAKER OR LENDER MAY FILE A COPY OF THIS EXECUTED NOTE WITH ANY COURT OR OTHER TRIBUNAL AS WRITTEN EVIDENCE OF THE CONSENT OF MAKER AND LENDER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

U.    **Notices.**  Any notice that Lender or Maker may desire or be required to give to the other hereunder shall be deemed given when presented in accordance with Section 21(e) of the Pledge Agreement.

V.    **Conflicts.**  In the event of any conflict between the provisions of this Note and the provisions of the Pledge Agreement, the provisions of this Note shall control.

IN WITNESS WHEREOF, this Note has been executed and delivered on the date first set forth above.

**MAKER:**

TRADITIONS MANAGEMENT, LLC

By: _____
   Name: Michael M. Aslan
   Title: Chairman

84173807_5_331596_00024

EXHIBIT B

## LOAN AGREEMENT AND
## PLEDGE AND SECURITY AGREEMENT

This **LOAN AGREEMENT AND PLEDGE AND SECURITY AGREEMENT** dated as of the _16_ day of December, 2006 by and among **TRADITIONS MANAGEMENT, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Issuer**"), **AEY, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Pledgor**"), **MICHAEL M. AIKEN, MARK R. ENDERLE** and **MARK D. YARBOROUGH**, each having an address at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 (collectively, "**Principals**"; provided, however, that Principals are joining in the execution of this Agreement solely as to Sections 4(k), 5(q), 5(s) and 5(v) hereof) and **BERNARD NATIONAL LOAN INVESTORS, LTD.**, a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th Floor, New York, New York 10151 (together with its successors and assigns, "**Pledgee**").

## W I T N E S S E T H :

**WHEREAS**, this Agreement is being entered into and the security interest hereunder is being granted, to memorialize the agreements among Issuer, Pledgor and Pledgee, and to secure Pledgor's obligations under that certain Limited Secured Guaranty dated the date hereof from Pledgor to Pledgee (the "**Guaranty**") wherein Pledgor guaranties the obligations of Issuer in connection with a loan being made by Pledgee to Issuer in the principal sum of TWENTY-SIX MILLION FIVE HUNDRED THOUSAND AND NO/100 ($26,500,000) DOLLARS (the "**Loan**"), evidenced by that certain Promissory Note dated the date hereof made by Issuer to and for the benefit of Pledgee (together with all extensions, renewals, replacements, restatements or modifications thereof, the "**Note**"; this Agreement, the Guaranty, the Note and the other documents evidencing or securing the Loan, collectively, the "**Loan Documents**");

**WHEREAS**, Pledgor owns the limited liability company membership interests described on **Schedule I** attached hereto; and

**WHEREAS**, it is a condition precedent to the obligation of Pledgee to make the Loan to Issuer, that Pledgor enter into the Guaranty and secure its obligations thereunder by executing and delivering this Agreement to Pledgee, together with all other documents required to be executed by Pledgor and delivered to Pledgee pursuant to this Agreement, the forms of which are annexed hereto as exhibits to the Agreement (collectively, the "**Pledge Documents**").

**NOW, THEREFORE**, in consideration of the premises and to induce Pledgee to make the Loan, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Pledgee as follows:

1.     **Defined Terms.** As used in this Agreement, the following terms have the meanings set forth or incorporated by reference below. All other capitalized terms not otherwise defined herein shall have the respective meanings given to such terms in the hereinafter referred to Code:

84173055_12

"**Agreement**" means this Pledge and Security Agreement, as it may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Annual Fee**" has the meaning set forth in the Service Agreements.

"**Business Day**" means a day of the year on which banks are not required or authorized by law to close in New York City.

"**Code**" means the Uniform Commercial Code from time to time in effect in the State of New York; provided, however, that with respect to the perfection, the effect of perfection or non-perfection and the priority of the security interests granted hereunder, and with respect to the exercise of remedies with regard to such security interests, "**Code**" shall mean the Uniform Commercial Code as in effect in an applicable jurisdiction in accordance with applicable law.

"**Collateral**" has the meaning set forth in Section 2 hereof.

"**Event of Default**" has the meaning set forth in Section 10 hereof.

"**Interest Rate**" means the rate at which interest shall accrue from the date of disbursement of the Loan on the principal balance thereof remaining from time to time outstanding. As more particularly set forth in the Note, the Interest Rate is nine and 625/1000 (9.625%) percent per annum.

"**Interest Reserve**" means the reserve account established and controlled by Lender, funded at closing with Loan proceeds in the amount of $1,000,000, inclusive of all interest actually earned thereon.

"**Issuer**" has the meaning ascribed to such term in the Recitals hereto.

"**Issuer Formation Agreement**" means the Organizational Documents of the Issuer.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest or any other encumbrance, charge or transfer of, on or affecting the Collateral, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" has the meaning ascribed to such term in the Recitals hereto.

"**Loan Documents**" has the meaning ascribed to such term in the Recitals hereto.

"**Loan Documents Event of Default**" shall mean a default by Pledgor under any of the Loan Documents, which default remains outstanding beyond applicable notice and grace periods, if any.

2

"**Maturity Date**" shall mean the first day of the first full calendar month following the fifth anniversary of the date hereof.

"**Obligations**" means:  (i) the performance of the obligations of Pledgor contained herein; (ii) the performance of each obligation of Pledgor contained in the Guaranty, and in any renewal, extension, amendment, modification, consolidation, change thereof, or substitution or replacement therefor.

"**Organizational Documents**" means (i) with respect to a limited partnership, such Person's certificate of limited partnership, limited partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (ii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iii) any and all agreements between any constituent member, partner or shareholder of the Person in question, including any contribution agreement or indemnification agreements.  In each case, "**Organizational Documents**" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Other Obligations**" means:  (i) the performance of the obligations of Pledgor contained herein; (ii) the performance of each obligation of Pledgor contained in the other Pledge Documents; and (iii) the performance of each obligation of Pledgor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Loan Document.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge Documents**" has the meaning set forth in the Recitals hereto.

"**Pledged Interests**" means the limited liability company preferred membership interests in Issuer, together with:  (a) all options, warrants, and other rights now or hereafter acquired by Pledgor in respect of such preferred membership interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Issuer or otherwise) and all other property, rights and instruments of any description at any time issued or issuable as an addition to or in substitution for such preferred membership interests; (b) all certificates, instruments and other writings representing or evidencing such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor, and all accounts and general intangibles arising out of, or in connection with, such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor; (c) any and all moneys or property due and to become due to Pledgor now or in the future in respect of such preferred membership interests in Issuer, or to which Pledgor may now or in the future be entitled with respect to such preferred membership interests in its capacity as a member of Issuer, whether by way of a dividend, distribution, return of capital or otherwise; and (d) all rights of Pledgor with respect to such preferred membership interests under each Issuer Formation Agreement applicable to Issuer (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its

3

84173055_12

ownership of such preferred membership interests in Issuer) including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of such preferred membership interests in Issuer.

"**Pledgee**" has the meaning set forth in the Preamble hereto, together with its successors and assigns.

"**Pledgor**" has the meaning set forth in the Preamble hereto.

"**Principals**" means Michael M. Aiken, Mark R. Enderle and Mark D. Yarborough.

"**Proceeds**" means (i) Pledgor's share, right, title and interest in and to all distributions, monies, fees, payments and proceeds now or hereafter becoming due and payable to Pledgor by Issuer with respect to the Pledged Interests, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the Code; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash and non-cash proceeds of any of the foregoing.

"**Receivables**" means all rights of every nature of Issuer under the Contracts and all obligations of the obligors thereunder.

"**Revenues**" means all gross revenue from operations paid to or otherwise received by Issuer from any source including, without limitation, the Receivables and any and all monies, fees and payments from operations, and including distributions to Issuer from its subsidiaries, but excluding any life insurance proceeds payable to Issuer pursuant to key man policies insuring the lives of the Principals now or hereafter becoming due and payable to Issuer.

"**Service Agreements**" means, collectively, (a) that certain Service Agreement dated as of the date hereof between Issuer and En Theos, LLC, (b) that certain Service Agreement dated as of the date hereof between Issuer and Gemini I, LLC, and (c) that certain Service Agreement dated as of the date hereof between Issuer and Hideaway Investments, LLC.

(i)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(ii)    The word "including" when used in this Agreement shall be deemed to be followed by the words "without limitation".

2.      **Pledge; Security for the Loan.**

(a)     **Pledge and Grant of Security Interest in Pledged Interests.**  Pledgor hereby pledges and grants to Pledgee, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the

Obligations, a first priority security interest in all of Pledgor's right, title and interest to the following (the "**Collateral**"):

        (i)     the Pledged Interests; and

        (ii)    to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

Issuer has evidenced its acknowledgement and consent to the pledge and grant given hereby, by execution and delivery of an Acknowledgement and Consent in the form attached hereto as **Exhibit A**.

(b)    <u>Assignment and Grant of Security Interest in Receivables</u>.  Issuer hereby pledges, grants, assigns and transfers to Pledgee, all of Issuer's right, title and interest in and to the Receivables, and all documents and instruments executed in connection therewith, and all collateral securing such Receivables and the products and proceeds thereof.  This assignment shall constitute a security agreement under the Code.  Following the occurrence of an Event of Default, Pledgee shall have the exclusive right to collect and receive the Receivables for so long as this Agreement remains in effect.

(c)    <u>Grant of Security Interest in Interest Reserve</u>.  Issuer hereby pledges, grants, assigns and transfers to Pledgee, a security interest in and to the Interest Reserve, and the products and proceeds thereof.  This assignment shall constitute a security agreement under the Code.  Pledgee shall have the exclusive right to control the Interest Reserve and to withdraw and utilize the funds therein in accordance with Section 3(e) hereof for so long as this Agreement remains in effect.

        3.    **The Loan.**

(a)    <u>Repayment Obligation</u>.  Issuer is obligated under the Note to repay to Pledgee, on or before the Maturity Date, the aggregate outstanding principal amount of Loan together with all accrued interest.

(b)    <u>Interest</u>.

        (i)    Interest on the outstanding principal balance of the Loan shall accrue from the date of disbursement thereof until such principal amounts shall be paid in full, at a rate per annum equal to the Interest Rate (subject to paragraph (ii) below).  If Loan proceeds are disbursed to an escrowee, the Loan shall commence to bear interest from and including the date of such disbursement to such escrowee regardless of the date such proceeds are disbursed from escrow; <u>provided</u>, <u>however</u> that the interest actually accruing on such proceeds, if any, shall be for Pledgor's benefit.  To the extent not prepaid, interest on the outstanding principal balance of the Loan shall be permitted to accrue, and accrued interest shall bear interest monthly.  A balloon payment consisting of the outstanding principal balance of the Loan, together any accrued and unpaid interest, will be due and payable on the Maturity Date.

(ii)    Upon the occurrence and during the continuance of an Event of Default, Pledgor shall pay interest on the unpaid principal balance of the Note at a rate per annum equal at all times to the lesser of (x) the maximum non-usurious rate permitted by law or (y) five (5.0%) per annum over the Interest Rate.

(iii)    Notwithstanding any provision to the contrary contained in this Agreement or the other Loan Documents, Pledgor shall not be required to pay, and Pledgee shall not be permitted to collect, any amount of interest in excess of the maximum amount of interest permitted by law ("Excess Interest"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Agreement or in any of the other Loan Documents, then in such event: (1) the provisions of this Section shall govern and control; (2) Pledgor shall not be obligated to pay any Excess Interest; (3) any Excess Interest that Pledgee may have received hereunder shall be, at Pledgee's option, (x) applied as a credit against the outstanding principal balance of the Loan (without any prepayment penalty or premium therefor) or for accrued and unpaid interest thereon (not to exceed the maximum amount permitted by law), (y) refunded to the payor thereof, or (z) any combination of the foregoing; (4) the interest rate(s) provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "Maximum Rate"), and this Agreement and the other Loan Documents shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (5) Pledgor shall not have any action against Pledgee for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on the Loan is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Loan shall, to the extent permitted by law, remain at the Maximum Rate until Pledgee shall have received or accrued the amount of interest which Pledgee would have received or accrued during such period on the Loan had the rate of interest not been limited to the Maximum Rate during such period.

(c)    Payments and Computations.

(i)    Pledgor shall make each payment hereunder and under the Note to Pledgee in U.S. dollars in same day funds. In the event funds are received after 2:00 p.m. (New York City time), such funds shall be deemed to have been paid by Pledgor on the following Business Day.

(ii)    All computations of interest and fees shall be made by Pledgee on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by Pledgee of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(iii)    Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

6

(d)    <u>Use of Revenues</u>.  All net Revenues received by Issuer, net of budgeted overhead and operating expenses, including the operating expenses of Issuer's subsidiaries and affiliates to the extent such operating expenses are provided for in an Approved Budget, shall be used, disbursed and applied in the following order of priority:

(i)    First, to Pledgee to the extent, and for the payment of, all accrued and unpaid interest on the Loan; <u>provided, however,</u> that if net Revenues are insufficient to fully satisfy Pledgor's obligation to pay accrued interest on the Loan, the unpaid interest shall continue to accrue, compounding monthly until paid, for up to 90 days beyond the applicable Payment Date (as such term is defined in the Note); <u>provided, however,</u> that interest shall be due and payable on the applicable Payment Date (the failure to pay such accrued interest on or before such Payment Date, a "Payment Default") and as more particularly provided in Section 10 hereof it shall be an "Event of Default" hereunder if such Payment Default remains uncured for more than 90 days after the applicable Payment Date regardless of whether net Revenues are sufficient to fully satisfy Pledgor's obligation to pay accrued interest on the Loan); and <u>provided further, however,</u> that at any time when any accrued and unpaid interest remains outstanding, no net Revenues shall be distributed in accordance with clauses (ii) or (iii) of this Section 3(d), or otherwise;

(ii)    Second, the balance, if any (but only as and when no accrued and unpaid interest on the Loan remains outstanding), for the payment of the Annual Fees payable under and in accordance with the Service Agreements, in no event to exceed $1,000,000 per annum in the aggregate; <u>provided, however,</u> that if net Revenues are insufficient in a given year to fully satisfy Issuer's obligation to pay the Annual Fees and less than $1,000,000 in the aggregate is paid in such year, the unpaid portion of such Annual Fees shall not accrue, and shall not be payable in the next year; and

(iii)    Third, 80% of the balance, if any, to Pledgee for application in reduction of the outstanding principal balance of the Loan and the remaining 20% thereof to Pledgor for distribution to the Principals for the payment (on behalf of Pledgor, Issuer or the Principals, as applicable) of taxes incurred by Pledgor, Issuer or Principals by reason of such application in reduction of principal.

(e)    <u>Cure Period; Use of Interest Reserve</u>.  Anything herein to the contrary notwithstanding, accrued interest is due and payable on each Payment Date, and failure to pay such accrued interest on or before such Payment Date shall constitute a Payment Default hereunder and under the Note; provided, however, that in respect of any such Payment Default there shall be a 90-day period, commencing on such Payment Date, within which Borrower may cure such Payment Default by the payment of all accrued and unpaid interest through such Payment Date which, if not otherwise paid by Issuer, shall be paid from the Interest Reserve until the Interest Reserve is fully depleted.  Anything herein to the contrary notwithstanding, Pledgor shall be credited with the then-outstanding balance of the Interest Reserve including, without limitation, accrued and undisbursed interest thereon, at and in connection with the repayment of the Loan, whether such repayment is a prepayment, a payment at maturity, a repayment upon an acceleration of the Loan by reason of the occurrence of an Event of Default, or otherwise.

7

(f)    <u>Taxes</u>.

(i)    Any and all payments by Pledgor or by Issuer hereunder, under the Note or under any other Loan Document shall be made in accordance with subsection (c) of this Section, free and clear of and (except to the extent permitted under subsection (d) of this Section) without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes that are imposed on Pledgee's overall net income by the United States and taxes that are imposed on Pledgee's overall net income, capital and/or assets (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which Pledgee is organized or any political subdivision thereof and taxes that are imposed on Pledgee's overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of Pledgee's applicable lending office or any political subdivision thereof (all such excluded taxes being hereafter referred to as "<u>Excluded Taxes</u>" and all such non-excluded or non-permitted taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under the Note being hereinafter referred to as "<u>Taxes</u>"). If Pledgor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Pledgee (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection (e)) Pledgee receives an amount equal to the sum it would have received had no such deductions been made, (ii) Pledgor shall make such deductions and (iii) Pledgor shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(ii)    INTENTIONALLY OMITTED.

(iii)    Pledgor shall indemnify Pledgee for and hold it harmless against the full amount of Taxes. This indemnification shall be made within 30 days from the date Pledgee makes written demand therefor.

(iv)    Within 60 days after the date of any payment of Taxes, Pledgor shall furnish to Pledgee, at its address referred to in Section 21(e), evidence of such payment. In the case of any payment hereunder or under the Note by or on behalf of Pledgor through an account or branch outside the United States or by or on behalf of Pledgor by a payor that is not a United States person, if Pledgor determines that no Taxes are payable in respect thereof, Pledgor shall furnish, or shall cause such payor to furnish, to Pledgee, at such address, an opinion of counsel acceptable to Pledgee stating that such payment is exempt from Taxes. For purposes of this subsection (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Code.

(g)    <u>Late Charge</u>. No late charges shall be charged in respect of payments due under the Note or any other Loan Documents.

(h)    <u>Application of Payments</u>. Except as otherwise expressly provided in the last sentence of this subsection (g), all payments to Pledgee made hereunder shall be applied by Pledgee first, to any accrued and unpaid interest, and then in reduction of the outstanding

8

principal balance of the Loan. Following and during the continuance of an Event of Default, all sums collected by Pledgee shall be applied in such order of priority to such items set forth below as Pledgee shall determine in its sole discretion: (i) to the costs and expenses, including reasonable attorneys' and paralegals' fees and costs of appeal, incurred in the collection of any or all of the Loan due or the realization of any collateral securing any or all of the Loan; and (ii) to any or all unpaid amounts owing pursuant to the Loan Documents in any order of application as Pledgee, in its sole discretion, shall determine.

(i)     Pledgee's Records; Mutilated, Destroyed or Lost Notes. The balance on Pledgee's books and records shall be presumptive evidence (absent manifest error) of the amounts due and owing to Pledgee by Pledgor; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Pledgor's obligations under the Loan Documents. In case the Note shall become mutilated or defaced, or be destroyed, lost or stolen, Pledgor shall, upon request from Pledgee, execute and deliver a new Note of like principal amount in exchange and substitution for the mutilated or defaced Note, or in lieu of and in substitution for the destroyed, lost or stolen Note. In the case of a mutilated or defaced Note, the mutilated or defaced Note shall be surrendered to Pledgor upon delivery to Pledgee of the new Note. In the case of any destroyed, lost or stolen Note, Pledgee shall furnish to Pledgor, upon delivery to Pledgee of the new Note (i) certification of the destruction, loss or theft of such Note and (ii) such security or indemnity as may be reasonably required by Pledgor to hold Pledgor harmless.

(j)     Right to Convert. At any time while any amounts due and payable to Pledgee hereunder remain unpaid (including after Pledgee may have received notice of prepayment from Pledgor or Issuer but prior to repayment in full of the Loan), Pledgee shall have the right to convert the Loan (to the extent then outstanding), and all of Pledgee's rights as lender in respect thereof, to a direct ownership interest of 10% of the fully-diluted common membership interests of Issuer as of the date of the conversion, which ownership shall be in all respects consistent with the terms of common membership interests ownership under the Issuer Formation Agreement (the "Conversion"). The common interests issued in connection with a Conversion shall be duly authorized and validly issued as of the date of the conversion. Such Conversion may be exercised by Pledgee at any time between 10 and 120 days following written notice to Pledgor given at any time while any amounts due and payable to Pledgee hereunder remain outstanding. Anything herein to the contrary notwithstanding, if Pledgor or Issuer shall have given Pledgee notice of their intent to prepay the Loan in full, the issuance by Pledgee of a Conversion notice at any time prior to the 15th day following such prepayment notice shall be deemed to modify the prepayment notice to provide that instead of prepaying the Loan in full, Pledgor or Issuer shall prepay the Loan in part such that a principal balance of $100 remains outstanding, which $100 balance may not be repaid, and shall remain outstanding, until the earlier to occur of: (i) the Conversion, or (ii) 120 days from Pledgee's issuance of the Conversion notice. This Agreement secures Pledgee's right to exercise the Conversion, and if, as and when Pledgee exercises the Conversion, the termination of this Agreement and cancellation of the Note shall be expressly conditioned upon memorializing such equity arrangements to Pledgee's satisfaction.

9

4. **Representations and Warranties.** Issuer and Pledgor (and, as to subsection (k) of this Section only, Principals, individually and not jointly and severally) represent and warrant as of the date hereof that:

(a) no authorization, consent of or notice to any other Person (including, without limitation, any member, partner, shareholder or creditor of Pledgor or Issuer) that has not been obtained, is required in connection with the execution, delivery, performance, validity, enforcement or enforceability of this Agreement including, without limitation, the assignment and transfer by Pledgor of any of the Collateral or the Receivables to Pledgee or the subsequent transfer thereof by Pledgee pursuant to the terms hereof;

(b) Pledgor is the sole record and beneficial owner of, and has good and marketable title to, the Pledged Interests free of any and all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement, and the Pledged Interests have not previously been assigned, sold, transferred, pledged or encumbered (except pursuant to this Agreement);

(c) upon the filing of the UCC-1 financing statement referred to in Section 14 hereof with the Secretary of State of the State indicated on **Schedule II** hereto, the Lien granted pursuant to this Agreement shall constitute a valid, perfected first priority Lien on the Pledged Interests and related Proceeds in such jurisdiction, enforceable against the creditors of Pledgor and any Persons purporting to purchase any Pledged Interests and related Proceeds from Pledgor;

(d) Issuer is organized under the laws of the State of Delaware;

(e) Pledgor is organized under the laws of the State of Delaware;

(f) there currently exist no certificates, instruments or writings representing the Pledged Interests except for the Issuer Formation Agreement; provided, however, that to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Pledgee, together with stock or bond powers duly endorsed in blank;

(g) the equity interests in Issuer have been validly issued as provided in the applicable Issuer Formation Agreement;

(h) there are no options, warrants or other agreements (other than the applicable Issuer Formation Agreement) outstanding with respect to the Collateral;

(i) **Schedule II** hereto states Pledgor's (1) exact legal name as indicated on the public record in Pledgor's jurisdiction of organization, (2) type of entity, (3) organizational identification number, (4) principal place of business and chief executive office, (5) jurisdiction of incorporation or formation, (6) name under which Pledgor does business, if other than its legal name, and (7) address for the past six (6) years, or if less, the date since which it has been so located;

(j) All Collateral which constitutes a certificated "security" (under the Code) has been delivered to Pledgee;

10

(k)    **Schedule IV** lists all of the existing sales and marketing agreements in effect as of the date hereof, including any modifications and amendments thereto (collectively, the "**Existing Contracts**"; together with the sales and marketing agreements Issuer enters into after the date hereof, collectively the "**Contracts**"). Each of the Existing Contracts is in full force and effect as of the date hereof, and neither Issuer nor Pledgor has received any notice, or has any actual knowledge, that there has occurred a material default under any of the Existing Contracts by any party thereto, except as disclosed on **Schedule V**;

(l)    The Principals are collectively the owners, directly or indirectly, of 100% of the outstanding beneficial ownership interests in Pledgor;

(m)    To Issuer's and Pledgors' actual knowledge, no other security agreement or financing statement covering the Receivables or any part thereof has been made or filed and no security interest, other than the one herein created, has been created, attached or perfected in the Receivables; and

(n)    as of the date hereof, no dispute, set-off, counterclaim or defense exists on the part of Issuer or any other party in respect of any material part of the Receivables except as may be disclosed on **Schedule V** hereto.

5.    **Covenants.** Each of Issuer and Pledgor (and, as to subsections (q), (s) and (v) of this Section only, Principals, individually and not jointly and severally) covenants and agrees with Pledgee that, except with Pledgee's prior written consent, from and after the date of this Agreement until Issuer's and Pledgor's obligations in respect of the Loan (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note) are fully discharged and paid in full:

(a)    Acknowledgements of Parties.    If Pledgor shall, as a result of its ownership of the Pledged Interests, become entitled to receive or shall receive an ownership or equity certificate (including, without limitation, any certificate representing a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any of the Pledged Interests, or otherwise in respect thereof, Pledgor shall accept the same as Pledgee's agent, hold the same in trust for Pledgee and deliver the same forthwith to Pledgee in the exact form received, duly endorsed by Pledgor to Pledgee, if required, together with an undated ownership interest power covering such certificate duly executed in blank and with, if Pledgee so requests, signature guarantied, to be held by Pledgee hereunder as additional security for Pledgor's Obligations.  Subject to the right, if any, of Pledgor and its members to receive distributions, any sums paid upon or in respect of the Pledged Interests upon the liquidation or dissolution of Issuer, and any distribution of capital made on or in respect of the Pledged Interests, and any property distributed upon or with respect to the Pledged Interests pursuant to the recapitalization or reclassification of the capital of Issuer or pursuant to the reorganization thereof, shall be delivered to Pledgee to be held by it, subject to the terms hereof, as additional security for the Loan.  If any sums of money or property so paid or distributed in respect of the Pledged Interests shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Pledgee, hold such money or property in trust for Pledgee, segregated from other funds of Pledgor, as additional security for the Obligations.

11

(b)     Without the prior written consent of Pledgee, which consent may be withheld by Pledgee at its sole option, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, Issuer to issue any equity interests or to issue any other securities convertible into or granting the right to purchase or exchange for any equity interests in Issuer, or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by this Agreement. Pledgor shall defend the right, title and interest of Pledgee in and to the Collateral against the claims and demands of all Persons whomsoever.

(c)     At any time and from time to time, upon the reasonable written request of Pledgee, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Pledgee may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including, without limitation, filing UCC financing or continuation statements, provided that the amount of the indebtedness secured hereby shall not be increased thereby. Pledgor hereby authorizes Pledgee to file any such financing statement or continuation statement to the extent permitted by law. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Pledgee, duly endorsed in a manner satisfactory to Pledgee, to be held as Collateral pursuant to this Agreement.

(d)     Pledgor shall not amend or modify, or permit the amendment or modification of, the Issuer Formation Agreement in any respect.

(e)     Neither Pledgor nor Issuer shall incur any indebtedness (excluding ordinary course trade payables in amounts not materially in excess of those set forth in an Approved Budget from time to time).

(f)     Pledgor will not (i) change its name, identity or structure or (ii) reorganize under the laws of another jurisdiction, unless (A) it shall have given 30 days' prior written notice to such effect to Pledgee, and (B) all action reasonably necessary or advisable, in Pledgee's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken.

(g)     INTENTIONALLY OMITTED.

(h)     Issuer shall not amend the terms of the Issuer Formation Agreement to provide that the Pledged Interests are securities governed by Article 8 of the Code.

(i)     Pledgor shall not enter into any agreement whereby it transfers or cedes the voting rights in Issuer that are associated with the Collateral, or otherwise restricts such voting rights in any way.

(j)     Pledgor, Issuer or any other entity issuing the Collateral shall promptly deliver to Pledgee share certificates or other instruments representing any Collateral acquired or

12

received after the date of this Agreement with a stock or bond power duly executed by Pledgor in the form attached as **Schedule III** hereto. If at any time Pledgee notifies Pledgor that it requires additional stock or bond powers endorsed in blank, Pledgor shall promptly execute in blank and deliver the requested stock power to the requesting party.

(k)     Pledgor shall notify Pledgee of any contemplated change to the information provided on **Schedule II** hereof, at least 30 days prior to such change taking effect.

(l)     Neither Pledgor nor Issuer shall make any distributions of Revenues in any manner that is inconsistent with this Agreement or with Issuer's limited liability company agreement. In no event shall Issuer pay any portion of the Annual Fees accrued in any prior year or otherwise in any manner inconsistent with Section 3(d) hereof.

(m)    Neither Pledgor nor Issuer shall establish any reserves not otherwise contemplated in the then-current Approved Budget.

(n)     Neither Pledgor nor Issuer shall commence any material legal actions.

(o)     Pledgor shall not take any action to sell, dissolve or liquidate Issuer or to permit the sale, dissolution or liquidation of Issuer;

(p)     Pledgor shall not, and shall not permit Issuer to (i) make or agree to any material change in insurance coverage under any policy in which Pledgor or Issuer has any interest from that in place as of the date hereof; (ii) make any disposition or distribution of insurance proceeds other than to Pledgee (x) at any time when there is outstanding any accrued and unpaid interest on the Loan (and then only to the extent necessary to pay such accrued and unpaid interest), or (y) in the event that two (2) or more Principals die in which event Pledgor and Issuer shall use the proceeds of Issuer's key man life insurance policies insuring the lives of the Principals to make all remaining payments of principal and accrued interest on the Loan; provided, however, that, in the event that there are excess funds following such principal and accrued interest payments, Issuer shall retain such excess proceeds and shall use such proceeds as determined by the Board of Managers in its discretion.

(q)     Principals shall not, and shall not permit Pledgor or Issuer to, terminate or cancel (other than in accordance with the express terms thereof), transfer or assign (other than for full and fair consideration or in accordance with the express terms thereof), or make or agree to any material change in, any material contract to which Pledgor or Issuer is a party (including, without limitation, the Contracts and the Employment Agreements between Issuer and each of the Principals).

(r)     Pledgor shall not, and shall not permit Issuer to, issue any press releases or external communications naming Pledgee and/or its affiliates or partners.

(s)     Principals shall not, and shall not permit Pledgor or Issuer to, knowingly misappropriate any Revenues, nor shall Principals intentionally cause or permit Issuer to make any payment or distribution of Revenues in any manner inconsistent with the terms of Section 3(d) hereof.

13

84173055_12

(t)     Pledgor shall not, and shall not permit Issuer to, incur any expense materially in excess of that which is reflected on the then-current Approved Budget.

(u)     Pledgor shall not, and shall not permit Issuer to, enter into any transactions with affiliates except to the extent that they are either: (i) in the ordinary course of business with wholly-owned affiliates, (ii) on an arms-length basis; or (iii) are expressly permitted hereunder.

(v)     Principals shall not, and shall not permit Pledgor or Issuer to consent to or acquiesce in the appointment of a receiver, liquidator or trustee for Pledgor or Issuer, or to the adjudication of Pledgor or Issuer as a bankrupt or insolvent, or to the filing of any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, by or against Pledgor or Issuer, or the institution of any proceeding for the dissolution or liquidation of Pledgor or Issuer.

(w)     Protection of Security Interest in the Receivables.  Issuer shall take any and all steps necessary to preserve and protect the priority of the security interest herein granted in the Receivables, and in furtherance of this obligation Issuer agrees that:

(i)     Issuer shall not create any other security interest in, sell, assign, pledge, transfer or otherwise dispose of or encumber any of the Receivables or any interest therein, or offer to do so, or permit anything to be done that may impair the value of the Receivables in a material respect, or permit any material part of the Receivables to be or become subject to any lien, attachment, execution, sequestration, other legal or equitable process, or encumbrance of any kind or character other than the security interests created by this Pledge Agreement;

(ii)     upon Pledgee's request, Issuer shall execute and deliver to Pledgee any documents requested by Pledgee to effectively implement the purposes of the assignment of Receivables, including financing statements under the Uniform Commercial Code;

(iii)     From and after the occurrence of an Event of Default, Pledgee may from time to time, at its option, perform any agreement or obligation of Issuer hereunder which Issuer fails to perform, and take any action which Pledgee deems necessary or appropriate for the maintenance or preservation of any of the Receivables or its security interest therein; and

(iv)     Issuer shall not convey, transfer, assign, pledge, or allow any ownership, Lien or other interest in the Receivables other than Issuer's and Pledgees's respective interests as described hereunder.

Pledgee acknowledges that the Loan proceeds either have been or will be distributed to Issuer's members, and agrees that (i) such distribution is approved and shall not constitute a violation of this Agreement or any other Loan Documents and (ii) not to seek recovery of such distribution under any bankruptcy or insolvency law or under Delaware Code, Title 6 Chapter 18 § 607 or any similar law; provided, however, that this clause (ii) shall not prohibit an action against one or more of the Principals for breach of Section 4(k), 5(q), 5(s) or 5(v).

84173055_12

EXHIBIT C

## SECURED NON-RECOURSE GUARANTY

This **SECURED NON-RECOURSE GUARANTY** dated as of the _18th_ day of December, 2006 made by **AEY, LLC,** a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Non-Recourse Guarantor**") to and for the benefit of **BERNARD NATIONAL LOAN INVESTORS, LTD.,** a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th floor, New York, New York 10151 (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H:

**WHEREAS,** Lender is this day making a loan to Traditions Management, LLC ("**Borrower**"), in the principal sum of up to TWENTY-SIX MILLION FIVE HUNDRED THOUSAND AND NO/100 ($26,500,000) DOLLARS (the "**Loan**") pursuant to that certain Loan Agreement and Pledge and Security Agreement dated as of the date hereof among Lender, Borrower and Non-Recourse Guarantor (as it may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**") and evidenced by that certain Promissory Note made by Borrower to Lender (together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**"; the Pledge Agreement, the Note and the other documents evidencing and securing the Loan, collectively, the "**Loan Documents**");

**WHEREAS,** Lender requires, as a condition to making the Loan, that Non-Recourse Guarantor guaranty, subject to the express terms and provisions hereof, the payment of the Loan and performance of Borrower's obligations under the Note, the Pledge Agreement and the other Loan Documents as more particularly set forth herein (collectively, the "**Guarantied Obligations**"), and to secure such guaranty by granting to Lender a security interest in and to the preferred membership interests in Borrower owned by Non-Recourse Guarantor; and

**WHEREAS,** Non-Recourse Guarantor expects to derive a substantial economic benefit from the Loan and, accordingly, Non-Recourse Guarantor desires to guaranty the Guarantied Obligations as provided herein, and to execute and deliver this Guaranty and the Pledge Agreement (the collateral under the Pledge Agreement, consisting of the "Collateral", the "Receivables" and the "Interest Reserve", as such terms are defined in the Pledge Agreement, herein collectively, the "**Collateral**") in order to satisfy the condition described in the preceding paragraph.

**NOW, THEREFORE,** in consideration of the foregoing and other benefits accruing to Non-Recourse Guarantor, the receipt and sufficiency of which are hereby acknowledged, Non-Recourse Guarantor hereby makes the following representations and warranties to the Lender and hereby covenants and agrees with Lender as follows:

84175792_5

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1 Guaranty of Obligation.** Subject to the express terms and conditions hereof, Non-Recourse Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment of the Guarantied Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.

**1.2 Limitation on Recourse.** (a) Notwithstanding any provision in this Agreement to the contrary, but subject to the qualifications set forth in this Section and to the terms of Section 1.12 hereof, Lender shall not enforce the liability and obligation of Non-Recourse Guarantor to perform and observe the obligations contained in this Guaranty by an action or proceeding wherein a money judgment shall be sought against Non-Recourse Guarantor. Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding solely in order to enable Lender to enforce and realize upon this Guaranty and the Pledge Agreement with respect to the Collateral, and any judgment in any such action or proceeding shall be enforceable against Non-Recourse Guarantor only to the extent of the Collateral. Lender, by accepting this Guaranty and the Pledge Agreement agrees that it shall not sue for, seek or demand any deficiency judgment against Non-Recourse Guarantor in any such action or proceeding, under, by reason of or in connection with this Guaranty or the Pledge Agreement. The provisions of this Section shall not, however: (i) constitute a waiver, release or impairment of any obligation evidenced or secured by the Pledge Agreement or this Guaranty; (ii) impair the right of Lender to name Non-Recourse Guarantor as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement; (iii) affect the validity or enforceability of any other guaranty or indemnity made in connection with the Loan; or (iv) impair the right of Lender to bring suit with respect to fraud or intentional misrepresentation by Non-Recourse Guarantor in connection with the Pledge Agreement or this Guaranty.

(b) Notwithstanding anything to the contrary in any of the Loan Documents, but subject to subparagraph (a) above, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness under the Loan Documents or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with the Loan Documents.

(c) Anything herein to the contrary notwithstanding, this Guaranty shall cease, terminate and be of no further force or effect upon the termination and repayment in full of the Loan together with all amounts payable to Lender under the Loan Documents.

**1.3 Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and not a guaranty of collection. This Guaranty may not be revoked by Non-Recourse Guarantor and shall continue to be effective with respect to any Guarantied Obligations arising or created after any attempted revocation by Non-Recourse Guarantor and after Non-Recourse Guarantor's death (if Non-Recourse Guarantor is a natural person), in which

2

event this Guaranty shall be binding upon Non-Recourse Guarantor's estate and Non-Recourse Guarantor's legal representatives and heirs. The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Non-Recourse Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

      1.4 **Guarantied Obligations Not Reduced by Offset.** The Guarantied Obligations and the liabilities and obligations of Non-Recourse Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

      1.5 **Payment By Non-Recourse Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Non-Recourse Guarantor shall, subject to the provisions of Section 1.2(a) above, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

      1.6 **No Duty To Pursue Others.** It shall not be necessary for Lender (and Non-Recourse Guarantor hereby waives any rights which Non-Recourse Guarantor may have to require Lender), in order to enforce the obligations of Non-Recourse Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

      1.7 **Waivers.** Non-Recourse Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default under, and as

3

such term is defined in the Pledge Agreement, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guarantied.

      **1.8 Payment of Expenses.**  In the event that Non-Recourse Guarantor should breach or fail to timely perform any provisions of this Guaranty, Non-Recourse Guarantor shall, subject to the provisions of Section 1.2(a) above, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

      **1.9 Effect of Bankruptcy.**  Subject to the provisions of Section 1.2 above, in the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Non-Recourse Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect.  It is the intention of Borrower and Non-Recourse Guarantor that Non-Recourse Guarantor's obligations hereunder shall not be discharged except by performance of such obligations and then only to the extent of such performance.

      **1.10    Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the repayment in full of the Loan together with all of the amounts payable to Lender under the Loan Documents, Non-Recourse Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Non-Recourse Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Non-Recourse Guarantor under or in connection with this Guaranty or otherwise.

      **1.11    Borrower.**  The term **"Borrower"** as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

      **1.12    Limitation on Liability.**  (a)  Notwithstanding anything to the contrary elsewhere contained herein or in any Loan Document to which Non-Recourse Guarantor is a party, but subject to the terms of Section 1.2 hereof, the aggregate liability of Non-Recourse Guarantor under the Guaranty for payment of the obligations guaranteed by this Guaranty shall not exceed an amount which, in the aggregate, is One Thousand Dollars ($1,000) less than the

4

greater of (i) Non-Recourse Guarantor's Net Worth (as such term is defined in paragraph (b) of this Section) calculated as of the date of this Guaranty; and (ii) Non-Recourse Guarantor's Net Worth calculated as of any later date on which (1) Non-Recourse Guarantor expressly reaffirms this Guaranty, (2) demand is made on Non-Recourse Guarantor hereunder, (3) payment is made by Non-Recourse Guarantor hereunder or (4) any judgment, order or decree is entered requiring Non-Recourse Guarantor to make payment hereunder or in respect hereof.

(b)    As used in paragraph (a) of this Section, "**Net Worth**" means the amount, as of the respective date of calculation, by which the sum of the "fair saleable value" of all of Non-Recourse Guarantor's assets is greater than the amount that will be required to pay all of the Non-Recourse Guarantor's debts, in each case matured or unmatured, contingent or otherwise, as of the date of calculation, but excluding liability arising under this Guaranty and excluding, to the maximum extent permitted by applicable law or equity with the objective of avoiding rendering such Non-Recourse Guarantor insolvent, liabilities subordinated to the obligations arising out of loans or advances made by Borrower of any of its Subsidiaries to such Non-Recourse Guarantor. The meaning of the term "fair saleable value" and the calculation of assets and liabilities shall be determined in accordance with Section 548 of 11 U.S.C. § 101 et seq., as amended from time to time (the "**Bankruptcy Code**"). Non-Recourse Guarantor hereby permits the indebtedness of Borrower to exceed Non-Recourse Guarantor's liability under this Guaranty.

1.13    **Additional Waivers**. (a) Non-Recourse Guarantor hereby waives, subject to the provisions of Section 1.2 hereof: (i) any defense based upon any legal disability or other defense of Borrower, any other guarantor or other person, or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment of all sums payable under the Loan Documents; (ii) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower or any defect in the formation of Borrower; (iii) any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Non-Recourse Guarantor; (iv) all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for a guaranteed obligation, may have destroyed Non-Recourse Guarantor's rights of subrogation and reimbursement against Borrower ; (v) any and all rights of subrogation, reimbursement, contribution or indemnification against Borrower or any other person with respect to Non-Recourse Guarantor's obligations under this Guaranty; (vi) any defense based upon Lender's failure to disclose to Non-Recourse Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable under the Loan Documents; (vii) any defense based upon any statute or rule or law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome that that of a principal; (viii) any defense based upon Lender's election, in any proceeding instituted under the Bankruptcy Code, or the application of Section 1111(b)(2) of the Bankruptcy Code or any successor statute; (ix) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code; (x) subject to Section 1.10 hereof, any right of subrogation, any right to enforce any remedy which Lender may have against Borrower and any right to participate in, or benefit from, any security now or hereafter held by Lender; (xi) notice of acceptance of this Guaranty by Lender and of presentment, demand, protest, notice of protest and of dishonor,

5

notice of default and all other notices of every kind or nature now or hereafter provided by agreement or available at law; (xii) the pleading of any statute of limitations as a defense to the obligations hereunder; (xiii) any right to require or compel Lender, prior to exercising its rights hereunder to first proceed against Borrower or any security for the Loan, or to pursue any other remedy available to Lender; and (xiv) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or its failure to proceed promptly or otherwise as against Borrower, Non-Recourse Guarantor or any security. Notwithstanding any foreclosure of Lender's security interest with respect to any or all of the collateral for the Loan, whether by the exercise of the power of sale, by an action for judicial foreclosure or by an acceptance of a deed or assignment in lieu of foreclosure, Non-Recourse Guarantor shall remain bound under this Guaranty. Non-Recourse Guarantor agrees that the payment of all sums payable under the Loan Documents or any part thereof or other act which tolls any statute of limitations applicable to the Loan Documents shall similarly operate to toll the statute of limitations applicable to Non-Recourse Guarantor's liability hereunder. Lender's failure to exercise, or delay in exercising, any right or power hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power.

(b)    Without limiting any rights of Lender or Non-Recourse Guarantor to use any other language to express an intent to waive any or all of the rights and defenses described herein, Non-Recourse Guarantor agrees that, among other things, but subject in any event to the provisions of Section 1.2 hereof: (i) Lender may collect from Non-Recourse Guarantor without first foreclosing on any collateral pledged by Borrower, if any; and (ii) if Lender forecloses on any collateral pledged by Borrower, if any: (A) the amount of the indebtedness evidenced by the Loan Documents may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Lender may collect from Non-Recourse Guarantor even if Lender, by foreclosing on the collateral, has destroyed any right Non-Recourse Guarantor may have to collect from Borrower.

(c)    Non-Recourse Guarantor further agrees that the validity of this Guaranty and the obligations of Non-Recourse Guarantor hereunder shall in no way be terminated, affected or impaired by reason of: (i) the assertion by Lender of any rights or remedies which it may have under or with respect to the Loan Documents, against any person obligated thereunder; (ii) any failure to file or record any of the Loan Documents or to take or perfect any security intended to be provided thereby; (iii) the release or exchange of any collateral for the Loan; (iv) the commencement of a case under the Bankruptcy Code, by or against any person obligated under the Loan Documents, or the death of any Non-Recourse Guarantor; or (v) any payment made in respect of the Loan or any other indebtedness arising under the Loan Documents, whether made by Borrower or Non-Recourse Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Loan, nor shall it have the effect of reducing the liability of Non-Recourse Guarantor hereunder. It is further understood that if Non-Recourse Guarantor shall have taken advantage of, or be subject to the protection of, any provision of the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare

6

the Loan due and payable on the happening of any default or event by which, under the terms of the Loan Documents, the Loan shall become due and payable, Lender may, as against Non-Recourse Guarantor, nevertheless, declare the Guarantied Obligations due and payable and enforce any and all of its rights and remedies provided for herein, subject in any event to the provisions of Section 1.2 hereof.

(d)    Non-Recourse Guarantor further covenants: (i) that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Loan Documents; (ii) that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Loan Documents or other collateral for the Loan; and (iii) that other indulgence or forbearance may be granted under any or all of the Loan Documents, without notice to or further consent of Non-Recourse Guarantor.

## ARTICLE II

### EVENTS AND CIRCUMSTANCES NOT REDUCING
### OR DISCHARGING NON-RECOURSE GUARANTOR'S OBLIGATIONS

Non-Recourse Guarantor hereby consents and agrees to each of the following and agrees that Non-Recourse Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Non-Recourse Guarantor might otherwise have as a result of or in connection with any of the following:

2.1 **Modifications.**  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guarantied Obligations, the Note, the Pledge Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guarantied Obligations or any failure of Lender to notify Non-Recourse Guarantor of any such action.

2.2 **Adjustment.**  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Non-Recourse Guarantor.

2.3 **Condition of Borrower or Non-Recourse Guarantor.**  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Non-Recourse Guarantor or any other party at any time liable for the payment of all or part of the Guarantied Obligations; or any dissolution of Borrower or Non-Recourse Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Non-Recourse Guarantor or any changes in the shareholders, partners or members of Borrower or Non-Recourse Guarantor; or any reorganization of Borrower or Non-Recourse Guarantor.

2.4 **Invalidity of Guarantied Obligations.**  The invalidity, illegality or unenforceability of all or any part of the Guarantied Obligations or any document or agreement executed in connection with the Guarantied Obligations for any reason whatsoever including, without limitation, the fact that (i) the Guarantied Obligations or any part thereof exceeds the

7

amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is _ultra vires_, (iii) the officers or representatives executing the Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, or (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, it being agreed that Non-Recourse Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

2.5 **Release of Obligors.**  Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Non-Recourse Guarantor that, subject to Section 1.2 hereof, Non-Recourse Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Non-Recourse Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

2.6 **Other Collateral.**  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

2.7 **Release of Collateral.**  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

2.8 **Care and Diligence.**  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

2.9 **Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall

84175792_5

prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Non-Recourse Guarantor that Non-Recourse Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guarantied Obligations.

2.10 **Offset.** The Note, the Guarantied Obligations and the liabilities and obligations of Non-Recourse Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guarantied Obligations, whether such right of offset, claim or defense arises in connection with the Guarantied Obligations (or the transactions creating the Guarantied Obligations) or otherwise.

2.11 **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

2.12 **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

2.13 **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guarantied Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Non-Recourse Guarantor or increases the likelihood that Non-Recourse Guarantor will be required to pay the Guarantied Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Non-Recourse Guarantor that Non-Recourse Guarantor shall be obligated to pay the Guarantied Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guarantied Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Non-Recourse Guarantor represents and warrants to Lender as follows:

3.1 **Benefit.** Non-Recourse Guarantor is an affiliate of Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guarantied Obligations.

3.2 **Familiarity and Reliance.** Non-Recourse Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guarantied Obligations; however, Non-Recourse Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

9

**3.3 No Representation By Lender.** Other than those representations, warranties and statements expressly set forth in the Loan Documents, neither Lender nor any other party has made any representation, warranty or statement to Non-Recourse Guarantor in order to induce the Non-Recourse Guarantor to execute this Guaranty.

**3.4 Legality.** The execution, delivery and performance by Non-Recourse Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Non-Recourse Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Non-Recourse Guarantor is a party or which may be applicable to Non-Recourse Guarantor. This Guaranty is a legal and binding obligation of Non-Recourse Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.5 Survival.** All representations and warranties made by Non-Recourse Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1 Subordination of All Non-Recourse Guarantor Claims.** As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Non-Recourse Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Non-Recourse Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Non-Recourse Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Non-Recourse Guarantor's payment of all or a portion of the Guarantied Obligations. For so long as any portion of the Guarantied Obligations remain outstanding Non-Recourse Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2 Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Non-Recourse Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Non-Recourse Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guarantied Obligations, any dividend or payment which is otherwise payable to Non-Recourse Guarantor and which, as between

10

Borrower and Non-Recourse Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guarantied Obligations, Non-Recourse Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guarantied Obligations, and such subrogation shall be with respect to that proportion of the Guarantied Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3 Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Non-Recourse Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Non-Recourse Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Non-Recourse Guarantor covenants promptly to pay the same to Lender.

**4.4 Liens Subordinate.** Non-Recourse Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantied Obligations, regardless of whether such encumbrances in favor of Non-Recourse Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Non-Recourse Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Non-Recourse Guarantor.

## ARTICLE V

## MISCELLANEOUS

**5.1 Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2 Notices.** All notices given hereunder shall be in writing and shall be either hand delivered, mailed by registered U.S. mail, Return Receipt Requested, first class postage

11

prepaid, or sent by overnight courier to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

If to Lender:        _____
                     _____
                     _____
                     _____
                     Attention: _____
                     Facsimile No. _____

and a copy to:       Katten Muchin Rosenman LLP
                     575 Madison Avenue
                     New York, New York  10022
                     Attention:  Jill D. Block, Esq.
                     Facsimile No. 212-894-5521

If to Non-Recourse
Guarantor:           AEY LLC
                     816 Krystal Building
                     One Union Square
                     Chattanooga, TN 37402
                     Attention: Michael M. Aiken
                     Facsimile No. 423-265-5680

with a copy to:      Traditions Management LLC
                     816 Krystal Building
                     One Union Square
                     Chattanooga, TN 37402
                     Attention: Lisa T. Reynolds, Senior Vice President
                     Facsimile No. 423-265-5680

and a copy to:       Chambliss, Bahner & Stophel, P.C.
                     1000 Tallan Building
                     Two Union Square
                     Chattanooga, TN 37402
                     Attention: William P. Aiken, Esq.
                     Facsimile No. 423-580-1216

**5.3 Submission to Jurisdiction.** Any legal suit, action or proceeding against Lender or Non-Recourse Guarantor arising out of or relating to this Guaranty may at Lender's option be instituted in any Federal or State court in the City of New York, County of New York, pursuant to Section 5 1402 of the New York General Obligations Law and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Non-Recourse Guarantor hereby irrevocably submits to

12

the jurisdiction of any such court in any suit, action or proceeding. Non-Recourse Guarantor does hereby designate and appoint:

>AEY LLC
>816 Krystal Building
>One Union Square
>Chattanooga, TN 37402
>Attention: Michael M. Aiken
>Facsimile No. 423-265-5680

as its authorized agent to accept and acknowledge on its behalf service of any and all process which may be served in any such suit, action or proceeding in any Federal or State court in New York, New York, and agrees that service of process upon such agent at such address and written notice of said service mailed or delivered to Non-Recourse Guarantor in the manner provided herein shall be deemed in every respect effective service of process upon Non-Recourse Guarantor in any such suit, action or proceeding in the State of New York.

**5.4 Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5 Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6 Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Non-Recourse Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Non-Recourse Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7 Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8 Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9 Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature

13

of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

       **5.10**   **Rights and Remedies.** If Non-Recourse Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Non-Recourse Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

       **5.11**   **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Pledge Agreement, unless such term is otherwise specifically defined herein.

       **5.12**   **Entirety.** **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF NON-RECOURSE GUARANTOR AND LENDER WITH RESPECT TO NON-RECOURSE GUARANTOR'S GUARANTY OF THE GUARANTIED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY NON-RECOURSE GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN NON-RECOURSE GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN NON-RECOURSE GUARANTOR AND LENDER.**

       **5.13**   **Waiver of Right To Trial By Jury.** **NON-RECOURSE GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY NON-RECOURSE GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH**

THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY NON-RECOURSE GUARANTOR.

      **5.14**   **Reinstatement in Certain Circumstances.**  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Non-Recourse Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

          **IN WITNESS WHEREOF,** Non-Recourse Guarantor has caused this Guaranty to be duly executed as of the date set forth above.

                                        **NON-RECOURSE GUARANTOR:**

                                        AEY, LLC

                                        By: _____
                                           Name: _Michael M. Aiken_
                                           Title: _President_

EXHIBIT D

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**
Chattanooga, Tennessee

**FINANCIAL STATEMENTS**

December 31, 2006 and 2005

# TABLE OF CONTENTS

Independent Auditor's Report                                        Page    1

Consolidated Balance Sheets                                                 2

Consolidated Statements of Income and Members' Equity                       3

Consolidated Statements of Cash Flows                                       4

Notes to Consolidated Financial Statements                             5 - 12



PETTY & LANDIS, P.C.

CERTIFIED PUBLIC ACCOUNTANTS

### INDEPENDENT AUDITOR'S REPORT

To The Members
Traditions Management, LLC and Subsidiaries
Chattanooga, Tennessee

We have audited the accompanying consolidated balance sheets of Traditions Management, LLC and Subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income and members' equity, and consolidated statements of cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above presents fairly, in all material respects, the financial position of Traditions Management, LLC and Subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Petty & Landis, P.C.*

Chattanooga, Tennessee
August 15, 2007

1

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

December 31, 2006 and 2005

| | | 2006 | | 2005 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash | $ | 3,723,036 | $ | 133,807 |
| Trade accounts receivable | | 948,831 | | 1,489,508 |
| Other receivables | | 3,744 | | 13,312 |
| Prepaid expenses | | 414,358 | | 648,353 |
| Total Current Assets | | 5,089,969 | | 2,284,980 |
| **PROPERTY AND EQUIPMENT** | | | | |
| Equipment | | 87,582 | | 63,418 |
| Vehicles | | | | 46,677 |
| Leasehold improvements | | 5,960 | | |
| | | 93,542 | | 110,095 |
| Less accumulated depreciation | | 33,874 | | 25,809 |
| Property and Equipment, net | | 59,668 | | 84,286 |
| **OTHER ASSETS** | | | | |
| Deposits | | 5,077 | | 9,427 |
| Financing costs | | 145,617 | | |
| Restricted funds held in escrow | | 1,000,000 | | |
| Total Other Assets | | 1,150,694 | | 9,427 |
| Total Assets | $ | 6,300,331 | $ | 2,378,693 |
| **LIABILITIES AND MEMBERS' EQUITY (DEFICIT)** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable and accrued expenses | $ | 1,857,542 | $ | 217,621 |
| Accrued state income taxes | | | | 7,668 |
| Unearned revenue | | 1,411,000 | | 1,527,000 |
| Total Current Liabilities | | 3,268,542 | | 1,752,289 |
| **NOTES PAYABLE, LONG-TERM** | | 26,500,000 | | |
| **MEMBERS' EQUITY (DEFICIT)** | | (23,468,211) | | 626,404 |
| Total Liabilities and Members' Equity (Deficit) | $ | 6,300,331 | $ | 2,378,693 |

The accompanying notes are an integral part of these financial statements.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF INCOME AND MEMBERS' EQUITY

For the years ended December 31, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| **REVENUE** | | |
| Gross fee revenue | $ 8,623,552 | $ 12,060,652 |
| Commissions paid | (3,984,010) | (2,175,690) |
| Net Fee Revenue | 4,639,542 | 9,884,962 |
| Reimbursements | 3,250,689 | 1,672,521 |
| Net Revenue | 7,890,231 | 11,557,483 |
| **OPERATING EXPENSES** | 7,195,270 | 3,754,763 |
| Income From Operations | 694,961 | 7,802,720 |
| **OTHER INCOME (EXPENSES)** | | |
| Interest income | 2,821 | 511 |
| Depreciation expense | (27,864) | (22,646) |
| Interest expense | (99,558) | (196) |
| Total Other Expense | (124,601) | (22,331) |
| Income Before Taxes | 570,360 | 7,780,389 |
| State income taxes | | 5,141 |
| Net Income | 570,360 | 7,775,248 |
| Members' equity, beginning of year | 626,404 | 1,904,227 |
| Distributions to members | (24,664,975) | (9,053,071) |
| Members' Equity (Deficit), End of Year | $ (23,468,211) | $ 626,404 |

The accompanying notes are an integral part of these financial statements.

3

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**For the years ended December 31, 2006 and 2005**

|  | 2006 | 2005 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | $ 570,360 | $ 7,775,248 |
| Adjustment to reconcile net income to net cash provided by operating activities: | | |
| Depreciation expense | 27,864 | 22,646 |
| Bad debt expense | 20,291 | |
| Loss on equipment transferred to members | 25,261 | |
| Changes in: | | |
| Trade accounts receivable | 520,386 | 1,037,293 |
| Other receivables | 9,568 | (5,215) |
| Prepaid expenses | 233,995 | (297,009) |
| Deposits | 4,350 | (200) |
| Accounts payable and accrued expenses | 1,639,921 | (46,832) |
| Accrued state income taxes | (7,668) | (5,428) |
| Unearned revenue | (116,000) | 526,000 |
| Net Cash Provided by Operating Activities | 2,928,328 | 9,006,503 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of fixed assets | (33,068) | (35,584) |
| Proceeds from disposal of equipment | 4,561 | |
| Net Cash Used by Investing Activities | (28,507) | (35,584) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from long-term borrowings | 26,500,000 | |
| Transfer of loan proceeds to escrow | (1,000,000) | |
| Distributions to members | (24,664,975) | (9,053,071) |
| Financing costs | (145,617) | |
| Net Cash Provided (Used) by Financing Activities | 689,408 | (9,053,071) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 3,589,229 | (82,152) |
| Cash and cash equivalents, beginning of year | 133,807 | 215,959 |
| Cash and Cash Equivalents, End of Year | $ 3,723,036 | $ 133,807 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Cash paid for interest | $ 99,558 | $ 196 |

The accompanying notes are an integral part of these financial statements.

EXHIBIT E

# ReedSmith

**Lance Gotthoffer**
Direct Phone: +1 212 549 0289
Email: lgotthoffer@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
www.reedsmith.com

April 14, 2008

**Via Overnight Courier and Electronic Mail**

Traditions Management, LLC
816 Krystal Building
One Union Square
Chattanooga, Tennessee  37402

Attn:  Michael M. Aiken
maiken@traditionsmgt.com

**Secured Loan Transaction Dated 18 December 2006**

Dear Mr. Aiken:

We are counsel for Bernard National Loan Investors, Ltd. Your attention is directed to the Loan Agreement and Pledge and Security Agreement dated December 18, 2006 (the "LPS Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings ascribed thereto in the LPS Agreement.

As we have heretofore advised you, facts have come to Lender's attention showing a default by you and your related parties under the Loan Documents. We have, over the past months, repeatedly given you an opportunity to refute or explain those facts. You, and your counsel, have steadfastly refused to do so, through and including your counsel's letter of April 10, 2008. Thus, these facts stand unrebutted and in those circumstances, Lender has no choice but to act upon them.

Although such Notice is not required and is provided solely as a courtesy, notice is hereby given that at least the following defaults and Events of Default under the LPS Agreement have occurred and are continuing.

1. Traditions Management, LLC ("Borrower"), AEY, LLC ("Pledgor"), and/or the individual Principals caused a fourth quarter distribution of one million five hundred thousand dollars ($1,500,000) from working capital (the "Excess Distributions"). Either the Excess Distributions resulted from misapplying Revenues in violation Section 3(d), and thereby also breaching covenants of Borrower, Pledgor and the Principals (see LPS Agreement §§ 5(s), 10(a)(iii), 10(a)(iv)), or Borrower and/or Pledgor have created a prohibited reserve on their books, violating the covenant in Section 5(m).

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH

OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

Michael M. Aiken
April 14, 2008
Page 2

**ReedSmith**

2.     Borrower and/or Pledgor have spent approximately double the travel/meals/entertainment ("T/M/E") expenses in the Approved Budget, in violation of their covenant not to incur expenses materially in excess of that Approved Budget.  See LPS Agreement § 5(t).

3.     Lender provided Borrower and Pledgor with the opportunity to explain the Excess Distributions and expenses, but they have chosen to remain silent in violation of Section 5(c) of the LPS Agreement.

Therefore, take further notice that Lender is now entitled to exercise its Remedies, and may elect to do so at its sole option in accordance with the Loan Documents.

Lender does not waive any default or Events of Default that may have occurred under the Loan Documents and further reserves all its rights and remedies as a result thereof, including, but not limited to, the right to accelerate amounts owed under the Loan Documents, and the right to foreclose upon the Pledged Interests or any other component of Lender's Collateral.

Very truly yours,

Lance Gotthoffer/al

Lance Gotthoffer

cc:     Chambliss, Bahner & Stophel, P.C.  (via overnight courier and electronic mail)
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402
Attn:  William P. Aiken, Jr., Esquire
waiken@cbslawfirm.com

Covington & Burling LLP  (via overnight courier and electronic mail)
620 Eighth Avenue
New York, New York  10018
Attn: C. William Phillips, Esq.
cphillips@cov.com

# ReedSmith

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
www.reedsmith.com

**Lance Gotthoffer**
Direct Phone: +1 212 549 0289
Email: lgotthoffer@reedsmith.com

April 14, 2008

**<u>Via Overnight Courier and Electronic Mail</u>**

AEY, LLC
816 Krystal Building
One Union Square
Chattanooga, Tennessee  37402

Attn:  Michael M. Aiken
maiken@traditionsmgt.com

**<u>Secured Loan Transaction Dated 18 December 2006</u>**

Dear Mr. Aiken:

We are counsel for Bernard National Loan Investors, Ltd. Your attention is directed to the Loan Agreement and Pledge and Security Agreement dated December 18, 2006 (the "LPS Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings ascribed thereto in the LPS Agreement.

As we have heretofore advised you, facts have come to Lender's attention showing a default by you and your related parties under the Loan Documents. We have, over the past months, repeatedly given you an opportunity to refute or explain those facts. You, and your counsel, have steadfastly refused to do so, through and including your counsel's letter of April 10, 2008. Thus, these facts stand unrebutted and in those circumstances, Lender has no choice but to act upon them.

Although such Notice is not required and is provided solely as a courtesy, notice is hereby given that at least the following defaults and Events of Default under the LPS Agreement have occurred and are continuing.

      1.     Traditions Management, LLC ("Borrower"), AEY, LLC ("Pledgor"), and/or the individual Principals caused a fourth quarter distribution of one million five hundred thousand dollars ($1,500,000) from working capital (the "Excess Distributions"). Either the Excess Distributions resulted from misapplying Revenues in violation Section 3(d), and thereby also breaching covenants of Borrower, Pledgor and the Principals (see LPS Agreement §§ 5(s), 10(a)(iii), 10(a)(iv)), or Borrower and/or Pledgor have created a prohibited reserve on their books, violating the covenant in Section 5(m).

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH

OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

Michael M. Aiken
April 14, 2008
Page 2

**ReedSmith**

2.    Borrower and/or Pledgor have spent approximately double the travel/meals/entertainment ("T/M/E") expenses in the Approved Budget, in violation of their covenant not to incur expenses materially in excess of that Approved Budget.  See LPS Agreement § 5(t).

3.    Lender provided Borrower and Pledgor with the opportunity to explain the Excess Distributions and expenses, but they have chosen to remain silent in violation of Section 5(c) of the LPS Agreement.

Therefore, take further notice that Lender is now entitled to exercise its Remedies, and may elect to do so at its sole option in accordance with the Loan Documents.

Lender does not waive any default or Events of Default that may have occurred under the Loan Documents and further reserves all its rights and remedies as a result thereof, including, but not limited to, the right to accelerate amounts owed under the Loan Documents, and the right to foreclose upon the Pledged Interests or any other component of Lender's Collateral.

Very truly yours,

*Lance Gotthoffer /al*

Lance Gotthoffer

cc:    Chambliss, Bahner & Stophel, P.C.  (via overnight courier and electronic mail)
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402
Attn:  William P. Aiken, Jr., Esquire
waiken@cbslawfirm.com

Covington & Burling LLP  (via overnight courier and electronic mail)
620 Eighth Avenue
New York, New York  10018
Attn:  C. William Phillips, Esq.
cphillips@cov.com