UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

BERNARD NATIONAL LOAN INVESTORS, :
LTD.

          Plaintiff,      :

          v.         :

TRADITIONS MANAGEMENT, LLC, AEY, :
LLC, MICHAEL AIKEN, MARK ENDERLE
and MARK YARBOROUGH.      :

          Defendants.     :

------------------------------------ X

Case No. 08-CV-3573

**SECOND AMENDED COMPLAINT**

Plaintiff Bernard National Loan Investors, Ltd. ("Bernard" or the "Plaintiff"), by and

through its counsel, Reed Smith LLP, for its second amended complaint against Defendants

Traditions Management, LLC ("Traditions"), AEY, LLC ("AEY"), Michael Aiken ("Aiken"),

Mark Enderle ("Enderle"), and Mark Yarborough ("Yarborough" and, together with Traditions,

AEY, Aiken and Enderle, the "Defendants"), alleges as follows:

## INTRODUCTION

1.     This case involves millions of dollars in service fees that were paid to Defendant

Traditions between the 4th quarter of 2006 and the present, which fees, in substantial part, should

have been paid over by Traditions to its lender, Plaintiff Bernard, pursuant to the express terms

of a Loan Agreement and Pledge and Security Agreement between the parties (the "LPS

Agreement"), to retire the principal of a $26.5 million loan Bernard extended to Traditions (the

"Loan").

2.      Specifically, in the summer of 2006, Traditions, which held itself out as the exclusive marketer for at least ten developers of high-end luxury real estate projects, sought an investment of $25.5 million from Bernard. As a material inducement, Traditions touted that it had net fee revenues of almost $8 million already earned on the sale of certain properties, which fees would be paid at closings definitively scheduled to occur in the 4th quarter of 2006, and which fees could be applied for Bernard's benefit. Bernard ultimately agreed to extend a loan of $26.5 million based upon, among others, Traditions' representation that 80% of these fees as further adjusted (approximately $5.3 million), would immediately go to Bernard at year end to pay down the Loan principal.

3.      The parties then entered into the LPS Agreement on December 18, 2006, expressly embodying the right of Bernard to receive 80% of all net revenues obtained by Traditions. Thus, if Traditions were telling the truth, and even allowing for the possible slippage of those closings to the 1st quarter of 2007, by March 31, 2007, almost one quarter of the Loan should have been repaid.

4.      The problem is, it was not. No principal payments whatsoever were made in either the 4th quarter of 2006 or in the 1st quarter of 2007. And the problem is, Defendants refuse to say whether or not these real estate transactions closed as represented in late 2006 or early 2007, and whether Traditions received the almost $8 million in fees it said pre-loan that it would collect then; and if not, what happened to the transactions; and if so, what happened to the money?

5.      Moreover, it now appears that despite its representations, Defendants never expected this fee revenue to be realized in 2006. Instead, Defendants misled Bernard to ensure

the Loan closed that year (resulting in distributions to Traditions' three principals of a hefty $8 million each), rather than running the risk that if the Loan did not close until 2007, Traditions would be unable to meet its projections and the deal would implode.

6.    There is more.  Traditions also represented prior to the Loan that it had numerous other exclusive contracts in place with developers, non-cancellable except for cause, that would yield it millions of dollars in commissions in 2007.  And, it appears from available public sources that many of the properties on which Traditions had an exclusive arrangement were sold and/or did close in 2007.  Therefore, there should have been enormous sums paid to Traditions, 80% of the net revenues of which should have been paid to Bernard under the relevant Loan documents.

7.    Defendants do not deny that there were such sales, that there were such closings, and that Traditions did receive such fees.  But Bernard has received only a mere $1.6 million in principal payments, less than one tenth of what was promised, begetting the question -- what happened to the rest of these monies?

8.    Only Defendants know, and they are not telling.  Moreover, the information that they have provided to Bernard since the Loan closed has been carefully choreographed to obscure, rather than explicate, what is going on.

9.    It also appears that this is no accident.  Defendants' conduct is consistent with a pattern and practice of financial transgressions by their Principal, Michael Aiken.  Mr. Aiken has been sued in at least three actions since 2001 brought by lenders alleging, among other things, misrepresentations and concealments of material facts, and defaults on loans that total millions of

dollars. Each of these actions was brought not long after the relevant loan closing, and each resulted in a substantial judgment adverse to, or a settlement by, Mr. Aiken.

10.    Thus, it now appears that Defendants' actions are part of a pre-existing scheme to secure the proceeds of the Loan by misrepresentation, and to divert the proceeds to the individual benefit of the Defendants in violation of the terms of the relevant Loan documents, giving rise to claims in fraud and conversion, as well as breach of contract.

## THE PARTIES

11.    Bernard is a Cayman Islands company limited by shares with its principal place of business in New York City, New York. Bernard is a specialized investment group in the business of providing commercial loans to qualified commercial entities. Bernard is serviced in part by D.B. Zwirn & Co. ("DBZ").

12.    Traditions is a Delaware limited liability company, with its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee. Traditions is a real estate marketing services firm that specializes in the sales and marketing of new, high-end luxury residences. Traditions employs approximately 30 persons who are based either at its corporate headquarters or at project sites.

13.    Traditions was founded in 2002 by Mark Enderle, Mark Yarborough and Michael Aiken (collectively, the "Principals"). Each of the Principals has an affiliated limited liability company (the "LLCs"), which three LLCs are the members of Traditions, along with AEY. Those member LLCs are citizens of Delaware and Nevada.

14.    AEY is a Delaware limited liability company with its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee.  As is the case with Traditions, AEY is owned and controlled by the Principals.  AEY holds all of the preferred interests in Traditions.  Such preferred interests serve, in part, as the collateral for the Loan.

15.    Michael Aiken is the Chairman of Traditions, responsible for corporate finance and strategic planning; Mark Enderle is the President and Chief Executive Officer, responsible for developing sales and marketing programs; and Mark Yarborough is the Vice Chairman & Chief Sales Officer, responsible for sales and client development.  Each is an adult individual and citizen of Tennessee.  Each personally undertook performance of certain loan covenants, and, in that capacity, each is a signatory of the Loan Documents (as defined herein).

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), the citizenship of the parties being diverse and the matters in controversy exceeding the amount of $75,000, exclusive of interest and costs.

17.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a)(2), and pursuant to the provisions of the Loan Documents, wherein Defendants consented to suit in this forum.

## FACTS

A.  **Traditions and Its Promises**

18.    In or before the summer of 2006, Traditions engaged the investment bank Dresner Kleinwort and Wasserstein ("Dresner") to seek a deal whereby the Principals could monetize their ownership interests in Traditions, i.e., obtain an equity investment, financing or other

structured transaction that would enable the Principals to receive a $25 million payment based on their ownership interests in Traditions. Dresner, in turn, approached Bernard.

19.    As explained in a July 2006 "Confidential Information Memorandum" (which will be made available upon entry of a confidentiality order) and as reinforced in numerous oral conversations with Aiken, Traditions' business was to represent, pursuant to exclusive brokerage contracts, developers of high-end luxury residential communities such as the Ocean Club on Paradise Island in the Bahamas and Kukui'ula in Hawaii. Traditions would sell their full spectrum of inventory, from unimproved lots to completed condominiums priced as high as $20 million, to high net worth individuals, with Traditions being compensated by a variety of service fees and bonuses. These fees typically became fully earned whenever Traditions delivered a signed contract from a buyer to the developer and, depending upon the nature of the transaction, might be paid in full at that time, or paid in part with the balance paid when the transaction closed, i.e., the property or unit was actually delivered to the buyer.

20.    According to Defendants, Traditions' business was characterized by high profit margins and was largely recession-proof, as the high net worth individuals that buy properties of this kind are not price sensitive and are largely immune to market fluctuations. In addition, many of the buyers of such properties were foreign nationals, benefited by the weakness of the U.S. dollar against their own countries' currencies. Traditions also stressed that it had low debt, no significant capital expenditures, and that most of its business expenses were advanced or reimbursed by the developers.

21.    Aiken, who dealt with Bernard on behalf of Defendants, presented himself as an expert in this specialized field, claiming to have generated in excess of $700 million in sales for

Traditions' clients and in excess of $15 million in distributions to the Principals. Traditions, by Aiken, also represented that it worked closely with the developers, kept its finger on the pulse of each project, and thus was able to estimate with ease and reasonable certainty when each sold property would close and, therefore, when Traditions would receive the unpaid portion of its fee (the "Earned Fee Backlog"). Finally, Traditions represented that it could readily track the status of each property and its Earned Fee Backlog on a property by property basis.

22.    Most significantly, Defendants represented at the outset, and, thereafter continuously represented, that Traditions held ten exclusive service agreements with high-end luxury residential developers in respect of the following projects: Silverleaf, The Residences at the Ritz Carlton (Phase I), Tower Residences at the Ritz Carlton (Phase II), Escondido, Kukui'ula, Ocean Club Residence and Marina, Makena Bay Club, Hill Country Harbor, Spring Valley Ranch and The Capella Hughes Center (collectively, the "Contracts").

23.    According to Aiken, the Contracts were to generate over $4 billion in real estate sales, $134 million in net fee revenue and $117 million in EBITDA to Traditions between September 2006 and December 2015, with a substantial amount to be paid by the end of 2006.

24.    Initial discussions toward an equity investment began in August 2006. However, during the course of the ensuing 4½ months of negotiation, the transaction gradually evolved into a financing arrangement. The parties ultimately agreed (as later memorialized in the LPS Agreement) to a $25.5 million lending arrangement whereby, for the five-year term of the Loan, Traditions would make stipulated interest payments and, in addition, would pay Bernard 80% of the "net revenues" obtained by Traditions not otherwise allocated under the LPS Agreement and

a budget to be agreed upon by the parties, such 80% payments to be applied to the reduction of principal. See LPS Agreement, § 3(d)(iii).

25.    Defendants Aiken, Enderle and Yarborough were desirous of having this Loan close prior to December 31, 2006, as it was anticipated that all or substantially all of the proceeds would immediately be distributed to them, i.e., they would pocket some $25 million, and it is well understood in the investment banking world that if a deal in progress does not close by year-end, there is a greater capacity for slippage and delay in the following year.  A failure to close by December 31, 2006 could readily lead a lender to insist on actual full year performance figures, and a comparison thereof to projections before closing, and if the deviation was too high, could lead to the scuttling of any deal.

26.    A material inducement to Bernard respecting the Loan was Aiken's ongoing representation since the summer of 2006 that Traditions had already presented signed contracts to developers in respect of certain identified properties, (primarily unimproved lots but also for some residential units), and that closings on these properties were definitively scheduled for the 4th quarter of 2006.  These contracts, per Aiken, totaled some $307 million, and would result in Traditions obtaining $8.1 million in EBITDA, freeing up $7.2 million of cash for distributions. See, e.g., September 7, 2006 Emails annexed hereto as Exhibit "A."  When run through the 80% "waterfall" provisions of the anticipated loan agreement, this would yield Traditions $5.432 million to be applied to the reduction of Loan principal, as follows:

| Projects Under Contract | Dec-06 |
|---|---|
| **Net Sales Revenue** | |
| Capella Residences – Las Vegas | $0 |
| Escondido | $774,324 |
| Highgrange | ($6,279) |
| Hill County Harbor | $1,550,173 |
| Kukui'ula | $2,749,550 |
| Makena Bay Club | ($3,890) |
| Ocean Club Residences & Marina | $591,559 |
| Residences at the Ritz-Carlton – Dallas | $255,995 |
| Tower Residences at Ritz-Carlton – Dallas | $651,018 |
| Silverleaf | $2,351,619 |
| **Total Current Projects** | **$8,914,070** |
| Corporate Overhead | ($545,210) |
| Management Salaries | ($249,750) |
| **EBITDA** | **$8,119,109** |
| DBZ Interest | ($625,591) |
| **Cash Available for Debt Repayment** | **$7,243,769** |
| Principal Payments | ($5,432,827) |

27.    If this was correct, it would mean that the Loan principal would be reduced by almost 25% within the first few weeks of the Loan, making it a low risk, highly attractive vehicle for the lender. Given that: i) according to Traditions, these were fees already earned, ii) they were derived in large part from closings on unimproved lots, iii) Traditions professed special knowledge of the field, and iv) the fact that units would not be scheduled for a year-end closing unless they were substantially complete, Bernard reasonably relied upon Traditions' representations to move forward with the Loan.

28.     In addition to the Contracts, Aiken also claimed that Traditions was in advanced negotiations on contracts for at least an additional five projects which would provide Traditions with an estimated additional EBITDA of $10 million over two years. These funds, as received, would run through the waterfall in the anticipated loan agreement and thus provide a strong likelihood that the principal of the Loan would be paid down in full in two or three years, rather than five years. At no time prior to the closing of the Loan did Defendants retreat from these projections. See, e.g., October 10-11 Emails annexed hereto as Exhibit "B."

29.     As negotiations continued, it became apparent that the transaction would not be completed in September 2006, as originally desired, but would conclude, if at all, during the latter part of the 4th quarter of 2006. So as to preserve the value of the deal to Bernard, it was thus agreed that any fee payments Traditions received during the 4 1/2 month negotiation period would not be distributed to the Principals even if received pre-closing. Specifically, cash flow in excess of $1 million generated from anticipated property closings during the period from September 2006 until the actual Loan closing would be subject to the same calculation as agreed to for the Loan going forward, i.e., 80% of all net cash flow would be used to reduce the Loan amount at closing. See Exhibit "A." Thus, notwithstanding the duration of negotiations, in all discussions, Aiken represented that the estimated net cash flow for the 4th quarter was going to be $7.79 - $1.0 = $6.79 x 80% = $5.432 million. Id.

30.     The Principals also reported $3.6 million in distributions for the year through November 2006, which they claimed came from proceeds received from Earned Fee Backlog run off unrelated to the represented 4th quarter 2006 cash flow. Pursuant to the agreement of the parties, the Principals were not allowed to take further distributions from fee revenues received

thereafter, as any such fee revenues would be applied as per the waterfall in the anticipated Loan Documents.

## B.    The Loan Documents

31.    On December 18, 2006, Bernard entered into formal loan documentation with Defendants, specifically, a Promissory Note, and a Loan Agreement and Pledge and Security Agreement among Bernard, Traditions, AEY, and the Principals.    True and correct copies of the Promissory Note and the LPS Agreement are annexed hereto as Exhibits "C" and "D", respectively.    The Loan was secured by, among other items, Traditions' preferred membership interests, the cash flow from the Contracts, and any additional assets owned and/or acquired by Traditions.    AEY also provided a Secured Non-Recourse Guaranty, whereby, among other things, AEY agreed to guarantee the Loan irrevocably and unconditionally.    A true and correct copy of the Secured Non-Recourse Guaranty is annexed hereto as Exhibit "E."    (Exhibits "C"- "E" are collectively, the "Loan Documents").

32.    At closing, Bernard wired $25.5 million to Traditions and established and funded a $1 million interest reserve.    Pursuant to the LPS Agreement, Traditions then promptly distributed all but approximately $700,000 of the unreserved amount directly to the Principals, or some $8 million each.

33.    The LPS Agreement had a stated five-year term.    Pursuant thereto, Traditions was to make interest payments in stipulated amounts at specified times.    In addition, the LPS Agreement explicitly entitled Bernard to 80% of all otherwise unallocated "net Revenues" received by Traditions during the life of the Loan to reduce principal.    Thus, Section 3(d)(iii) of the LPS Agreement, the "Waterfall" provision, provides in pertinent part:

<u>Uses of Revenues</u>.   All net Revenues received by Issuer [Traditions], net of budgeted overhead and operating expenses, including the operating expenses of Issuer's subsidiaries and affiliates to the extent such operating expenses are provided for in an Approved Budget, shall be used, disbursed and applied in the following order of priority:

…

Third, 80% of the balance, if any, to Pledgee [Bernard] for application in reduction of the outstanding principal balance of the Loan and the remaining 20% thereof to Pledgor [AEY] for distribution to the Principals for the payment (on behalf of Pledgor, Issuer or the Principals, as applicable) of taxes incurred by Pledgor, Issuer or Principals by reason of such application in reduction of principal.

<u>See</u> LPS Agreement, § 3(d)(iii).

34.     In other words, all parties understood and agreed that Bernard would be entitled to sweep 80% of all cash flow net of overhead (including $1 million in total annual salaries to the Principals), until such time as the Loan was fully repaid.

35.     To protect Bernard, the Loan Documents also contained representations, warranties and covenants pertaining to the financial condition and conduct of Traditions, AEY, and the Principals, both as of the closing and on an ongoing basis, including:

        (a)     a representation and warranty at Section 4(k) of the LPS Agreement that all of the Existing Contracts (as defined in the LPS Agreement) were in full effect at closing;

        (b)     a covenant at Section 5(l) that neither Defendant AEY nor Defendant Traditions will make any distributions of revenue in any manner inconsistent with the LPS Agreement;

        (c)     a covenant at Section 5(m) that neither Traditions nor AEY will establish any reserves not otherwise contemplated in the then-current approved budget;

        (d)     a covenant at Section 5(q) of the LPS Agreement that the Principals will not allow Defendant Traditions and/or Defendant AEY to terminate, cancel, transfer, assign, or make any material change in any contracts;

- 12 -

        (e)     a covenant at Section 5(s) that the Principals shall not permit Traditions or AEY to knowingly misappropriate any Revenues, nor shall they intentionally cause or permit AEY to make any payment or distribution of Revenues (as defined in the LPS Agreement) in any manner inconsistent with the uses of Revenue set forth in the LPS Agreement; and

        (f)     a covenant at Section 5(t) of the LPS Agreement that AEY may not permit Traditions to incur any expense materially in excess of that which is reflected in the Approved Budget (as defined in the LPS Agreement).

36.    The LPS Agreement does not contain a merger or integration clause, so these representations and warranties were not exclusive.

37.    In light of its right to 80% of unallocated net revenues, as well as the forward looking covenants in the Loan Documents, Bernard understood that it would receive financial and other information sufficient to assess compliance therewith, and to assess on an ongoing basis the financial integrity of both the Loan and Traditions. In addition, Section 5(c) of the LPS Agreement expressly provides with respect to AEY, the sole shareholder and thus the controlling person of Traditions:

> At any time and from time to time, upon the reasonable written request of [Bernard], and at the sole expense of [AEY], [AEY] shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as [Bernard] may reasonably request for the purposes of obtaining, creating, perfecting, validating, or preserving the full benefits of this agreement and of the rights and powers herein granted . . . .

See LPS Agreement, § 5(c).

38.    At the time the Loan Documents were executed, Defendants for the first time reported that a substantial amount of the closings that were to generate Earned Fee Backlog cash flow in the 4th quarter 2006 would not occur until the first part of 2007. See LPS Agreement, Exhibit D. Defendants also reported that one Contract (Hill Country Harbor) was on hold

pending further discussions with the developers as to whether the project would involve the sale of built product or unimproved lots. See LPS Agreement, Exhibit E and Schedule V.

39.    Defendants recognized that if such closings did not occur in 2006 it would impact the 2007 budget, and thus promised to revise and update the 2007 budget it provided at closing immediately after January 1, 2007. See LPS Agreement, Exhibit D. This was important. The 2007 budget was substantially identical to the net revenue projections that Defendants had been providing Bernard since September 2006. If, however, a significant portion of the closings projected for the 4th quarter 2006 did not occur that year but were carried over into 2007, the budget for 2007 would have to be increased accordingly to take into account the fee revenue that would now be generated in 2007. If there was no such adjustment, it would have to be because these closings did occur in the 4th quarter 2006 as planned, but if that were the case, they would have generated up to $5.3 million in fees that were to have been paid to Bernard in 2006, and that did not happen.

40.    The promised 2007 budget revision was never provided, leaving the 2007 projections that Defendants had been presenting to Bernard since September of 2006 intact. This means that unless the fees were paid in 2006 and misappropriated by Defendants, Defendants must always have expected these closings to occur in 2007 and deliberately misled Bernard as to the timing to close the Loan – and get the Principals their $8 million distributions – in 2006. It was the first in a long line of inconsistent and irreconcilable financial reports furnished by Defendants that simply do not add up.

## C. **Defendants' Misconduct: "Where's the Money?"**

41.     By reason of the foregoing, after the Loan closed, Bernard justifiably believed that it would receive substantial principal payments under the LPS Agreement which would significantly reduce the Loan amount no later than the end of the 1st quarter 2007. In fact, however, by the end of the 1st quarter 2007, Bernard had received no principal payments whatsoever from Traditions.

42.     No market or other conditions existed that could explain why the properties, if sold and scheduled as Aiken had represented, would systemically not have closed and yielded substantial fees that, in turn, would be paid to Bernard under the LPS Agreement.

43.     Notwithstanding Traditions' failure to make principal payments in the 1st quarter of 2007, Aiken repeatedly represented that Traditions' business was actually running better than planned. Specifically, for the first six months of 2007, Traditions reported projected total net sales of $311 million versus actual of $350 million, or $39 million above plan, net fee revenue of $5.954 million versus plan of $5.75 million, or $198,000 above plan, and EBITDA for the period of $4,506,817, versus plan of $4,611,294, or only $104,000 behind plan. Despite these results in a period when the markets were undeniably healthy, during those first six months of 2007, Traditions made only $200,000 in principal payments to Bernard against an expected $2,993,151, and by the start of the 3rd quarter 2007, it became apparent that something was very wrong.

44.     Accordingly, Bernard asked for an explanation as to what had happened to the closings originally scheduled for the 4th quarter 2006, and what was happening in 2007. This was information solely and exclusively within Defendants' knowledge and control. However,

Defendants consistently refused to provide information sufficient to permit Bernard to assess what was going on. Moreover, the information that Defendants did provide was incomplete and inscrutable, raising, rather than alleviating, Bernard's concerns.

45.    The financial reporting that Defendants have supplied to Bernard sheds no light on the question of what fees were collected and when -- indeed, their reporting methodology seems deliberately calculated to conceal the answer. Traditions, for instance, does not reflect its Earned Fee Backlogs on its income statement. Instead, it provides to Bernard, on an irregular basis, a report showing the amount of gross earned but unpaid fees that it maintains are due. However, Traditions does not provide this information on a unit-by-unit basis, nor does it provide a reconciliation showing the changes from the prior period. As a consequence, if a report for March 31, 2007 showed earned but unpaid fees of $5 million and the report for June 30, 2007 showed $4 million, it would not mean that $1 million in deferred fees had been paid. It could mean that $3 million had been paid but that new sales had generated an additional $2 million in earned but unpaid fees. And the financial statements that Traditions provides do not have the notes typically included in such statements that would enable the reader to do a reconciliation. Thus, one cannot determine from these reports, when or whether, for example, the Ocean Club units scheduled for closing in 4th quarter 2006 in fact closed.

46.    Further, in responding to Bernard's inquiries regarding the missing principal payments in the first half of 2007, Defendants claimed that sales had been made but no cash collected due to the increase in the Earned Fee Backlogs. Yet later in 2007, when Traditions apparently did collect many of these deferred fees, the cash flow from such collections was never reported. In effect, Traditions switched back and forth from a cash basis to an accrual method of

accounting as was best suited for its purpose of avoiding explaining its failure to pay back the Loan principal as required under the LPS Agreement.

47.     By reason of the accounting employed by Defendants, there is no way Bernard can verify from available information what payments Traditions received and whether they are being properly applied under Section 3(d)(iii) of the LPS Agreement.

48.     Similarly, although Traditions projected it had 10 Contracts which would yield over $4 billion in real estate sales, and assured Bernard from the outset of discussions that it could track its inventory of unsold lots and units, Traditions now claims that it is unable to provide Bernard with per project inventory backlog data so as to allow Bernard to confirm projected project revenues in other words, Traditions says that it does not track the status of its ongoing and future real estate projects.   If this were true, it would be an admission that Defendants lied to Bernard from day one of the negotiations -- because it would be impossible to make any competent revenue projections without knowing with reasonable certainty what inventory was available for future sales -- but given Traditions' business, its statement is about as plausible as General Motors saying it cannot track its inventory of Cadillacs, Buicks and Chevrolets.

49.     Unsurprisingly, at least through 2006, Traditions' auditors were able to obtain this information from the company as set forth in the audited 2006 Financial Statement:

**Project Duration**

At any given time, the Company has a certain number of projects under contract. Each of these projects typically involves a finite number of units to be sold and therefore represents a finite amount of fees to be earned. As of December 31, 2006 and 2005 the following represents the approximate percentage of units *remaining*, by project.

|                          | 2006 | 2005 |
|--------------------------|------|------|
| Silverleaf               | 34%  | 46%  |
| Escondido                | 35%  | 48%  |
| Crescent – Phase I       | 6%   | 17%  |
| Crescent – Phase II      | 100% | N/A  |
| Ocean Club               | 6%   | 55%  |
| Kukui'ula                | 99%  | 100% |
| Maluaka (formerly Makena)| 100% | 100% |
| Spring Valley Ranch      | 10%  | N/A  |

See Traditions Management, LLC and Subsidiaries Financial Statements, p. 10, annexed hereto as Exhibit "F" (emphasis supplied).

50.     Moreover, Traditions' website contains specific information on the percentage of units sold on particular projects and total per project dollar amounts in sales. See Excerpts from Traditions website, annexed hereto as Exhibit "G." Similarly, the websites of many of the projects being marketed by Traditions set forth the number of units sold and delivered. See, e.g., Excerpts from the Residences at the Ritz Carlton, Dallas website annexed hereto as Exhibit "H." If Defendants' claim of ignorance is untrue, then they are intentionally misrepresenting to Bernard their accounting capabilities and attempting to obscure relevant revenues from Bernard in violation of Section 5(s) of the LPS Agreement, governing the treatment of revenue. If true, Defendants are creating a risk of serious deficiencies in internal recordkeeping and publishing false information for public consumption.

51.     But all of this begets the question of why, if Traditions had the capacity to track units sold at least as of 2006, it lost or abandoned that capacity in 2007 after the Loan closed and it became obligated to pay 80% of the net revenue it derived from the sale of such units to Bernard.

52.     Traditions' audited financial statements are no better.  For example, the Principals took $3.6 million in distributions prior to December 2006.  However, these distributions are nowhere reflected in the year end audited financial statements, leaving open the question of whether those distributions were funded by fees that came in after September 2006, which fees should have been reserved for reduction of the Loan principal pursuant to the parties' agreement, and why and how this $3.6 million could have dropped out of the financial statements in the first place.  See Exhibit "F."

53.     The bottom line is, fees were received by Traditions in either 2006 or 2007 that should have been paid in substantial part to Bernard to reduce the Loan principal, and that they have not been so paid.  But as to when they were paid to Traditions, and what has in fact been done with them, only Defendants know.  Just as only Defendants know why, if the $5.3 million in assured 4th quarter 2006 principal payments were all deferred to 2007, no upward adjustment of the 2007 projections or budget was ever made from September 2006 onward.  And Defendants are not telling.

54.     These are not the only anomalies in the reports and documents provided by Traditions.  And, these anomalies both corroborate the likelihood that Defendants are misappropriating fee revenue that should go to Bernard and confirm the need for Defendants to

provide meaningful financial and other information to Bernard. Thus, prior to the Loan closing, Traditions reported the following numbers for the Hill Country Harbor project for 2006:

> Net Real Estate Product Sales totaling $50k
> Gross Fee Revenue $3,696K
> Commissions $1,584K
> Net Fee Revenues $2,112K
> Disbursements $160,955
> Net Revenues $2,272,965
> Expenses $733,486
> EBITDA $1,539,478

These numbers were supposed to represent fees due on sales that had actually taken place.

55.    Thereafter, in Schedule V to the LPS Agreement, Defendants represented that going forward, the Hill Country Harbor developer might elect to sell the lots unimproved and that the project was on hold pending further discussion. Defendants also said that the situation should be clarified by January 2007. Six months later, Traditions suddenly announced that because, inter alia, the developer had decided not to move forward with the project as originally envisioned, the Hill County Harbor Contract was being terminated, leaving a host of unanswered questions.

56.    First, what happened to the previously earned fees? Even if the Contract was terminated, those previously earned fees would not have been affected. Second, was termination already contemplated at closing but the Contract kept on the list to bolster Traditions' projections? Third, under the LPS Agreement, Defendants could not terminate or modify the Contract without Bernard's approval, which approval was never obtained. See LPS Agreement, § 5(q). Finally, the developer did not, as Defendants implied, decide to sell the land unimproved. Instead, the developer is now working with a marketing firm other than Traditions to sell

developed real estate. In other words, somehow, the Hill Country Harbor contract not only failed to provide the actual earned fees Traditions represented were in place, but a third party is reaping the future fees that were supposed to secure and repay Bernard -- all without adequate explanation by Defendants.

57.    Traditions also represented at closing that it had a contract in effect for the Capella Residence at Hughes Center, which contract was projected to start generating seven-figure fee income in 2008. But this turned out to be another "phantom" contract that has now somehow disappeared.

58.    These discrepancies, significant as they are, still beg the central question. Traditions, and the developers which it represents, reported banner sales throughout 2007, sales which should have yielded Traditions net revenues that dwarf the $1.6 million it has paid to Bernard under the LPS Agreement. See Exhibit "G." Moreover, unlike the sub-prime or home residential markets, there has been no report of systemic failures in the high-end luxury market and public reports reflect nearly all units at the subject developments not only have sold but have closed and are occupied. Traditions should have thus monetized a large part of its Earned Fee Backlog in 2007. Yet, none of this money has reached Bernard despite the clear provisions of the LPS Agreement. And Defendants will not say why.

59.    After Defendants refused to provide any meaningful, coherent information to Bernard, Bernard retained counsel who made a request for such information in a more formal fashion. In particular, prior to bringing suit, Bernard, by counsel, made written demand for specific information from Traditions, including the following materials that should shed light on many of the foregoing issues:

- 21 -

- audited financial statements for 2007;

- monthly operating statements for 2007 and 2008;

- report of actual capital expenditures and costs incurred in each quarter of 2007, compared against budget;

- calculation for the following amortization payments:

    May 1, 2007:       $200,000;

    August 21, 2007:  $1,000,000;

    January 4, 2008:   $400,000;

- per property quarterly operating statements for 2007, and first quarter 2008;

- status report of the current inventory of units per project;

- detailed accounting of T/M/E expenses for 2007;

- a calculation of the impact on cash flow from changes in earned fee backlog by quarter; and

- documentation/explanation of the fourth quarter 2007 distribution to members of $1.5 million.

60.    Defendants did not provide such information.

61.    However, information available to Bernard nonetheless confirmed that Defendants were, and remain, in default of the Loan Documents. These defaults include, but are not limited to, the following:

(a)    Defendants have siphoned $1.5 million from 4th quarter 2007 working capital (the "Excess Distributions"). Despite an outright prohibition against creating any reserves on Traditions' books (as the money used to create such reserves would necessarily come from funds due to Bernard under the Waterfall provision of the LPS Agreement), in the 1st quarter 2007, Traditions reported $1.5 million as cash from Loan proceeds, which $1.5 million was distributed to the Principals in 4th quarter 2007. Either the Excess Distributions resulted from misapplying Revenues in violation of Section 3(d) of the LPS Agreement, which sets forth the procedures and priority for disbursing net Revenues, thereby also breaching covenants of Borrower, Pledgor and the Principals (see LPS Agreement §§ 5(s), 10(a)(iii), 10 (a)(iv)), or Defendants have created a prohibited reserve on their books, violating the covenant in Section 5(m), which forbids the establishment of any reserves not contemplated in the Approved Budget. Section 5(s) prohibits Aiken and the other Principals from knowingly misappropriating any Revenues

or intentionally causing or permitting Traditions to make distribution of Revenues inconsistent with the terms of Section 3(d).  Sections 10(a)(iii) and (iv) make it an event of default to act inconsistently with Section 3(d) or violate the covenant of 5(s); and

(b)    In 2007 alone, Defendants enjoyed -- at the expense of the bottom line and Bernard's security -- the benefit of travel, entertainment and meal expenses totaling more than $1.5 million -- nearly double the amount permitted in the Approved Budget, in violation of Defendants' covenant pursuant to LPS Agreement § 5(t).  Section 5(t) provides that AEY may not permit Traditions to incur any expense materially in excess of that which is reflected in the Approved Budget; and

62.    Further, without the additional information that it requested, Bernard cannot determine the extent to which revenues are being generated, and whether those revenues are being applied in accordance with the Loan Documents or being diverted for unlawful purposes -- a concern heightened by the discovery of the aforementioned $1.5 million diversion and the misrepresentations concerning the 4th quarter 2006/1st quarter 2007 closings.

63.    Accordingly, Bernard served notices of default on or about April 14, 2008 (the "Notices of Default").  True and correct copies of the Notices of Default are attached hereto as Exhibit "I."

64.    Defendant Aiken's history of involvement over the last six years in at least three claims by other lenders of financial defaults and related misconduct brought almost immediately after closing gives rise to further cause for grave concern to Bernard.  For example, in Frontier Bank v. Michael Aiken, No. 01-1139 (Tenn. Ch. December 14, 2001), a case filed just months after the plaintiff extended a loan to Aiken, the court awarded plaintiff a judgment in the amount of $521, 249 based on allegations that Aiken misrepresented and intentionally concealed facts regarding his financial condition in order to induce the plaintiff into issuing him a loan.  Further, the court in Charter Bank & Trust v. Michael M. Aiken, No. BP691P5635 (Ga. April 3, 2002) awarded plaintiff a judgment in the amount of $1,551, 936 based on claims that Aiken defaulted

- 23 -

on another loan mere months after issuance. If not enough, the plaintiff in <u>SunTrust Bank v.</u> <u>Michael Aiken, et al.</u>, No. 01-1069 (Tenn. Ch. January 2, 2002), alleged that Aiken defaulted under the terms of yet another loan. Aiken settled the case.

65.    For the foregoing reasons, and as a consequence of its failure to pay Bernard the principal payments due under the LPS Agreement in an amount not yet capable of quantification, Defendants have materially breached the LPS Agreement and Bernard is entitled not just to an accounting and a turnover of the principal payments due, but to rescind the LPS Agreement and recover the full remaining Loan balance plus related damages.

66.    Any applicable cure period under the Loan Documents has elapsed without cure by Defendants.

67.    Bernard has performed all of its material obligations under the Loan Documents.

### IN AND FOR A FIRST CLAIM UPON
### WHICH RELIEF CAN BE GRANTED

### Fraud

### (Asserted Against Defendants Traditions, AEY and Aiken)

68.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

69.    In order to induce Bernard to make the Loan, Aiken represented, <u>inter alia</u>, that Traditions had peculiar knowledge of the market; could state with relative certainty when closings would occur and fees would be generated; and that Traditions had contracts for sale on specified properties that would close no later than the 4th quarter of 2006 and yield Bernard some $5.3 million in principal payments.

- 24 -

70.    However, because Bernard did not receive any principal payments in 4th quarter 2006, it now appears that these closings did not occur, if at all, until 2007. Because Traditions never changed its 2007 budget to include the revenues to be generated by these closings, even after it indicated that many of them might occur in early 2007, it appears that Traditions always anticipated these closings would not occur until 2007, and knowingly misrepresented that they would occur in 2006 to ensure the Loan would close that year and the Principals would immediately receive their $8 million distributions. Further, it now appears that these defendants knew that there was never enough inventory to support the overall future fee projections proffered by Aiken.

71.    Even if this were not the case, these defendants were at a minimum reckless in their projections as to the 4th quarter closings that were a material inducement of the Loan. Since these closing were primarily of lot sales, there could be no developer delay or other reason that would delay the closings if they were, in fact, definitively scheduled. Further, as it now turns out, when Aiken made these representations, many of the units in question were nowhere near completion and, as any person knowledgeable in the industry would have realized, they could not possibly close by year end.

72.    Therefore, when Aiken made these representations, he had no good faith basis to believe that the closings would occur as represented, but rather he made such representations so that the Loan would close in 2006 and he and his colleagues would then receive some $8 million each in distributions.

73.    Bernard justifiably relied on Aiken's representations. If Bernard had know the truth, i.e., that Aiken was either misrepresenting when the closings would occur or, in the

alternative, that he and Traditions had no real grasp on market conditions and timing, it would never had entered into the Loan.

74.    Bernard was not aware of the falsity of the representations, since such falsity was non-obvious and not readily discoverable through reasonable investigation.

75.    Further, as set forth in, for example, Paragraphs 41 - 64 above, both prior to and during the course of the Loan, Defendants contrived a scheme to defraud by supplying Bernard with partial, selective information, deliberately prepared so as to conceal material facts from Bernard and to omit other information necessary to make the statements therein not misleading.

76.    Bernard has been materially damaged as a direct and proximate result of Defendants' fraud, and is entitled to a rescission of the Loan Documents and all damages, including punitive damages, flowing from the fraud in accordance with the Loan Documents and New York law.

77.    Further, Section 11(f) of the LPS Agreement states that, "Anything herein to the contrary notwithstanding, Principals' liability for the breach, violation or failure of a representation, warranty or covenant under Section 4(k), 5(q), 5(s) or 5(v) hereof shall be limited to $25,500,000 in the aggregate." See LPS Agreement, §11(f).

78.    Accordingly, pursuant to LPS Agreement Section 11(f), Defendant Aiken, as a Principal, is also individually liable in the amount of $25.5 million for, among other things, his misrepresentations regarding the Contracts as prohibited by section 4(k).

## IN AND FOR A SECOND CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Conversion

### (Asserted Against All Defendants)

79.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

80.    Defendants' caused and/or permitted the misappropriation of $1.5 million in excess distributions for the personal benefit of the Principals and not for the purpose set forth in the Loan Documents or as agreed by the parties.  This constitutes conversion of those funds.

81.    This conversion has been the direct and proximate cause of material damage to Bernard, and Bernard is accordingly entitled to all damages flowing from the conversion and all other such damages this Court deems just and proper.

82.    Further, as set forth herein, Defendants have converted fee proceeds, comprising Bernard's collateral, which proceeds should have funded principal payments to Bernard under the LPS Agreement, in an amount not yet capable of precise ascertainment.

83.    As also set forth herein, the Principals are individually liable for damages arising from the misappropriation of Traditions' Revenues or for causing or permitting Traditions to make any distribution of Revenues inconsistent with approved Revenue uses and priorities and the Approved Budget in violation of Section 5(s) of the LPS Agreement.

## IN AND FOR A THIRD CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Breach of Contract

### (Asserted Against All Defendants)

84.     Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

85.     By reason of the conduct set forth above, including but not limited to Paragraphs 41 - 66, Defendants have breached, or have anticipatorily breached, the Loan Documents.

86.     Bernard is entitled to obtain from Defendants all damages flowing from that breach in accordance with the Loan Documents and New York law.

87.     Each of the Principals is also individually liable for the breaches described herein in an amount up to $25.5 million pursuant to Section 11(f) of the LPS Agreement.

## IN AND FOR A FOURTH CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Specific Performance

### (Asserted Against Defendants Traditions Management, LLC and AEY, LLC)

88.     Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

89.     Section 18 of the LPS Agreement provides, in pertinent part, that Bernard "shall be entitled to bring . . . an action for specific performance or any other appropriate action or proceeding to enable [Bernard] to enforce and realize upon its security interest hereunder." See LPS Agreement, §18.

- 28 -

90.   By reason of the facts set forth above, Bernard is entitled to specific performance of Section 5(c) of the LPS Agreement, pursuant to which Bernard is entitled to the following Requested Information from AEY:

- audited financial statements for 2007;
- monthly operating statements for 2007 and 2008;
- report of actual capital expenditures and costs incurred in each quarter of 2007, compared against budget;
- calculation for the following principal payments:

    May 1, 2007:            $200,000;

    August 21, 2007:        $1,000,000;

    January 4, 2008:        $400,000;

- per property quarterly operating statements for 2007, and first quarter 2008;
- status report of the current inventory of units per project;
- detailed accounting of T/M/E expenses for 2007;
- a calculation of the impact on cash flow from changes in earned fee backlog by quarter; and
- documentation/explanation of the fourth quarter 2007 distribution to members of $1.5 million.

91.   To avoid continued and irreparable harm to Bernard, the other Defendants, which control AEY, should be enjoined and restrained from any conduct that would prohibit or impede AEY's providing this information to Bernard forthwith.

92.   Bernard has no adequate remedy at law.

## IN AND FOR A FIFTH CLAIM UPON
## <u>WHICH RELIEF CAN BE GRANTED</u>

### <u>Breach of the Duty of Good Faith and Fair Dealing</u>

### <u>(Asserted Against All Defendants)</u>

93.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

94.    Defendants each owe Bernard the duty of good faith and fair dealing that inheres in every contract, and specifically through the Loan Documents.

95.    Defendants' refusal to supply Bernard with a meaningful explanation as to why it has received virtually no principal payments as required under the LPS Agreements, and their refusal to supply the Requested Information, is not commercially reasonable and violates the covenant of good faith and fair dealing, and threatens to deprive Bernard of its reasonable expectations under the Loan Documents.

96.    Bernard has been materially damaged by Defendants' violations of the covenant of good faith and fair dealing which, among other things, have prevented Bernard from having the necessary information to assess the health of its collateral, and to monitor Defendants' compliance with the representations, warranties and covenants set forth in the Loan Documents.

97.    Defendants should be required to provide this information to Bernard forthwith and should be held liable for any damages flowing from their failure heretofore to provide this information in a timely and proper fashion.

## IN AND FOR A SIXTH CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

### Indemnification

### (Asserted Against Defendant AEY, LLC)

98.    Bernard hereby incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

99.    Bernard is entitled to indemnification from AEY for fees and costs associated with any action brought for failure on the part of AEY to comply with, or perform under, the LPS Agreement.  See LPS Agreement, §19(a)(iv).

100.    Section 19(a)(iv) provides that AEY has a duty to indemnify Bernard up to the value of Bernard's interest in the Collateral [i.e. the Contacts, etc.] for losses arising from "any failure on the part of [AEY] to perform or be in compliance with any of the terms of this Agreement."  See LPS Agreement, §19(a)(iv).

101.    Bernard is entitled to indemnification from AEY for fees and costs arising from actions regarding the ownership of the LPS Agreement or any interest in the Collateral.  See LPSAgreement, §19(a)(i).

102.    Bernard is further entitled to indemnification from AEY for fees and costs relating to the enforcement of the provisions of the LPS Agreement, the Promissory Note, and/or any of the Loan Documents.  See LPS Agreement, §19(a)(iii).

103.    To date, Bernard has incurred indemnifiable expenses in excess of $75,000, exclusive of interest and costs, and such damages are continuing.

**WHEREFORE**, Plaintiff Bernard National Loan Investors, Ltd. demands judgment against Defendants Traditions Management, LLC, AEY, LLC, Michael Aiken, Mark Enderle, and Mark Yarborough as follows:

(a)    Damages from all Defendants in accordance with the Loan Documents and New York law as pled herein;

(b)    Damages and indemnification from AEY, LLC in accordance with the Loan Documents in an amount to be determined at trial but, in any event, in excess of $75,000;

(c)    Specific performance of the Loan Documents by Traditions Management, LLC and AEY, LLC;

(d)    Punitive damages in an amount to be determined at trial;

(e)    Attorneys' fees, interest and costs from all Defendants; and

(f)    Such other relief as the Court may deem just and proper.

Dated:  August 8, 2008

REED SMITH LLP

By _____
Lance Gotthoffer, Esq.
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

Attorneys for Plaintiff
Bernard National Loan Investors, Ltd.

- 32 -

EXHIBIT A

**From:**   Mike Aiken [maiken@traditionsmgt.com]
**Sent:**   Saturday, October 07, 2006 4:47 PM
**To:**     'Lisa T. Reynolds'
**Subject:** FW: Distributions

FYI---Let's discuss

**Michael M. Aiken**
*Traditions Management, LLC*
*One Union Square, Suite 816*
*Chattanooga, TN 37402*
*423-267-5003*
*423-488-3521 (mobile)*
*423-265-5680 (fax)*

**From:** Benkirane, Driss [mailto:driss.benkirane@dbzco.com]
**Sent:** Thursday, September 07, 2006 10:30 AM
**To:** Rimalovski, Noel
**Cc:** maiken@traditionsmgt.com
**Subject:** RE: Distributions

to clarify, if the distributions between today and the closing date exceed $1 million, an adjustment to the purchase price will be necessary

**From:** Benkirane, Driss
**Sent:** Thursday, September 07, 2006 10:24 AM
**To:** 'Rimalovski, Noel'
**Cc:** maiken@traditionsmgt.com
**Subject:** RE: Distributions

ok - we're good to go then but we all have to understand that if the distributions exceed $1 mill b/w now and the time we close, an adjustment will be necessary

**From:** Rimalovski, Noel [mailto:Noel.Rimalovski@dresdnerkleinwort.com]
**Sent:** Thursday, September 07, 2006 10:22 AM
**To:** Benkirane, Driss
**Cc:** maiken@traditionsmgt.com
**Subject:** RE: Distributions

It's projected to be $7.79m, which is $100k lower than what you have in your projections.

**From:** Benkirane, Driss [mailto:driss.benkirane@dbzco.com]
**Sent:** Thursday, September 07, 2006 9:54 AM
**To:** Rimalovski, Noel
**Cc:** maiken@traditionsmgt.com
**Subject:** Re: Distributions

So what is the curent projection for oct 15-dec 31 distributions?


-----Original Message-----
From: Rimalovski, Noel <Noel.Rimalovski@dresdnerkleinwort.com>
To: Benkirane, Driss
CC: maiken@traditionsmgt.com <maiken@traditionsmgt.com>
Sent: Thu Sep 07 09:41:58 2006
Subject: Distributions

Driss:

Following-up on our conversation yesterday, below is the data regarding cash distributions:

1. Total distributions as of August 31st - $2,955,000

2. Estimated September distributions - $300,000

3. Projected total distributions as of September 30th - $3,255,000

Projected cash distributions as of September 30th are approximately $600,000 higher than the model provided to you and is primarily the result of 2005 receivables that were collected in January, 2006 (the model had reflected this distribution having occurred in 2005). More importantly, however, we have confirmed that the 4th quarter budget has not materially changed.

Please let me know if this addresses the issue you raised concerning the $25.5 million investment. If so, I will re-circulate the term sheet for signatures this morning. Look forward to hearing from you.

Noel

Noel Rimalovski, Director
Dresdner Kleinwort
1301 Avenue of the Americas
New York, NY 10019
T: +1 (212) 903-2181
M:+1 (917) 701-4165
F: +1 (212) 208-6079
E: noel.rimalovski@dresdnerkleinwort.com


If you have received this e-mail in error or wish to read our e-mail disclaimer statement and monitoring policy, please refer to http://www.dresdnerkleinwort.com/disc/email/ or contact the sender.

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. D.B. Zwirn & Co., L.P. reserves the right to archive and monitor all e-mail communications through its networks. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.


If you have received this e-mail in error or wish to read our e-mail disclaimer statement and monitoring policy, please refer to http://www.dresdnerkleinwort.com/disc/email/ or contact the sender.

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. D.B. Zwirn & Co., L.P.

reserves the right to archive and monitor all e-mail communications through its networks. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.

EXHIBIT B

**From:** Lisa T. Reynolds [lreynolds@traditionsmgt.com]
**Sent:** Wednesday, October 11, 2006 8:50 PM
**To:** Benkirane, Driss; You, Dale
**Cc:** maiken@traditionsmgt.com; 'Rimalovski, Noel'; 'Pavlov, Evgeni'; 'Crumrine, Matthew'
**Subject:** RE: UPDATES - as of September 30, 2006

Driss:

I apologize for not getting back to you sooner.  First, LOI deposits are typically refundable; deposits made @ time of binding contract are typically non-refundable.  Second, the amounts paid at LOI or at binding contract can vary from project to project.  Estimated current LOI and contract deposits are shown below.

With regard to your EBITDA question, this email, as well as the one I sent yesterday, have been in response to specific questions you've asked.  We are not suggesting that the 4Q06 budget be revised and continue to be confident in the numbers previously provided.  Don't hesitate to contact me if you have questions.

Thanks,
Lisa

**Lisa T. Reynolds**
*Traditions Management, LLC*
*One Union Square, Suite 816*
*Chattanooga, TN 37402*
*423-267-5003*
*423-488-9293 (Mobile)*
*423-265-5680 (Fax)*

**From:** Lisa T. Reynolds [mailto:lreynolds@traditionsmgt.com]
**Sent:** Tuesday, October 10, 2006 3:55 PM
**To:** 'dale.you@dbzco.com'
**Cc:** 'maiken@traditionsmgt.com'; 'Rimalovski, Noel'; 'Pavlov, Evgeni'; 'Crumrine, Matthew'; 'driss.benkirane@dbzco.com'
**Subject:** RE: UPDATES - as of September 30, 2006

Dale:

Per our conversation yesterday, below is additional information regarding projected sales for the remainder of this year.  Please note that these numbers are based on information I currently have available and that all are "approximates".

- Kukui'ula:  (85) LOI's - representing $121 million in sales $8.5 million refundable.
- Escondido:  (4) closings pending representing $1.4 million in net sales $80k non-refundable; (14) LOIs representing $21 million in net sales $700k refundable.
- Crescent (Phase I):  (1) contract pending for $3.3 million unit $495k non-refundable; only (5) additional units remain.
- Crescent (Phase II):  (21) LOI's w/$50k deposits - representing $29 million in sales $1.05 million refundable.
- Ocean Club:  (2) contracts pending representing $9 million in sales Deposits on "new" sales require a 30% non-refundable at time of binding contract - and an additional 40% (non-refundable) is paid within 30 to 45 days; only (5) additional units remain.

Thanks,
Lisa

**Lisa T. Reynolds**
*Traditions Management, LLC*
*One Union Square, Suite 816*
*Chattanooga, TN  37402*
*423-267-5003*
*423-488-9293 (Mobile)*
*423-265-5680 (Fax)*

---

**From:** Lisa T. Reynolds [mailto:lreynolds@traditionsmgt.com]
**Sent:** Sunday, October 08, 2006 12:26 PM
**To:** 'dale.you@dbzco.com'
**Cc:** 'maiken@traditionsmgt.com'; 'Rimalovski, Noel'; 'Pavlov, Evgeni'; 'Crumrine, Matthew';
'driss.benkirane@dbzco.com'
**Subject:** UPDATES - as of September 30, 2006



**T R A D I T I O N S**
M A N A G E M E N T
*Designers of Lifestyle. Purveyors of Land.*

**Dale:**

Per your conversation with Mike on Friday, we are continuing to gather the additional data you have requested, but wanted to get the attached to you for your meeting tomorrow.  Regarding the additional data, and as we previously discussed, this information is not used by either the Developer (s) or Traditions to run the business – and is more difficult to gather in a format that will be helpful to you.

As a further update, 2006 distributions through September 30th total $3,300,000 – which is consistent with the attached email(s) regarding same.  Don't hesitate to contact me if you have any questions.

**Thanks,**
**Lisa**

**Toll Free- 888-867-7731**
**Phone   - 423-267-5003 ext. 22**
**Fax      - 888-365-6580**



**Mobile**   - 888-448-9293
lreynolds@traditionsmgt.com

Krystal Building · One Union Square, Suite 316
Chattanooga, TN 37402

EXHIBIT C

# PROMISSORY NOTE

December _18_, 2006

**New York, New York**
**$26,500,000.00**

This **PROMISSORY NOTE** (this "Note") is dated this _18th_ day of December, 2006, made by **TRADITIONS MANAGEMENT, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Maker**"), to and for the benefit of **BERNARD NATIONAL LOAN INVESTORS, LTD.**, a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th Floor, New York, New York 10151, together with its successors and assigns in such capacity ("**Lender**").

FOR VALUE RECEIVED, subject to the provisions set forth in Section P herein, Maker promises to pay to the order of Lender, at 745 Fifth Avenue, 18th Floor, New York, New York 10151, or such other place as Lender may designate in writing, in the manner provided hereinafter, the principal sum of Twenty-Six Million Five Hundred Thousand and 00/100 Dollars ($26,500,000.00) (the "**Loan**"), on or before the Maturity Date (as such term is defined in that certain Pledge and Security Agreement between Maker and Lender dated as of the date hereof (the "**Pledge Agreement**") or the date to which the indebtedness evidenced hereby is accelerated pursuant to the terms of this Note and the terms of the other Loan Documents (as hereinafter defined), with interest, in the manner and upon the terms and conditions set forth below. All capitalized terms not expressly defined herein shall have the same meanings as set forth in the Pledge Agreement (as defined below).

A.    **Interest Rate.**  Interest shall accrue from the date of disbursement of the Loan on the principal balance thereof remaining from time to time outstanding at the rate ("**Interest Rate**") established below. Unless the Loan is then bearing interest at the Default Rate (as defined below), the Interest Rate shall be equal to nine and 625/1000 (9.625%) percent *per annum*. Interest shall be payable on the basis of a year consisting of three hundred sixty (360) days and charged for the number of days actually elapsed in each calendar month.

B.    **Principal and Interest Payments.**  Subject to the provisions of the Pledge Agreement, commencing on January 1, 2007, and continuing on the first day of each July and January thereafter until the Loan has been repaid in full, interest on the Loan shall be payable semi-annually in arrears on the first day of each January and July ("**Payment Date**") in the amount of all interest accrued and unpaid. The final payment of the entire unpaid principal balance of the Loan and all accrued and unpaid interest, charges, fees, and expenses then due and payable under the Loan Documents, if not sooner paid, shall be due and payable on the Maturity Date.

C.    **Interest Reserve.**  Anything herein to the contrary notwithstanding, Maker shall be credited with the then-outstanding balance of the Interest Reserve (as such term is defined in the Pledge Agreement) including, without limitation, accrued and undisbursed interest thereon, at and in connection with the repayment of the Loan, whether such repayment is a prepayment, a payment at maturity, a repayment upon an acceleration of the Loan by reason of the occurrence of an Event of Default, or otherwise.

D.    **Prepayment.** This Note may be prepaid, in whole or in part, at any time during the term of the Loan, provided Maker provides Lender not less than fifteen (15) days' prior written notice. Any prepayment of all or part of the Loan shall be applied first to all interest accrued on the Loan through the date of prepayment (in addition to any other amounts as are then due and payable under the Loan Documents) and then to the principal of the Loan.

E.    **Application of Payments.** Lender shall apply payments in accordance with the express terms of the Pledge Agreement. Anything herein or therein to the contrary notwithstanding, from and after the occurrence of an "Event of Default" (as such term is defined in the Pledge Agreement), Lender shall have the right unilaterally (and without the consent of Maker) to allocate any and all payments that may be received by or tendered to Lender made by Maker or any other person at any time or from time to time and that relate in any way to the Loan or any other of the obligations then due and payable in any order of priority as Lender in its sole and exclusive discretion shall elect, as follows: (i) to the payment of any costs and expenses of Lender that Maker is responsible for under the Loan Documents; (ii) to accrued but unpaid interest; and (iii) to principal. Maker (1) irrevocably waives the right to direct the application of payments and collections received by Lender from or on behalf of Maker and/or any other person, and (2) agrees that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections against the Loan or any other obligations then due and payable in such manner as Lender may deem appropriate, notwithstanding any entry by Lender upon any of its books and records.

F.    **Late Charges.** No late charges shall be charged in respect of payments due under this Note or any other Loan Document.

G.    **Security for Payment.** The payment of this Note is secured, *inter alia*, by the Pledge Agreement and any other document which evidences, secures or guarantees, all or any portion of the Loan are collectively referred to herein as the "**Loan Documents**". All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Documents are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and Maker covenants and agrees to keep and perform them or cause them to be kept and performed, strictly in accordance with their terms.

H.    **Defaults and Acceleration.**

(i)    IT IS HEREBY EXPRESSLY AGREED BY MAKER THAT TIME IS OF THE ESSENCE HEREOF. At any time during the existence of any uncured or continuing Event of Default, at the option of Lender, the entire unpaid principal balance of the Loan with interest accrued thereon and all other sums due by Maker hereunder or under the provisions of the other Loan Documents shall, upon demand become due and payable immediately.

(ii)    After maturity, whether by acceleration, declaration or while any uncured or continuing Event of Default exists, Maker promises to pay interest on the amount of principal due and outstanding hereunder at the rate of five (5.0%) per annum over the Interest Rate that would otherwise be then in effect ("**Default Rate**") and shall be payable upon demand, and all unpaid interest that has accrued under this Note, whether prior or subsequent to the occurrence of the Event of Default, shall be paid at the time of, and as a condition precedent to, the curing of the Event of Default. The Default Rate, when operative, shall be adjusted based on changes in

2

the Interest Rate.

      I.     **Nature of Remedies.**  The remedies of Lender as provided in this Note, the Pledge Agreement and any of the other Loan Documents shall be cumulative and concurrent, and may be pursued singly, successively, or together against only the Collateral and the Receivables.

      J.     **Waivers, Consents, Etc.**  Maker and any endorsers, sureties or guarantors hereof and any and all others who are now or may become liable for all or part of the obligations of Maker under this Note (all of the foregoing being collectively referred to herein as "**Obligors**"), agree to be jointly and severally bound hereby and jointly and severally, waive presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest, and protest of this Note and except as expressly provided to the contrary herein, in the other Loan Documents or by any Law, all other notices in connection with the delivery, acceptance, performance, default, or enforcement of this Note.

      K.     **Non-Waiver.**  Lender shall not by any act of omission or commission be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender and then only to the extent specifically set forth therein.  A waiver on one event shall not be construed as continuing or as a bar to or waiver of such right or remedy in connection with a subsequent event.

      L.     **Business Loan.**  Maker warrants and represents to Lender that Maker shall use the proceeds represented by this Note solely for the uses identified in the Pledge Agreement. Maker further warrants and represents to Lender and covenants with Lender that Maker is not in the business of extending credit for the purpose of purchasing or carrying margin securities (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds represented by this Note will be used to purchase or carry any margin securities or to extend credit to others for the purpose of purchasing or carrying any margin securities.

      M.     **Interest Laws.**  It being the intention of Lender and Maker to comply with the laws of the State of New York, it is agreed that notwithstanding any provision to the contrary in this Note, the Pledge Agreement or any of the other Loan Documents, no such provision shall require the payment or permit the collection of any interest ("Excess Interest") in excess of the maximum amount of interest permitted by law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the indebtedness evidenced by this Note.  If any Excess Interest is provided for, or is adjudicated to be provided for, in this Note, the Pledge Agreement or any of the other Loan Documents, then in such event:  (a) the provisions of this paragraph shall govern and control; (b) Maker shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Lender may have received hereunder shall be, at Lender's option, (i) applied as a credit against the outstanding principal balance of the Loan or for accrued and unpaid interest thereon (not to exceed the maximum amount permitted by law), (ii) refunded to the payor thereof, or (iii) any combination of the foregoing; (d) the applicable Interest Rate or rates hereunder shall be automatically subject to reduction to the maximum lawful contract rate allowed under the applicable usury laws of the aforesaid State, and this Note, the Pledge Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in such applicable interest rate or rates; and (e) to the extent permitted by Law, Maker shall not have any action against Lender for any damages

<div align="center">3</div>

whatsoever arising out of the payment or collection of any Excess Interest.

N. **Subsequent Holders.** Upon any endorsement, assignment or other transfer of this Note by Lender or by operation of law, the term "Lender" as used herein, shall mean the endorsee, assignee or other transferee or successor to Lender then becoming the holder of this Note; provided, however, that Lender may not endorse, assign or transfer this Note or any interest in the Loan in any manner not permitted under the Pledge Agreement. Lender shall obtain a confidentiality agreement in connection with any such permitted endorsement, assignment or other transfer of this Note in form reasonably satisfactory to Borrower.

O. **Subsequent Obligors.** This Note and all provisions hereof shall be binding on all persons claiming under or through Maker. The terms "Maker" and "Obligors", as used herein, shall include the respective successors, assigns, legal representatives, executors, administrators, devisees, legatees and heirs of Maker.

P. **Limitations on Recourse.** Anything herein or in any of the Loan Documents to the contrary notwithstanding, Lender shall not enforce the liability and obligation of Maker or Pledgor to perform and observe the obligations contained in this Note, the Pledge Agreement or the other Loan Documents by an action or proceeding wherein a money judgment shall be sought against Maker, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon Pledgor's interests in the Collateral and Maker's interest in the Receivables pursuant to the Pledge Agreement, and any judgment in any such action or proceeding shall be enforceable only against Pledgor's interest in the Collateral and Maker's interest in the Receivables pursuant to the Pledge Agreement.

Q. **Note Register; Ownership of Note.** The ownership of an interest in this Note shall be registered on a record of ownership maintained by Maker or its agent in accordance with notices received by Maker of any transfers of the Lender's interest in this Note; provided, however, that Lender may not transfer any of its interest in this Note or the Loan in any manner not permitted under the Pledge Agreement. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the permitted transfer is registered on such record of ownership and the transferee is identified as the owner of an interest in the obligation. Maker shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, this Note on the part of any other person or entity.

R. **Interpretation.** Whenever possible, each provision of this Note and the other Loan Documents shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or any of the other Loan Documents shall be prohibited or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of said documents. As used in this Note, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable, where the context so requires. The headings of sections and paragraphs in this Note are for convenience only and shall not be construed to limit or define the content, scope or intent of the provisions hereof.

84173807_5_331596_00024

S.    **Governing Law.**  PURSUANT TO SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BORROWER AGREES THAT THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF NEW YORK.

T.    **Jury Waiver.**  TO THE MAXIMUM EXTENT PERMITTED BY LAW, MAKER AND LENDER EACH HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS NOTE, OR IN ANY WAY CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE DEALINGS OF MAKER AND LENDER WITH RESPECT TO THIS NOTE, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, MAKER AND LENDER EACH HEREBY AGREES THAT ANY SUCH ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT MAKER OR LENDER MAY FILE A COPY OF THIS EXECUTED NOTE WITH ANY COURT OR OTHER TRIBUNAL AS WRITTEN EVIDENCE OF THE CONSENT OF MAKER AND LENDER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

U.    **Notices.**  Any notice that Lender or Maker may desire or be required to give to the other hereunder shall be deemed given when presented in accordance with Section 21(e) of the Pledge Agreement.

V.    **Conflicts.**  In the event of any conflict between the provisions of this Note and the provisions of the Pledge Agreement, the provisions of this Note shall control.

5

IN WITNESS WHEREOF, this Note has been executed and delivered on the date first set forth above.

MAKER:

TRADITIONS MANAGEMENT, LLC

By: _____
Name: Michael M. Aiken
Title: Chairman

84173807_5_331596_00024

EXHIBIT D

## LOAN AGREEMENT AND
## PLEDGE AND SECURITY AGREEMENT

This **LOAN AGREEMENT AND PLEDGE AND SECURITY AGREEMENT** dated as of the _1st_ day of December, 2006 by and among **TRADITIONS MANAGEMENT, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Issuer**"), **AEY, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Pledgor**"), **MICHAEL M. AIKEN, MARK R. ENDERLE** and **MARK D. YARBOROUGH**, each having an address at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 (collectively, "**Principals**"; provided, however, that Principals are joining in the execution of this Agreement solely as to Sections 4(k), 5(q), 5(s) and 5(v) hereof) and **BERNARD NATIONAL LOAN INVESTORS, LTD.**, a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th Floor, New York, New York 10151 (together with its successors and assigns, "**Pledgee**").

## WITNESSETH:

**WHEREAS**, this Agreement is being entered into and the security interest hereunder is being granted, to memorialize the agreements among Issuer, Pledgor and Pledgee, and to secure Pledgor's obligations under that certain Limited Secured Guaranty dated the date hereof from Pledgor to Pledgee (the "**Guaranty**") wherein Pledgor guaranties the obligations of Issuer in connection with a loan being made by Pledgee to Issuer in the principal sum of TWENTY-SIX MILLION FIVE HUNDRED THOUSAND AND NO/100 ($26,500,000) DOLLARS (the "**Loan**"), evidenced by that certain Promissory Note dated the date hereof made by Issuer to and for the benefit of Pledgee (together with all extensions, renewals, replacements, restatements or modifications thereof, the "**Note**"; this Agreement, the Guaranty, the Note and the other documents evidencing or securing the Loan, collectively, the "**Loan Documents**");

**WHEREAS**, Pledgor owns the limited liability company membership interests described on **Schedule I** attached hereto; and

**WHEREAS**, it is a condition precedent to the obligation of Pledgee to make the Loan to Issuer, that Pledgor enter into the Guaranty and secure its obligations thereunder by executing and delivering this Agreement to Pledgee, together with all other documents required to be executed by Pledgor and delivered to Pledgee pursuant to this Agreement, the forms of which are annexed hereto as exhibits to the Agreement (collectively, the "**Pledge Documents**").

**NOW, THEREFORE**, in consideration of the premises and to induce Pledgee to make the Loan, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Pledgee as follows:

1. **Defined Terms.** As used in this Agreement, the following terms have the meanings set forth or incorporated by reference below. All other capitalized terms not otherwise defined herein shall have the respective meanings given to such terms in the hereinafter referred to Code:

"**Agreement**" means this Pledge and Security Agreement, as it may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Annual Fee**" has the meaning set forth in the Service Agreements.

"**Business Day**" means a day of the year on which banks are not required or authorized by law to close in New York City.

"**Code**" means the Uniform Commercial Code from time to time in effect in the State of New York; provided, however, that with respect to the perfection, the effect of perfection or non-perfection and the priority of the security interests granted hereunder, and with respect to the exercise of remedies with regard to such security interests, "**Code**" shall mean the Uniform Commercial Code as in effect in an applicable jurisdiction in accordance with applicable law.

"**Collateral**" has the meaning set forth in **Section 2** hereof.

"**Event of Default**" has the meaning set forth in **Section 10** hereof.

"**Interest Rate**" means the rate at which interest shall accrue from the date of disbursement of the Loan on the principal balance thereof remaining from time to time outstanding. As more particularly set forth in the Note, the Interest Rate is nine and 625/1000 (9.625%) percent per annum.

"**Interest Reserve**" means the reserve account established and controlled by Lender, funded at closing with Loan proceeds in the amount of $1,000,000, inclusive of all interest actually earned thereon.

"**Issuer**" has the meaning ascribed to such term in the Recitals hereto.

"**Issuer Formation Agreement**" means the Organizational Documents of the Issuer.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest or any other encumbrance, charge or transfer of, on or affecting the Collateral, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" has the meaning ascribed to such term in the Recitals hereto.

"**Loan Documents**" has the meaning ascribed to such term in the Recitals hereto.

"**Loan Documents Event of Default**" shall mean a default by Pledgor under any of the Loan Documents, which default remains outstanding beyond applicable notice and grace periods, if any.

2

"**Maturity Date**" shall mean the first day of the first full calendar month following the fifth anniversary of the date hereof.

"**Obligations**" means: (i) the performance of the obligations of Pledgor contained herein; (ii) the performance of each obligation of Pledgor contained in the Guaranty, and in any renewal, extension, amendment, modification, consolidation, change thereof, or substitution or replacement therefor.

"**Organizational Documents**" means (i) with respect to a limited partnership, such Person's certificate of limited partnership, limited partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (ii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iii) any and all agreements between any constituent member, partner or shareholder of the Person in question, including any contribution agreement or indemnification agreements. In each case, "**Organizational Documents**" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Other Obligations**" means: (i) the performance of the obligations of Pledgor contained herein; (ii) the performance of each obligation of Pledgor contained in the other Pledge Documents; and (iii) the performance of each obligation of Pledgor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Loan Document.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge Documents**" has the meaning set forth in the Recitals hereto.

"**Pledged Interests**" means the limited liability company preferred membership interests in Issuer, together with: (a) all options, warrants, and other rights now or hereafter acquired by Pledgor in respect of such preferred membership interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Issuer or otherwise) and all other property, rights and instruments of any description at any time issued or issuable as an addition to or in substitution for such preferred membership interests; (b) all certificates, instruments and other writings representing or evidencing such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor, and all accounts and general intangibles arising out of, or in connection with, such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor; (c) any and all moneys or property due and to become due to Pledgor now or in the future in respect of such preferred membership interests in Issuer, or to which Pledgor may now or in the future be entitled with respect to such preferred membership interests in its capacity as a member of Issuer, whether by way of a dividend, distribution, return of capital or otherwise; and (d) all rights of Pledgor with respect to such preferred membership interests under each Issuer Formation Agreement applicable to Issuer (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its

3

ownership of such preferred membership interests in Issuer) including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of such preferred membership interests in Issuer.

"**Pledgee**" has the meaning set forth in the Preamble hereto, together with its successors and assigns.

"**Pledgor**" has the meaning set forth in the Preamble hereto.

"**Principals**" means Michael M. Aiken, Mark R. Enderle and Mark D. Yarborough.

"**Proceeds**" means (i) Pledgor's share, right, title and interest in and to all distributions, monies, fees, payments and proceeds now or hereafter becoming due and payable to Pledgor by Issuer with respect to the Pledged Interests, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the Code; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash and non-cash proceeds of any of the foregoing.

"**Receivables**" means all rights of every nature of Issuer under the Contracts and all obligations of the obligors thereunder.

"**Revenues**" means all gross revenue from operations paid to or otherwise received by Issuer from any source including, without limitation, the Receivables and any and all monies, fees and payments from operations, and including distributions to Issuer from its subsidiaries, but excluding any life insurance proceeds payable to Issuer pursuant to key man policies insuring the lives of the Principals now or hereafter becoming due and payable to Issuer.

"**Service Agreements**" means, collectively, (a) that certain Service Agreement dated as of the date hereof between Issuer and En Theos, LLC, (b) that certain Service Agreement dated as of the date hereof between Issuer and Gemini I, LLC, and (c) that certain Service Agreement dated as of the date hereof between Issuer and Hideaway Investments, LLC.

(i)      The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(ii)     The word "including" when used in this Agreement shall be deemed to be followed by the words "without limitation".

2.      **Pledge: Security for the Loan.**

(a)      **Pledge and Grant of Security Interest in Pledged Interests.** Pledgor hereby pledges and grants to Pledgee, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the

4

Obligations, a first priority security interest in all of Pledgor's right, title and interest to the following (the "Collateral"):

    (i)    the Pledged Interests; and

    (ii)    to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

    Issuer has evidenced its acknowledgement and consent to the pledge and grant given hereby, by execution and delivery of an Acknowledgement and Consent in the form attached hereto as Exhibit A.

    (b)    Assignment and Grant of Security Interest in Receivables. Issuer hereby pledges, grants, assigns and transfers to Pledgee, all of Issuer's right, title and interest in and to the Receivables, and all documents and instruments executed in connection therewith, and all collateral securing such Receivables and the products and proceeds thereof. This assignment shall constitute a security agreement under the Code. Following the occurrence of an Event of Default, Pledgee shall have the exclusive right to collect and receive the Receivables for so long as this Agreement remains in effect.

    (c)    Grant of Security Interest in Interest Reserve. Issuer hereby pledges, grants, assigns and transfers to Pledgee, a security interest in and to the Interest Reserve, and the products and proceeds thereof. This assignment shall constitute a security agreement under the Code. Pledgee shall have the exclusive right to control the Interest Reserve and to withdraw and utilize the funds therein in accordance with Section 3(e) hereof for so long as this Agreement remains in effect.

    3.    The Loan.

    (a)    Repayment Obligation. Issuer is obligated under the Note to repay to Pledgee, on or before the Maturity Date, the aggregate outstanding principal amount of Loan together with all accrued interest.

    (b)    Interest.

    (i)    Interest on the outstanding principal balance of the Loan shall accrue from the date of disbursement thereof until such principal amounts shall be paid in full, at a rate per annum equal to the Interest Rate (subject to paragraph (ii) below). If Loan proceeds are disbursed to an escrowee, the Loan shall commence to bear interest from and including the date of such disbursement to such escrowee regardless of the date such proceeds are disbursed from escrow; provided, however that the interest actually accruing on such proceeds, if any, shall be for Pledgor's benefit. To the extent not prepaid, interest on the outstanding principal balance of the Loan shall be permitted to accrue, and accrued interest shall bear interest monthly. A balloon payment consisting of the outstanding principal balance of the Loan, together any accrued and unpaid interest, will be due and payable on the Maturity Date.

(ii)    Upon the occurrence and during the continuance of an Event of Default, Pledgor shall pay interest on the unpaid principal balance of the Note at a rate per annum equal at all times to the lesser of (x) the maximum non-usurious rate permitted by law or (y) five (5.0%) per annum over the Interest Rate.

(iii)    Notwithstanding any provision to the contrary contained in this Agreement or the other Loan Documents, Pledgor shall not be required to pay, and Pledgee shall not be permitted to collect, any amount of interest in excess of the maximum amount of interest permitted by law ("Excess Interest"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Agreement or in any of the other Loan Documents, then in such event: (1) the provisions of this Section shall govern and control; (2) Pledgor shall not be obligated to pay any Excess Interest; (3) any Excess Interest that Pledgee may have received hereunder shall be, at Pledgee's option, (x) applied as a credit against the outstanding principal balance of the Loan (without any prepayment penalty or premium therefor) or for accrued and unpaid interest thereon (not to exceed the maximum amount permitted by law), (y) refunded to the payor thereof, or (z) any combination of the foregoing; (4) the interest rate(s) provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "Maximum Rate"), and this Agreement and the other Loan Documents shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (5) Pledgor shall not have any action against Pledgee for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on the Loan is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Loan shall, to the extent permitted by law, remain at the Maximum Rate until Pledgee shall have received or accrued the amount of interest which Pledgee would have received or accrued during such period on the Loan had the rate of interest not been limited to the Maximum Rate during such period.

(c)    <u>Payments and Computations</u>.

(i)    Pledgor shall make each payment hereunder and under the Note to Pledgee in U.S. dollars in same day funds. In the event funds are received after 2:00 p.m. (New York City time), such funds shall be deemed to have been paid by Pledgor on the following Business Day.

(ii)    All computations of interest and fees shall be made by Pledgee on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by Pledgee of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(iii)    Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

6

(d)    Use of Revenues.  All net Revenues received by Issuer, net of budgeted overhead and operating expenses, including the operating expenses of Issuer's subsidiaries and affiliates to the extent such operating expenses are provided for in an Approved Budget, shall be used, disbursed and applied in the following order of priority:

(i)    First, to Pledgee to the extent, and for the payment of, all accrued and unpaid interest on the Loan; provided, however, that if net Revenues are insufficient to fully satisfy Pledgor's obligation to pay accrued interest on the Loan, the unpaid interest shall continue to accrue, compounding monthly until paid, for up to 90 days beyond the applicable Payment Date (as such term is defined in the Note); provided, however, that interest shall be due and payable on the applicable Payment Date (the failure to pay such accrued interest on or before such Payment Date, a "Payment Default") and as more particularly provided in Section 10 hereof it shall be an "Event of Default" hereunder if such Payment Default remains uncured for more than 90 days after the applicable Payment Date regardless of whether net Revenues are sufficient to fully satisfy Pledgor's obligation to pay accrued interest on the Loan; and provided further, however, that at any time when any accrued and unpaid interest remains outstanding, no net Revenues shall be distributed in accordance with clauses (ii) or (iii) of this Section 3(d), or otherwise;

(ii)    Second, the balance, if any (but only as and when no accrued and unpaid interest on the Loan remains outstanding), for the payment of the Annual Fees payable under and in accordance with the Service Agreements, in no event to exceed $1,000,000 per annum in the aggregate; provided, however, that if net Revenues are insufficient in a given year to fully satisfy Issuer's obligation to pay the Annual Fees and less than $1,000,000 in the aggregate is paid in such year, the unpaid portion of such Annual Fees shall not accrue, and shall not be payable in the next year; and

(iii)    Third, 80% of the balance, if any, to Pledgee for application in reduction of the outstanding principal balance of the Loan and the remaining 20% thereof to Pledgor for distribution to the Principals for the payment (on behalf of Pledgor, Issuer or the Principals, as applicable) of taxes incurred by Pledgor, Issuer or Principals by reason of such application in reduction of principal.

(e)    Cure Period; Use of Interest Reserve.  Anything herein to the contrary notwithstanding, accrued interest is due and payable on each Payment Date, and failure to pay such accrued interest on or before such Payment Date shall constitute a Payment Default hereunder and under the Note; provided, however, that in respect of any such Payment Default there shall be a 90-day period, commencing on such Payment Date, within which Borrower may cure such Payment Default by the payment of all accrued and unpaid interest through such Payment Date which, if not otherwise paid by Issuer, shall be paid from the Interest Reserve until the Interest Reserve is fully depleted.  Anything herein to the contrary notwithstanding, Pledgor shall be credited with the then-outstanding balance of the Interest Reserve including, without limitation, accrued and undisbursed interest thereon, at and in connection with the repayment of the Loan, whether such repayment is a prepayment, a payment at maturity, a repayment upon an acceleration of the Loan by reason of the occurrence of an Event of Default, or otherwise.

7

(f)    Taxes.

(i)    Any and all payments by Pledgor or by Issuer hereunder, under the Note or under any other Loan Document shall be made in accordance with subsection (c) of this Section, free and clear of and (except to the extent permitted under subsection (d) of this Section) without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes that are imposed on Pledgee's overall net income by the United States and taxes that are imposed on Pledgee's overall net income, capital and/or assets (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which Pledgee is organized or any political subdivision thereof and taxes that are imposed on Pledgee's overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of Pledgee's applicable lending office or any political subdivision thereof (all such excluded taxes being hereafter referred to as "Excluded Taxes" and all such non-excluded or non-permitted taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under the Note being hereinafter referred to as "Taxes"). If Pledgor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Pledgee (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection (e)) Pledgee receives an amount equal to the sum it would have received had no such deductions been made, (ii) Pledgor shall make such deductions and (iii) Pledgor shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(ii)    INTENTIONALLY OMITTED.

(iii)    Pledgor shall indemnify Pledgee for and hold it harmless against the full amount of Taxes. This indemnification shall be made within 30 days from the date Pledgee makes written demand therefor.

(iv)    Within 60 days after the date of any payment of Taxes, Pledgor shall furnish to Pledgee, at its address referred to in Section 21(e), evidence of such payment. In the case of any payment hereunder or under the Note by or on behalf of Pledgor through an account or branch outside the United States or by or on behalf of Pledgor by a payor that is not a United States person, if Pledgor determines that no Taxes are payable in respect thereof, Pledgor shall furnish, or shall cause such payor to furnish, to Pledgee, at such address, an opinion of counsel acceptable to Pledgee stating that such payment is exempt from Taxes. For purposes of this subsection (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Code.

(g)    Late Charge. No late charges shall be charged in respect of payments due under the Note or any other Loan Documents.

(h)    Application of Payments. Except as otherwise expressly provided in the last sentence of this subsection (g), all payments to Pledgee made hereunder shall be applied by Pledgee first, to any accrued and unpaid interest, and then in reduction of the outstanding

8

principal balance of the Loan. Following and during the continuance of an Event of Default, all sums collected by Pledgee shall be applied in such order of priority to such items set forth below as Pledgee shall determine in its sole discretion: (i) to the costs and expenses, including reasonable attorneys' and paralegals' fees and costs of appeal, incurred in the collection of any or all of the Loan due or the realization of any collateral securing any or all of the Loan; and (ii) to any or all unpaid amounts owing pursuant to the Loan Documents in any order of application as Pledgee, in its sole discretion, shall determine.

(i)    Pledgee's Records; Mutilated, Destroyed or Lost Notes. The balance on Pledgee's books and records shall be presumptive evidence (absent manifest error) of the amounts due and owing to Pledgee by Pledgor; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Pledgor's obligations under the Loan Documents. In case the Note shall become mutilated or defaced, or be destroyed, lost or stolen, Pledgor shall, upon request from Pledgee, execute and deliver a new Note of like principal amount in exchange and substitution for the mutilated or defaced Note, or in lieu of and in substitution for the destroyed, lost or stolen Note. In the case of a mutilated or defaced Note, the mutilated or defaced Note shall be surrendered to Pledgor upon delivery to Pledgee of the new Note. In the case of any destroyed, lost or stolen Note, Pledgee shall furnish to Pledgor, upon delivery to Pledgee of the new Note (i) certification of the destruction, loss or theft of such Note and (ii) such security or indemnity as may be reasonably required by Pledgor to hold Pledgor harmless.

(j)    Right to Convert. At any time while any amounts due and payable to Pledgee hereunder remain unpaid (including after Pledgee may have received notice of prepayment from Pledgor or Issuer but prior to repayment in full of the Loan), Pledgee shall have the right to convert the Loan (to the extent then outstanding), and all of Pledgee's rights as lender in respect thereof, to a direct ownership interest of 10% of the fully-diluted common membership interests of Issuer as of the date of the conversion, which ownership shall be in all respects consistent with the terms of common membership interests ownership under the Issuer Formation Agreement (the "Conversion"). The common interests issued in connection with a Conversion shall be duly authorized and validly issued as of the date of the conversion. Such Conversion may be exercised by Pledgee at any time between 10 and 120 days following written notice to Pledgor given at any time while any amounts due and payable to Pledgee hereunder remain outstanding. Anything herein to the contrary notwithstanding, if Pledgor or Issuer shall have given Pledgee notice of their intent to prepay the Loan in full, the issuance by Pledgee of a Conversion notice at any time prior to the 15th day following such prepayment notice shall be deemed to modify the prepayment notice to provide that instead of prepaying the Loan in full, Pledgor or Issuer shall prepay the Loan in part such that a principal balance of $100 remains outstanding, which $100 balance may not be repaid, and shall remain outstanding, until the earlier to occur of: (i) the Conversion, or (ii) 120 days from Pledgee's issuance of the Conversion notice. This Agreement secures Pledgee's right to exercise the Conversion, and if, as and when Pledgee exercises the Conversion, the termination of this Agreement and cancellation of the Note shall be expressly conditioned upon memorializing such equity arrangements to Pledgee's satisfaction.

9

4.    **Representations and Warranties.**    Issuer and Pledgor (and, as to subsection (k) of this Section only, Principals, individually and not jointly and severally) represent and warrant as of the date hereof that:

(a)    no authorization, consent of or notice to any other Person (including, without limitation, any member, partner, shareholder or creditor of Pledgor or Issuer) that has not been obtained, is required in connection with the execution, delivery, performance, validity, enforcement or enforceability of this Agreement including, without limitation, the assignment and transfer by Pledgor of any of the Collateral or the Receivables to Pledgee or the subsequent transfer thereof by Pledgee pursuant to the terms hereof;

(b)    Pledgor is the sole record and beneficial owner of, and has good and marketable title to, the Pledged Interests free of any and all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement, and the Pledged Interests have not previously been assigned, sold, transferred, pledged or encumbered (except pursuant to this Agreement);

(c)    upon the filing of the UCC-1 financing statement referred to in Section 14 hereof with the Secretary of State of the State indicated on **Schedule II** hereto, the Lien granted pursuant to this Agreement shall constitute a valid, perfected first priority Lien on the Pledged Interests and related Proceeds in such jurisdiction, enforceable against the creditors of Pledgor and any Persons purporting to purchase any Pledged Interests and related Proceeds from Pledgor;

(d)    Issuer is organized under the laws of the State of Delaware;

(e)    Pledgor is organized under the laws of the State of Delaware;

(f)    there currently exist no certificates, instruments or writings representing the Pledged Interests except for the Issuer Formation Agreement; *provided, however,* that to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Pledgee, together with stock or bond powers duly endorsed in blank;

(g)    the equity interests in Issuer have been validly issued as provided in the applicable Issuer Formation Agreement;

(h)    there are no options, warrants or other agreements (other than the applicable Issuer Formation Agreement) outstanding with respect to the Collateral;

(i)    **Schedule II** hereto states Pledgor's (1) exact legal name as indicated on the public record in Pledgor's jurisdiction of organization, (2) type of entity, (3) organizational identification number, (4) principal place of business and chief executive office, (5) jurisdiction of incorporation or formation, (6) name under which Pledgor does business, if other than its legal name, and (7) address for the past six (6) years, or if less, the date since which it has been so located;

(j)    All Collateral which constitutes a certificated "security" (under the Code) has been delivered to Pledgee;

84173055_12

(k)    **Schedule IV** lists all of the existing sales and marketing agreements in effect as of the date hereof, including any modifications and amendments thereto (collectively, the "**Existing Contracts**"; together with the sales and marketing agreements Issuer enters into after the date hereof, collectively the "**Contracts**"). Each of the Existing Contracts is in full force and effect as of the date hereof, and neither Issuer nor Pledgor has received any notice, or has any actual knowledge, that there has occurred a material default under any of the Existing Contracts by any party thereto, except as disclosed on **Schedule V**;

(l)    The Principals are collectively the owners, directly or indirectly, of 100% of the outstanding beneficial ownership interests in Pledgor;

(m)    To Issuer's and Pledgors' actual knowledge, no other security agreement or financing statement covering the Receivables or any part thereof has been made or filed and no security interest, other than the one herein created, has been created, attached or perfected in the Receivables; and

(n)    as of the date hereof, no dispute, set-off, counterclaim or defense exists on the part of Issuer or any other party in respect of any material part of the Receivables except as may be disclosed on **Schedule V** hereto.

5.    **Covenants.** Each of Issuer and Pledgor (and, as to subsections (q), (s) and (v) of this Section only, Principals, individually and not jointly and severally) covenants and agrees with Pledgee that, except with Pledgee's prior written consent, from and after the date of this Agreement until Issuer's and Pledgor's obligations in respect of the Loan (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note) are fully discharged and paid in full:

(a)    **Acknowledgements of Parties.** If Pledgor shall, as a result of its ownership of the Pledged Interests, become entitled to receive or shall receive an ownership or equity certificate (including, without limitation, any certificate representing a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any of the Pledged Interests, or otherwise in respect thereof, Pledgor shall accept the same as Pledgee's agent, hold the same in trust for Pledgee and deliver the same forthwith to Pledgee in the exact form received, duly endorsed by Pledgor to Pledgee, if required, together with an undated ownership interest power covering such certificate duly executed in blank and with, if Pledgee so requests, signature guarantied, to be held by Pledgee hereunder as additional security for Pledgor's Obligations. Subject to the right, if any, of Pledgor and its members to receive distributions, any sums paid upon or in respect of the Pledged Interests upon the liquidation or dissolution of Issuer, and any distribution of capital made on or in respect of the Pledged Interests, and any property distributed upon or with respect to the Pledged Interests pursuant to the recapitalization or reclassification of the capital of Issuer or pursuant to the reorganization thereof, shall be delivered to Pledgee to be held by it, subject to the terms hereof, as additional security for the Loan. If any sums of money or property so paid or distributed in respect of the Pledged Interests shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Pledgee, hold such money or property in trust for Pledgee, segregated from other funds of Pledgor, as additional security for the Obligations.

11

(b)     Without the prior written consent of Pledgee, which consent may be withheld by Pledgee at its sole option, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, Issuer to issue any equity interests or to issue any other securities convertible into or granting the right to purchase or exchange for any equity interests in Issuer, or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by this Agreement. Pledgor shall defend the right, title and interest of Pledgee in and to the Collateral against the claims and demands of all Persons whomsoever.

(c)     At any time and from time to time, upon the reasonable written request of Pledgee, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Pledgee may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including, without limitation, filing UCC financing or continuation statements, provided that the amount of the indebtedness secured hereby shall not be increased thereby. Pledgor hereby authorizes Pledgee to file any such financing statement or continuation statement to the extent permitted by law. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Pledgee, duly endorsed in a manner satisfactory to Pledgee, to be held as Collateral pursuant to this Agreement.

(d)     Pledgor shall not amend or modify, or permit the amendment or modification of, the Issuer Formation Agreement in any respect.

(e)     Neither Pledgor nor Issuer shall incur any indebtedness (excluding ordinary course trade payables in amounts not materially in excess of those set forth in an Approved Budget from time to time).

(f)     Pledgor will not (i) change its name, identity or structure or (ii) reorganize under the laws of another jurisdiction, unless (A) it shall have given 30 days' prior written notice to such effect to Pledgee, and (B) all action reasonably necessary or advisable, in Pledgee's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken.

(g)     INTENTIONALLY OMITTED.

(h)     Issuer shall not amend the terms of the Issuer Formation Agreement to provide that the Pledged Interests are securities governed by Article 8 of the Code.

(i)     Pledgor shall not enter into any agreement whereby it transfers or cedes the voting rights in Issuer that are associated with the Collateral, or otherwise restricts such voting rights in any way.

(j)     Pledgor; Issuer or any other entity issuing the Collateral shall promptly deliver to Pledgee share certificates or other instruments representing any Collateral acquired or

12

received after the date of this Agreement with a stock or bond power duly executed by Pledgor in the form attached as **Schedule III** hereto. If at any time Pledgee notifies Pledgor that it requires additional stock or bond powers endorsed in blank, Pledgor shall promptly execute in blank and deliver the requested stock power to the requesting party.

(k)    Pledgor shall notify Pledgee of any contemplated change to the information provided on **Schedule II** hereof, at least 30 days prior to such change taking effect.

(l)    Neither Pledgor nor Issuer shall make any distributions of Revenues in any manner that is inconsistent with this Agreement or with Issuer's limited liability company agreement. In no event shall Issuer pay any portion of the Annual Fees accrued in any prior year or otherwise in any manner inconsistent with Section 3(d) hereof.

(m)    Neither Pledgor nor Issuer shall establish any reserves not otherwise contemplated in the then-current Approved Budget.

(n)    Neither Pledgor nor Issuer shall commence any material legal actions.

(o)    Pledgor shall not take any action to sell, dissolve or liquidate Issuer or to permit the sale, dissolution or liquidation of Issuer;

(p)    Pledgor shall not, and shall not permit Issuer to (i) make or agree to any material change in insurance coverage under any policy in which Pledgor or Issuer has any interest from that in place as of the date hereof; (ii) make any disposition or distribution of insurance proceeds other than to Pledgee (x) at any time when there is outstanding any accrued and unpaid interest on the Loan (and then only to the extent necessary to pay such accrued and unpaid interest), or (y) in the event that two (2) or more Principals die in which event Pledgor and Issuer shall use the proceeds of Issuer's key man life insurance policies insuring the lives of the Principals to make all remaining payments of principal and accrued interest on the Loan; provided, however, that, in the event that there are excess funds following such principal and accrued interest payments, Issuer shall retain such excess proceeds and shall use such proceeds as determined by the Board of Managers in its discretion.

(q)    Principals shall not, and shall not permit Pledgor or Issuer to, terminate or cancel (other than in accordance with the express terms thereof), transfer or assign (other than for full and fair consideration or in accordance with the express terms thereof), or make or agree to any material change in, any material contract to which Pledgor or Issuer is a party (including, without limitation, the Contracts and the Employment Agreements between Issuer and each of the Principals).

(r)    Pledgor shall not, and shall not permit Issuer to, issue any press releases or external communications naming Pledgee and/or its affiliates or partners.

(s)    Principals shall not, and shall not permit Pledgor or Issuer to, knowingly misappropriate any Revenues, nor shall Principals intentionally cause or permit Issuer to make any payment or distribution of Revenues in any manner inconsistent with the terms of Section 3(d) hereof.

(t)     Pledgor shall not, and shall not permit Issuer to, incur any expense materially in excess of that which is reflected on the then-current Approved Budget.

(u)     Pledgor shall not, and shall not permit Issuer to, enter into any transactions with affiliates except to the extent that they are either: (i) in the ordinary course of business with wholly-owned affiliates, (ii) on an arms-length basis; or (iii) are expressly permitted hereunder.

(v)     Principals shall not, and shall not permit Pledgor or Issuer to consent to or acquiesce in the appointment of a receiver, liquidator or trustee for Pledgor or Issuer, or to the adjudication of Pledgor or Issuer as a bankrupt or insolvent, or to the filing of any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, by or against Pledgor or Issuer, or the institution of any proceeding for the dissolution or liquidation of Pledgor or Issuer.

(w)     <u>Protection of Security Interest in the Receivables</u>.  Issuer shall take any and all steps necessary to preserve and protect the priority of the security interest herein granted in the Receivables, and in furtherance of this obligation Issuer agrees that:

(i)     Issuer shall not create any other security interest in, sell, assign, pledge, transfer or otherwise dispose of or encumber any of the Receivables or any interest therein, or offer to do so, or permit anything to be done that may impair the value of the Receivables in a material respect, or permit any material part of the Receivables to be or become subject to any lien, attachment, execution, sequestration, other legal or equitable process, or encumbrance of any kind or character other than the security interests created by this Pledge Agreement;

(ii)     upon Pledgee's request, Issuer shall execute and deliver to Pledgee any documents requested by Pledgee to effectively implement the purposes of the assignment of Receivables, including financing statements under the Uniform Commercial Code;

(iii)     From and after the occurrence of an Event of Default, Pledgee may from time to time, at its option, perform any agreement or obligation of Issuer hereunder which Issuer fails to perform, and take any action which Pledgee deems necessary or appropriate for the maintenance or preservation of any of the Receivables or its security interest therein; and

(iv)     Issuer shall not convey, transfer, assign, pledge, or allow any ownership, Lien or other interest in the Receivables other than Issuer's and Pledgees's respective interests as described hereunder.

Pledgee acknowledges that the Loan proceeds either have been or will be distributed to Issuer's members, and agrees that (i) such distribution is approved and shall not constitute a violation of this Agreement or any other Loan Documents and (ii) not to seek recovery of such distribution under any bankruptcy or insolvency law or under Delaware Code, Title 6 Chapter 18 § 607 or any similar law; provided, however, that this clause (ii) shall not prohibit an action against one or more of the Principals for breach of Section 4(k), 5(q), 5(s) or 5(v).

14

84175055_12

6.    **Certain Understandings of Parties; Registration of Pledge; Control of Pledged Collateral, Etc.**

(a)    (i) The parties acknowledge and agree that the Pledged Interests (other than capital stock, if any) constitute "general intangibles" (as defined in Section 9-102(a)(42) of the Code); and (ii) Pledgor therefore covenants and agrees that (A) the Pledged Interests (other than capital stock, if any) are not and will not be dealt in or traded on securities exchanges or securities markets, (B) the terms of the Pledged Interests (other than capital stock, if any) do not and will not provide that they are securities governed by Article 8 of the Code and (C) the Pledged Interests (other than capital stock, if any) are not and will not be investment company securities within the meaning of Section 8-103 of the Code.

(b)    **Registration of Pledge; Control of Collateral.**    Notwithstanding the foregoing, to better assure the perfection of the security interest of Pledgee in the Pledged Interests concurrently with the execution and delivery of this Agreement, Pledgor shall send written instructions in the form of **Exhibit B** hereto to Issuer, and shall cause Issuer to, and Issuer shall, deliver to Pledgee the Confirmation Statement and Instruction Agreement in the form of **Exhibit C** hereto pursuant to which Issuer will confirm that it has registered the pledge effected by this Agreement on its books and agrees to comply with the instructions of Pledgee in respect of the Pledged Interests without further consent of Pledgor or any other Person.

(c)    In the event that Pledgee transfers its interest in the Loan, Pledgor will promptly execute and deliver or cause each Issuer to execute and deliver, as applicable, documents in substantially the same form as the documents attached as **Exhibits A** through and including **D** hereto in favor of the assignee thereof.  Pledgee agrees not to transfer all or any part of its interest in the Loan to any of the parties listed on **Exhibit F** hereto.  In addition, the Principals shall have the right semi-annually to amend **Exhibit F**, provided any such amendment may include only persons who compete with Issuer or its subsidiaries or affiliates in the real estate marketing, sales and/or development business (a "**Competitor**") and, in any event, the Principals shall have the right to approve any such transfer by Pledgee of all or part of its interest in the Loan to any Competitor.  Anything herein to the contrary notwithstanding, Pledgee may transfer the Loan or interests therein at any time without notice to, or the approval of, Pledgor or the Principals to any entity that is not listed on **Exhibit F** and is not a Competitor, and in any event no notice or approval shall be required in connection with transfers of the Loan or interests therein by Pledgee to its affiliates (provided such affiliate is not a Competitor).

7.    **Budget.**

(a)    For the twelve-month period commencing on January 1, 2007, the budget attached as Exhibit E to this Agreement (the "**Initial Budget**") shall be the budget for such period, which Initial Budget may be amended by Pledgor prior to January 1, 2007, subject to Pledgee's approval rights as provided in the last sentence of this paragraph (a).  An annual budget ("**Annual Budget**") shall be submitted to Pledgee at least sixty (60) days prior to the end of the prior fiscal year.  Such Annual Budget shall set forth in reasonable detail, in a format reasonably determined by Pledgor, revenues and operating and other expenses.  Pledgee shall

15

have the right to approve the operating and other expenses contained in the Annual Budget, which approval shall not be unreasonably withheld.

     (b)    In the event Pledgee objects to the operating and other expenses contained in a proposed Annual Budget, Pledgee shall advise Pledgor of such objections in writing within twenty (20) days after receipt thereof, and Pledgor shall cause such Annual Budget to be revised within five (5) days after receipt of notice and resubmit the same to Pledgee. Pledgee shall advise Pledgor in writing of any objections to the operating and other expenses contained in such revised Annual Budget within ten (10) days after receipt thereof, and Pledgor shall cause such Annual Budget to be revised in accordance with the process described in this Section. In the event that the operating and other expenses contained in the revised Annual Budget are not acceptable to Pledgee this process shall continue (with Pledgee having in each case ten (10) days to review any submissions) until Pledgee approves the operating and other expenses contained in an Annual Budget (the Initial Budget and each such Annual Budget, when so approved, is referred to as an "Approved Budget"). Until such time that Pledgee approves the operating and other expenses contained in a proposed Annual Budget, the operating and other expenses contained in the most recently approved Approved Budget shall apply, provided that such Approved Budget shall be adjusted to reflect actual increases in the various line items reflected therein.

     8.    **Voting Rights.**  Notwithstanding anything contained herein, unless an Event of Default shall have occurred, Pledgor shall be permitted to exercise all voting, consent, administration, management and other powers, rights and remedies of Pledgor with respect to the Pledged Interests, provided that no vote shall be cast or right exercised or other action taken which could reasonably be expected to impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Pledge Documents or the Loan Documents.

     9.    **Rights of Pledgee.**

     (a)    If an Event of Default shall occur and be continuing, Pledgee shall have the right to receive any and all income, distributions, proceeds or other property received or paid in respect of the Pledged Interests and make application thereof to the Loan, in such order as Pledgee, in its sole discretion, may elect. If an Event of Default shall occur and be continuing, then all of the Pledged Interests at Pledgee's option, shall be registered in the name of Pledgee or its nominee (if not already so registered), and Pledgee or its nominee may thereafter exercise (i) all voting and all ownership and other rights pertaining to the Pledged Interests and (ii) any and all rights of conversion, exchange, and subscription and any other rights, privileges or options pertaining to the Pledged Interests as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of Issuer or upon the exercise by Pledgor or Pledgee of any right, privilege or option pertaining to such Pledged Interests, and in connection therewith, the right to deposit and deliver any and all of the Pledged Interests with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except to account for property actually received by it, but Pledgee shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

<div align="center">16</div>

(b)    The rights of Pledgee under this Agreement shall not be conditioned or contingent upon the pursuit by Pledgee of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Loan or against any other security therefor, guaranty thereof or right of offset with respect thereto. Pledgee shall not be liable for any failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Pledgor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(c)    Pledgor hereby grants to Pledgee or its nominee, on behalf of Pledgee, an irrevocable proxy to exercise all voting and membership rights relating to the Pledged Interests in any instance, which proxy shall be exercisable immediately upon the occurrence and during the continuance of an Event of Default. Pledgor has evidenced such proxy by execution and delivery of an Irrevocable Proxy Coupled with an Interest in the form attached hereto as **Exhibit D**. Upon the request of Pledgee, Pledgor agrees to deliver to Pledgee such further evidence of such irrevocable proxy to vote the Pledged Interests as Pledgee may request.

(d)    Upon full payment of the Loan, Pledgee's rights under this Agreement shall terminate and Pledgee shall execute and deliver to Pledgor UCC-3 termination statements or similar documents and agreements to terminate all of Pledgee's rights under this Agreement and all other Pledge Documents and return any certificates which, pursuant to the terms hereof, are then in the possession of Pledgee.

(e)    Pledgor also authorizes Pledgee, at any time and from time to time, to execute, in connection with a sale provided for herein, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(f)    The powers conferred on Pledgee hereunder are solely to protect Pledgee's interest in the Collateral and shall not impose any duty upon Pledgee to exercise any such powers. Pledgee shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or Pledgee shall be responsible to any Pledgor for any act or failure to act hereunder, except for its or their gross negligence or willful misconduct.

(g)    If any Pledgor fails to perform or comply with any of its agreements contained herein and Pledgee, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreements, the reasonable expenses of Pledgee incurred in connection with such performance or compliance, together with interest at the Default Rate if such expenses are not paid on demand, shall be payable by Pledgor to Pledgee on demand and shall constitute Obligations secured hereby.

10.    **Events of Default.**

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if Pledgor transfers or encumbers any portion of the Collateral in violation hereof;

17

84173055_12

(ii)    if Issuer transfers or encumbers any portion of the Receivables in violation hereof;

(iii)    if Pledgor or Issuer violates any of the covenants set forth herein, and such violation is not corrected by Pledgor or Issuer within 45 days following Pledgee's written request (provided, however, that no such request, and no such cure period, shall apply with respect to the violation of a covenant set forth in Section 5(o), (p), (q), (s), (t), (v) or (w) hereof);

(iv)    if any of the Principals, Issuer or Pledgor knowingly misappropriates any Revenues, or if Issuer intentionally makes any payment or distribution of Revenues in any manner inconsistent with the terms of Section 3(d) hereof;

(v)    if there occurs a Payment Default which remains uncured for more than 90 days following the applicable Payment Date, or if Issuer fails to repay the Loan in full, including all accrued and unpaid interest, on or before the Maturity Date;

(vi)    if any representation or warranty made by Issuer or Pledgor herein shall have been false or misleading in any material respect as of the date hereof, and such representation or warranty remains false or misleading 45 days following Pledgee's written request (provided, however, that the cure period with respect to a breach of a representation or warranty set forth in Section 4(c) shall be 90 days; and provided further, however, that no such request, and no such cure period, shall apply with respect to the breach of a representation or warranty set forth in Section 4(b), (g), (k) or (n) hereof);

(vii)    if Pledgor or Issuer shall make an assignment for the benefit of creditors;

(viii)    if a receiver, liquidator or trustee shall be appointed for Pledgor or Issuer, or if Pledgor or Issuer shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Pledgor or Issuer, or if any proceeding for the dissolution or liquidation of Pledgor or Issuer shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Pledgor or Issuer, upon such appointment, adjudication, petition or proceeding not being discharged, stayed or dismissed within 90 days;

(ix)    if Pledgor attempts to assign its rights under this Agreement or any of the other Pledge Documents or any interest herein or therein in contravention of the Pledge Documents;

(x)    if any federal tax Lien or state or local income tax Lien is filed against Pledgor or Issuer and either (A) such Lien is not discharged of record within 90 days or (B) a proceeding contesting such Lien is not initiated in good faith within 45 days after same is filed provided such proceeding is diligently prosecuted in good faith;

(xi)    if Principals shall at any time collectively own, directly or indirectly, less than 100% of the outstanding beneficial ownership interests in Pledgor; or

18

(xii)    if Pledgor or Issuer shall terminate or cancel (other than in accordance with the express terms thereof), transfer or assign (other than for the full and fair consideration or in accordance with the express terms thereof), or make or agree to any material change in, any material contract to which Pledgor or Issuer is a party (including, without limitation, the Contracts and the Employment Agreements between Issuer and each of the Principals).

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clause (iii) or (iv) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Pledge Documents or at law or in equity, Pledgee may take such action, without notice or demand, that Pledgee deems advisable to protect and enforce its rights against Pledgor and in and to the Collateral including, without limitation, declaring the Loan to be immediately due and payable, and Pledgee may enforce or avail itself of any or all rights or remedies provided in this Agreement and may exercise all the rights and remedies of a secured party under the Code against Pledgor and the Collateral including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clause (iii) or (iv) above, the Loan and all obligations of Pledgor hereunder shall immediately and automatically become due and payable, without notice or demand, and Pledgor hereby expressly waives any such notice or demand, anything contained herein or in any other Pledge Document to the contrary notwithstanding.

11.    Remedies.  If an Event of Default shall occur and be continuing, Pledgee may exercise, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Loan:

(a)    all rights and remedies of a secured party under the Code in effect in each applicable jurisdiction and such additional rights and remedies to which a secured party is entitled at law or in equity including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Pledgee were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be reasonably appropriate to give effect to such right);

(b)    Pledgee may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(c)    Pledgee may contact the parties to the Contracts, and may provide them with a copy of this Agreement to demonstrate Issuer's consent to the exercise by Pledgee of the following remedy:  Pledgee may direct the payors under the Contracts to make any payments under the Contracts which are due and payable to Issuer directly to Pledgee, for application by Pledgee in accordance with Section 3(d) hereof; and

(d)    Pledgee in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

19

Without limiting the generality of the foregoing, Pledgee, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below or otherwise required hereby) to or upon any Pledgor, any Issuer or any other Person (all and each of which demands, presentments, protests, advertisements and notices, or other defenses, are hereby waived to the extent permitted under applicable law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Pledgee or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery without assumption of any credit risk. Pledgee shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice. Pledgee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived or released. Pledgee shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Pledgee hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Loan, in such order as specified in Section 9-615 of the Code, and only after such application and after the payment by Pledgee of any other amount required by any provision of law, including, without limitation, Sections 9-610 and 9-615 of the Code, need Pledgee account for the surplus, if any, to Pledgor. To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Pledgee arising out of the exercise by Pledgee of any of its rights hereunder, except for any claims, damages and demands it may have against Pledgee or its affiliates arising from the willful misconduct, bad faith or gross negligence of Pledgee or its affiliates, or any agents or employees of the foregoing. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 30 days before such sale or other disposition.

(e)    The rights, powers, privileges and remedies of Pledgee under this Agreement are cumulative and shall be in addition to all rights, powers, privileges and remedies available to Pledgee at law or in equity. All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of Pledgee hereunder.

(f)    Anything herein to the contrary notwithstanding, Principals' liability for the breach, violation or failure of a representation, warranty or covenant under Section 4(k), 5(q), 5(s) or 5(v) hereof shall be limited to $25,500,000 in the aggregate.

12.    **Private Sales**. (a) Pledgor recognizes that Pledgee may be unable to effect a public sale of any or all of the Pledged Interests, by reason of certain prohibitions contained in

20

the Securities Act of 1933, as amended, and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Pledgee than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Pledgee shall be under no obligation to delay a sale of any of the Pledged Interests for the period of time necessary to permit each Issuer or any Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if any Issuer or any Pledgor would agree to do so. Notwithstanding the foregoing, Pledgee shall have the free right to transfer the Pledged Interests subject to the terms of the Issuer Formation Agreement. Furthermore, Pledgee agrees not to sell the Pledged Interests to any party to whom Pledgee would not be permitted to sell an interest in the Loan in accordance with Section 6(e) hereof.

(b)     Pledgor further shall use its best efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Pledged Interests pursuant to this Section 12 valid and binding and in compliance with any and all other requirements of applicable law. Pledgor further agrees that a breach of any of the covenants contained in this Section 12 will cause irreparable injury to Pledgee, that Pledgee has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 12 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred hereunder, or any defense relating to Pledgee's willful misconduct, bad faith or gross negligence.

(c)     Pledgee shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Pledgor hereby waives any claims against Pledgee arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Loan, even if Pledgee accepts the first offer received and does not offer any Collateral to more than one offeree, provided that Pledgee has acted in a commercially reasonable manner in conducting such private sale.

(d)     Section 9-610 of the Code states that Pledgee is able to purchase the Pledged Interests only if they are sold at a public sale. Pledgee has advised Pledgor that SEC staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The Code permits Pledgor to agree on the standards for determining whether Pledgee has complied with its obligations under Article 9 of the Code. Pursuant to the Code, Pledgor specifically agrees (x) that it shall not raise any objection to Pledgee's purchase of the Pledged Interests (through bidding on the obligations or otherwise) and (y) that a foreclosure sale

21

conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the Code; (ii) will be considered commercially reasonable notwithstanding that Pledgee, has not registered or sought to register the Pledged Interests under the Securities Laws, even if any Pledgor or the applicable Issuer agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that the Pledgee purchases the Pledged Interests at such a sale.

(e)     Pledgor agrees that Pledgee shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Interests or other Collateral sold by Pledgee pursuant to this Agreement.  Pledgee, may, in its sole discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers.  Without in any way limiting Pledgee's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)     Pledgee conducts the foreclosure sale in the State of New York,

(ii)     The foreclosure sale is conducted in accordance with the laws of the State of New York,

(iii)     Not more than 10 days before, and not less than five days in advance of the foreclosure sale, Pledgee notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale,

(iv)     The foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted in front of the Supreme Court located in New York County or such other New York State Court having jurisdiction over the Collateral on any Business Day between the hours of 9 a.m. and 5 p.m.,

(v)     The notice of the date, time and location of the foreclosure sale is published in New York Times or Wall Street Journal (or such other newspaper widely circulated in New York, New York) for seven consecutive days prior to the date of the foreclosure sale, and

(vi)     Pledgee sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State of Delaware conducted not later than 20 days and not earlier than 30 days before such notification date.

(vii)     Any sale of the Collateral, other than a foreclosure sale to the Pledgee, shall be conducted by a nationally recognized investment banker and will be on commercially reasonable terms.

13.     **Limitation on Duties Regarding Collateral.**  Pledgee's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to use reasonable care.  Pledgor hereby agrees that Pledgee shall be deemed to have used reasonable care with respect to Collateral in its

22

possession if it deals with such Collateral in the same manner as Pledgee deals with similar securities and property for its own account. Neither Pledgee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise.

14. **Financing Statements; Other Documents.** Pledgor hereby authorizes Pledgee to file UCC-1 financing statements with respect to the Collateral. Pledgor agrees to deliver any other document or instrument which Pledgee may reasonably request with respect to the Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

15. **Attorney-in-Fact.** Without limiting any rights or powers granted by this Agreement to Pledgee, Pledgee is hereby appointed, upon the occurrence and during the continuance of an Event of Default, the attorney-in-fact of Pledgor, which appointment as attorney-in-fact is irrevocable and coupled with an interest, for the purpose of carrying out the provisions of this Agreement and taking any action in connection therewith and executing any instruments which Pledgee may deem reasonably necessary or advisable to accomplish the purposes hereof including, without limitation:

(a) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b) to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(c) to file any claims or take any action or institute any proceedings that the Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Pledgee, with respect to any of the Collateral;

(d) to execute, in connection with the sale provided for in Section 11 or 12 hereof, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Collateral, including, without limitation, to transfer or cause the transfer of the Collateral, or any part thereof, on the books of Issuer or other entity issuing such Collateral, to the name of Pledgee or any nominee; and

(e) to affix to any certificates and documents representing the Collateral the stock powers delivered with respect thereto.

Pledgee hereby acknowledges that the power of attorney powers set forth in this Section 15 may be exercised by Pledgee only upon the occurrence and continuation of an Event of Default.

If so requested by Pledgee, Pledgor shall ratify and confirm any such sale or transfer by executing and delivering to Pledgee at the Pledgor's expense all proper deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request.

23

16.    **Control.**  If, in order to maintain a perfected security interest in the Pledged Interests, Pledgee must perfect through "control" the security interest in the Pledged Interests as securities governed by Article or Division 8 of the Code ("**Division 8**"), Pledgor agrees, at any time promptly following written request therefor from Pledgee, to cause the applicable Issuer to modify its Issuer Formation Agreement to provide that the ownership interests in such Issuer are securities governed by Division 8 and to enter into a control agreement with Pledgee with respect to such Pledged Interests (pursuant to which such Issuer shall agree, upon receipt of notice from Pledgee at any time following an Event of Default, to comply with all instructions originated by Pledgee with respect to the Pledged Interests without further consent of Pledgor).

17.    **Reserved.**

18.    **Non-Recourse.**  (a)  Subject to the qualifications set forth in this Section, Pledgee shall not enforce the liability and obligation of Pledgor or Issuer to perform and observe the obligations contained in this Agreement or the other Loan Documents by an action or proceeding wherein a money judgment shall be sought against Pledgor or Issuer. Pledgee shall be entitled to bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Pledgee to enforce and realize upon its security interest hereunder; and any judgment in any such action or proceeding shall be enforceable against Pledgor or Issuer only to the extent of Pledgor's interest in the Collateral and Issuer's interest in the Receivables. Pledgee, by accepting this Agreement agrees that it shall not sue for, seek or demand any deficiency judgment or other money judgment against Pledgor or Issuer in any such action or proceeding, under, by reason of or in connection with this Agreement. The provisions of this Section shall not, however: (i) constitute a waiver, release or impairment of any obligation evidenced or secured pursuant to this Agreement; (ii) impair the right of Pledgee to name Pledgor as a party defendant in any action or suit for foreclosure and sale hereunder; (iii) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan; or (iv) impair the right of Pledgee to bring suit with respect to fraud or intentional misrepresentation by Pledgor or Issuer in connection herewith.

(b)    This Agreement shall cease, terminate and be of no further force or effect upon the repayment in full of the Loan together with all amounts payable to Pledgee under the Loan Documents.

19.    **Indemnification.**

(a)    **General Indemnification.**  To the extent, and only to the extent, of the value of its interest in the Collateral, and subject to Section 18 hereof, Pledgor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (as such term is hereinafter defined) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any

24

way relating to any one or more of the following: (i) ownership of this Agreement, the Collateral or any interest therein or receipt of any Proceeds; (ii) any amendment to, or restructuring of, the Loan, the Note and this Agreement, the Note or any other Loan Document; (iii) any and all lawful action that may be taken by Pledgee in connection with the enforcement of the provisions of this Agreement, the Note or any other Loan Document, whether or not suit is filed in connection therewith, or in connection with Pledgor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (iv) any failure on the part of Pledgor to perform or be in compliance with any of the terms of this Agreement; (v) the enforcement by any Indemnified Party of the provisions of this <u>Section 19</u>; (vi) the payment of any commission, charge or brokerage fee to anyone claiming through Pledgor which may be payable in connection with the funding of the Loan; or (vii) any misrepresentation made by Pledgor in this Agreement or any other Pledge Document. Any amounts payable to Pledgee by reason of the application of this <u>Section 19</u> shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Pledgee until paid; <u>provided</u>, <u>however</u>, that Pledgor shall not be obligated to indemnify Pledgee for Losses directly or indirectly arising out of or relating in any way to the willful misconduct, bad faith or gross negligence of Pledgee or its affiliates , or any agents or employees of the foregoing.. For purposes of this <u>Section 19</u>, the term "<u>Indemnified Parties</u>" means Pledgee and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by this Agreement is or will have been perfected, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, investors or prospective investors in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, and any successors by merger, consolidation or acquisition of all or a substantial portion of Pledgee's assets and business).

(b)    <u>ERISA Matters</u>

(i)    Pledgor represents and warrants as of the date hereof that Pledgor is not an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), subject to Title I of ERISA, and none of the assets of Pledgor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (a) Pledgor is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Pledgor are not subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated hereby.

(ii)    From the date hereof until payment and performance in full of all Pledgor's obligations in respect of the Loan, Pledgor shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the

25

exercise by Pledgee of any of its rights hereunder) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(iii)    Pledgor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Pledgee's sole discretion) that Pledgee may incur, directly or indirectly, as a result of a default under subsections (i) or (ii) of this Section.

20.    **Construction.**    All covenants, representations, terms and conditions contained in this Agreement applicable to Pledgor, Issuer, Pledged Interests or any Issuer Formation Agreement shall be deemed to apply to Pledgor, Issuer, Pledged Interests or Issuer Formation Agreement, individually.    It shall constitute an Event of Default if any covenant, representation, term or condition contained in this Agreement applicable to Pledgor, Issuer, Pledged Interests or Issuer Formation Agreement is breached (beyond any applicable notice and cure periods) with respect to any single Pledgor, Issuer, Pledged Interests or Issuer Formation Agreement.

21.    **Miscellaneous.**

(a)    · **Severability.**    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(b)    **Headings.**    The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(c)    **No Waiver; Cumulative Remedies.**    Pledgee shall not by any act (except by a written instrument pursuant to Section 21(d) hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof.    No failure to exercise, nor any delay in exercising, on the part of Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof.    No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.    A waiver by Pledgee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Pledgee would otherwise have on any future occasion.    The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

26

(d) <u>Waivers and Amendments; Successors and Assigns</u>. None of the terms or provisions of this Agreement may be waived, amended, or otherwise modified except by a written instrument executed by the party against which enforcement of such waiver, amendment, or modification is sought. This Agreement shall be binding upon and shall inure to the benefit of Pledgor and the respective successors and assigns of Pledgor and shall be binding upon and shall inure to the benefit of Pledgee and its successors and assigns; provided no Pledgor shall have any right to assign its rights hereunder. The rights of Pledgee under this Agreement shall automatically be transferred to any transferee to which Pledgee transfers the Loan; <u>provided, however</u>, that Pledgee may transfer the Loan and rights in connection therewith only as expressly permitted in this Agreement.

(e) <u>Notices</u>. Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied (with request for confirmation) or sent by overnight courier service or United States registered mail return receipt requested, postage prepaid. Any notice so given shall be deemed effective upon delivery or on refusal or failure of delivery during normal business hours. Notices shall be addressed to the parties at the addresses described below or to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this subsection (e).

> To Issuer:
>
> Traditions Management, LLC
> 816 Krystal Building
> One Union Square
> Chattanooga, Tennessee 37402
> Attention: Michael M. Aiken
> Facsimile: 423-265-5680
>
> With a copy to:
>
> Chambliss, Bahner & Stophel, P.C.
> 1000 Tallan Building
> Two Union Square
> Chattanooga, TN 37402
> Attention: William P. Aiken, Jr., Esq.
> Facsimile: 423-508-1216
>
> To Pledgor:
>
> AEY, LLC
> 816 Krystal Building
> One Union Square
> Chattanooga, Tennessee 37402
> Attention: Michael M. Aiken
> Facsimile: 423-265-5680
>
> With a copy to:
>
> Chambliss, Bahner & Stophel, P.C.
> 1000 Tallan Building
> Two Union Square
> Chattanooga, TN 37402
> Attention: William P. Aiken, Jr., Esq.

27

Facsimile: 423-508-1216

To Pledgee:          [DBZ Entity]
                     745 Fifth Avenue
                     18th Floor
                     New York, New York 10151
                     Attention:_____
                     Facsimile: _____

With a copy to:      Katten Muchin Rosenman LLP
                     525 West Monroe Street
                     Chicago, Illinois 60661
                     Attention: Andrew D. Small, Esq.
                     Facsimile: 312-577-8662

(f)    Submission to Jurisdiction.

ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PLEDGEE
OR PLEDGOR ARISING OUT OF OR RELATING TO THIS SECURITY
INSTRUMENT MAY AT PLEDGEE'S OPTION BE INSTITUTED IN ANY FEDERAL
OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK,
PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS
LAW, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR
HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF
ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY
IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY
SUIT, ACTION OR PROCEEDING. PLEDGOR DOES HEREBY DESIGNATE AND
APPOINT

Michael M. Aiken
816 Krystal Building
One Union Square
Chattanooga, TN 37402

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF
SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH
SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW
YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SUCH
AGENT AT SUCH ADDRESS AND WRITTEN NOTICE OF SUCH SERVICE MAILED
OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE
DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON
PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF
NEW YORK. PLEDGOR (I) SHALL GIVE PROMPT NOTICE TO PLEDGEE OF ANY
CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT
ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE
AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH
SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON

84173055_12

AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(g)    Usury.  Notwithstanding anything to the contrary, (i) all agreements and communications between Pledgor and Pledgee are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Pledgee shall never exceed the maximum lawful rate or amount, (ii) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of the Loan, and (iii) if through any contingency or event, Pledgee receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness to Pledgee, or if there is no such indebtedness, shall immediately be returned.

(h)    Agents.  Pledgee may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the bad faith, gross negligence or willful misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(i)    Irrevocable Authorization and Instruction to each Issuer.  Pledgor hereby authorizes and instructs each Issuer to comply with any instruction received by it from Pledgee in writing that is in accordance with the terms of this Agreement, without any other or further instructions from Pledgor, and Pledgor agrees that each Issuer shall be fully protected in so complying, absent gross negligence, bad faith or willful misconduct.

(j)    Counterparts.  This Agreement may be executed in any number of counterparts and all the counterparts taken together shall be deemed to constitute one and the same instrument.

(k)    WAIVER OF JURY TRIAL, DAMAGES, JURISDICTION.  EACH OF PLEDGOR AND PLEDGEE HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  PLEDGOR AND PLEDGEE EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO PLEDGEE TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR.  PLEDGOR REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY

84173055_12

SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

WITH RESPECT TO ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, PLEDGOR SHALL AND HEREBY DOES SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF NEW YORK (AND ANY APPELLATE COURTS TAKING APPEALS THEREFROM). PLEDGOR HEREBY WAIVES AND AGREES NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, (A) THAT IT IS NOT SUBJECT TO SUCH JURISDICTION OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN THOSE COURTS OR THAT THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY NOT BE ENFORCED IN OR BY THOSE COURTS OR THAT IT IS EXEMPT OR IMMUNE FROM EXECUTION, (B) THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (C) THAT THE VENUE OF THE ACTION, SUIT OR PROCEEDING IS IMPROPER. IN THE EVENT ANY SUCH ACTION, SUIT, PROCEEDING OR LITIGATION IS COMMENCED, PLEDGOR AGREES THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER PLEDGOR OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH LITIGATION UPON PLEDGOR AT THE ADDRESS OF PLEDGOR AND TO THE ATTENTION OF SUCH PERSON AS SET FORTH IN THIS SECTION 21.

No claim may be made by Pledgor against Pledgee, its affiliates and its respective directors, officers, employees, or attorneys for any special or punitive damages ("Special Damages") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to the transactions contemplated or relationship established by this Agreement, or any act, omission or event occurring in connection herewith or therewith; and to the fullest extent permitted by law Pledgor hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(l)    Costs. Except as otherwise expressly provided herein, each party shall bear and be responsible for its own costs and expenses in connection with the Loan and this Agreement and the other Loan Documents and all transactions referenced therein or contemplated thereby.

84173055_12

(m)  <u>Relationship of Issuer and Pledgee.</u>  Issuer and Pledgee intend that the relationship created hereunder and under the other Loan Documents be solely that of borrower and lender at all times prior to the issuance to Pledgee or its designee of an ownership interest in Issuer upon the exercise of the Conversion or the occurrence of an Event of Default hereunder. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Issuer and Pledgee, or to create any interest in the Collateral other than that of pledge.  Pledgee shall be treated as a lender (and not as a member of Issuer) for federal income tax purposes until the issuance to Pledgee or its designee of an ownership interest in Issuer upon the Conversion or the occurrence of an Event of Default hereunder.

(n)  <u>Survival.</u>  Upon repayment in full of the Loan, or termination of the Loan Documents by reason of the exercise of Pledgee's remedies hereunder, the representations, warranties and covenants set forth herein shall be of no further or continuing force or effect except to the extent this Agreement expressly provides to the contrary.

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]**

31

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date set forth above.

**PLEDGOR:**

**AEY, LLC**

By: _____
     Name: _____
     Title: _____

**ISSUER:**

**TRADITIONS MANAGEMENT, LLC**

By: _____
     Name: _____
     Title: _____

**PLEDGEE:**

_____

By: _____
     Name:
     Title:

**PRINCIPALS** (solely as to Sections 4(k), 5(q), 5(s) and 5(v) hereof):

_____
Michael M. Aiken

_____
Mark R. Enderle

_____
Mark D. Yarborough

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date set forth above.

PLEDGOR:

AEY, LLC

By:_____
           Name:
           Title:

ISSUER:

TRADITIONS MANAGEMENT, LLC

By:_____
           Name:
           Title:

PLEDGEE:

BERNARD NATIONAL LOAN
     INVESTORS, LTD.

By:_____
           Name:
           Title:      LAWRENCE D. CUTLER
                       CHIEF ADMINISTRATIVE &
                       COMPLIANCE OFFICER

PRINCIPALS (solely as to Sections
4(k), 5(q), 5(s) and 5(v) hereof):


_____
     Michael M. Aiken


_____
     Mark R. Enderle


_____
     Mark D. Yarborough

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the date set forth above.

**PLEDGOR:**

**AEY, LLC**

By:_____
     Name:
     Title:

**ISSUER:**

**TRADITIONS MANAGEMENT, LLC**

By:_____
     Name:
     Title:

**PLEDGEE:**

_____

By:_____
     Name:
     Title:

**PRINCIPALS** (solely as to Sections 4(k), 5(q), 5(s) and 5(v) hereof):

_____
     Michael M. Aiken

_____
     Mark R. Enderle

_____
     Mark D. Yarborough

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date set forth above.

**PLEDGOR:**

**AEY, LLC**

By:_____
      Name:
      Title:

**ISSUER:**

**TRADITIONS MANAGEMENT, LLC**

By:_____
      Name:
      Title:

**PLEDGEE:**

_____

By:_____
      Name:
      Title:

**PRINCIPALS** (solely as to Sections 4(k), 5(q), 5(s) and 5(v) hereof):

_____
    Michael M. Aiken

_____
    Mark R. Enderle

_____
    Mark D. Yarborough

<u>**EXHIBIT A**</u>

**FORM OF ACKNOWLEDGMENT AND CONSENT**

  **TRADITIONS MANAGEMENT, LLC** ("<u>Issuer</u>") hereby acknowledges receipt of a copy of that certain Loan Agreement and Pledge and Security Agreement (the "<u>Pledge Agreement</u>") between Issuer, AEY, LLC ("<u>Pledgor</u>") and [DBZ Entity] ("<u>Pledgee</u>"), and acknowledges that Pledgor is bound thereby.  Issuer agrees to notify Pledgee promptly in writing of the occurrence of any of the events described in <u>Section 5(a)</u> of the Pledge Agreement.

Dated:  December ___, 2006

           **TRADITIONS MANAGEMENT, LLC**

           By:_____
             Name:
             Title:

84173055_12

# EXHIBIT B

## FORM OF INSTRUCTION TO REGISTER PLEDGE

December ___, 2006

To:    TRADITIONS MANAGEMENT, LLC ("**Issuer**")

        In accordance with the requirements of that certain Loan Agreement and Pledge and Security Agreement dated as the date hereof (as it may be amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), between Issuer, ABY, LLC (collectively, with its successors and assigns, "**Pledgor**") and _____ ("**Pledgee**") (capitalized but undefined terms used herein as therein defined), you are hereby instructed, notwithstanding your and our understanding that the ownership interest described below is not a security under the Uniform Commercial Code, as a precaution in the event that such interest was nevertheless held to be a security, to register the pledge of the following interests as follows:

        All right, title and interest now owned or hereafter acquired by Pledgor in the following:

        (i)     all limited liability company preferred membership interests, together with (a) all options, warrants, and other rights now or hereafter acquired by Pledgor in respect of such preferred membership interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Issuer or otherwise) and all other property, rights and instruments of any description at any time issued or issuable as an addition to or in substitution for such preferred membership interests; (b) all certificates, instruments and other writings representing or evidencing such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor, and all accounts and general intangibles arising out of, or in connection with, such preferred membership interests in Issuer now owned or hereafter acquired by Pledgor; (c) any and all moneys or property due and to become due to Pledgor now or in the future in respect of such preferred membership interests in Issuer, or to which Pledgor may now or in the future be entitled with respect to such preferred membership interests in its capacity as a member of Issuer, whether by way of a dividend, distribution, return of capital or otherwise; and (d) all rights of Pledgor with respect to such preferred membership interests under each Issuer Formation Agreement applicable to Issuer (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of such preferred membership interests in Issuer) including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of such preferred membership interests in Issuer (collectively, the "**Pledged Interests**"); and

        (ii)     to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

        You are hereby further authorized and instructed to execute and deliver to Pledgee a Confirmation Statement and Instruction Agreement, substantially in the form of **Exhibit C** to

the Pledge Agreement and, to the extent provided more fully therein, to comply with the instructions of Pledgee in respect of the Collateral without further consent of, or notice to, Pledgor. Notwithstanding anything in this paragraph to the contrary, this instruction shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

Dated: December _____, 2006

**[NO FURTHER TEXT ON THIS PAGE]**

**SIGNATURES TO INSTRUCTION TO REGISTER PLEDGE**

**PLEDGOR:**

AEY, LLC

By:_____
      Name:
      Title:

**ISSUER:**

TRADITIONS MANAGEMENT, LLC

By:_____
      Name:
      Title:

**PLEDGEE:**

_____

By:_____
      Name:
      Title:

## <u>EXHIBIT C</u>

## FORM OF CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

December ____, 2006

To: _____ ("<u>Pledgee</u>")

Pursuant to the requirements of that certain Loan Agreement and Pledge and Security Agreement dated the date hereof (as amended, supplemented or otherwise modified from time to time, the "<u>Pledge Agreement</u>"), between Pledgee, AEY, LLC ("<u>Pledgor</u>") and Traditions Management, LLC ("<u>Issuer</u>"; capitalized but undefined terms used herein as therein defined), this Confirmation Statement and Instruction Agreement relates to those ownership interests (the "<u>Pledged Interests</u>"), as further described on <u>Schedule I</u> to the Pledge Agreement, issued by Issuer.

The Pledged Interests are not (i) "investment company securities" (within the meaning of Section 8-103 of the Code) or (ii) dealt in or traded on securities exchanges or in securities markets. None of the terms of any Pledged Interest or the Issuer Formation Agreement provides that it is a "security" (within the meaning of Sections 8-102(a)(15) and 8-103 of the Code).

Nevertheless, in the event that the Pledged Interests should be determined to be "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the Code), for purposes of perfecting the security interest of Pledgee therein, Issuer agrees as follows:

On the date hereof, the registered owner of the Pledged Interests is Pledgor.

The registered pledgee of the Pledged Interests is:

_____

There are no liens of Issuer on the Pledged Interests or any adverse claims thereto for which Issuer has a duty under Section 8-403 of the Code. Issuer has by book-entry registered the Pledged Interests in the name of the registered pledgee on or before the date hereof. No other pledge is currently registered on the books and records of Issuer with respect to the Pledged Interests.

Until the Loan is paid in full (exclusive of provisions which shall survive full payment), Issuer agrees to: (i) comply with the instructions of Pledgee sent in accordance with Section 20(i) of the Pledge Agreement, without any further consent from Pledgor or any other Person, in respect of the Collateral; and (ii) disregard any request made by Pledgor or any other person which contravenes the instructions of Pledgee with respect to the Collateral. Notwithstanding anything in this paragraph, this Confirmation Statement and Instruction Agreement shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

### [NO FURTHER TEXT ON THIS PAGE]

84173055_12

**SIGNATURES TO**
**CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT**

ISSUER:

TRADITIONS MANAGEMENT, LLC

By:_____
     Name:
     Title:

ACKNOWLEDGED AND AGREED:

PLEDGOR:

AEY, LLC

By:_____
     Name:
     Title:

PLEDGEE:

BERNARD NATIONAL LOAN
   INVESTORS, LTD.

By:_____
     Name:
     Title:  Director

**EXHIBIT D**

**FORM OF IRREVOCABLE PROXY COUPLED WITH INTEREST**

The undersigned member hereby irrevocably designates and appoints [_____] ("**Pledgee**"), to represent it at all annual and special meetings of the members of Traditions Management, LLC, a Delaware limited liability company (the "**Company**"), and the undersigned hereby authorizes and empowers Pledgee to vote any and all [membership interests/limited partnership interests] of the Company pledged by the undersigned to Pledgee pursuant to that certain Loan Agreement and Pledge and Security Agreement dated as of the date hereof between the undersigned, Issuer and Pledgee (as amended from time to time, the "**Pledge Agreement**"), and to do all things which the undersigned might do if present and acting itself. Capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Pledge Agreement.

This proxy is an irrevocable proxy coupled with an interest. The undersigned recognizes that Pledgee has an interest in said pledged interests to secure the obligations of Pledgor to Pledgee under the Loan Documents and, to the extent permitted by law, this proxy shall continue in full force and effect until all such obligations are paid in full.

This proxy is issued pursuant to the Pledge Agreement and shall remain subject to the terms thereof and Pledgee shall not exercise any right or privileges granted therein unless and until the occurrence of events set forth in the Pledge Agreement which authorizes the voting of the pledged interests pursuant to this proxy.

Dated: December ___, 2006

<div style="margin-left: 40%;">

**PLEDGOR:**

AEY, LLC

By:_____
       Name:
       Title

</div>

84173055_12

---

**TRADITIONS MANAGEMENT, LLC**

---

**SUBJECT:**   2007 CONSOLIDATED P&L

**DATE:**   12/14/2006

---

Attached is the consolidated budget for 2007 for Traditions Management, LLC. This budget will be amended and updated by January 1, 2007, by which time the company believes it will be able to more accurately reflect the upcoming fiscal year. A variety of issues will impact the final budget including, but not limited to, the following:

1.  The attached budget does not include:

    a.  The $1.0 million in aggregate annual fees payable to Entheos, LLC Gemini I, LLC and Hideaway Investments, LLC per the terms of their Service Agreement(s) (which is subject to cashflow use rules), and

    b.  Revenue from Projects Under Negotiation. A list of those potential projects is attached. The amended and updated budget for 2007 will be adjusted as appropriate for these projects.

2.  As noted on Schedule IV to the Loan Agreement and Pledge and Security Agreement, the contracts for Hill County Harbor and Spring Valley Ranch/High Grange are "fluid". The amended and updated budget for 2007 will be adjusted once the various issues relating to these contracts are resolved.

3.  By year end, the company will have a clearer understanding of total revenues for 2006 than it does at this time. The current year is unusual versus prior years in that a substantial amount of revenue and earnings were scheduled to occur in the final weeks of 2006. We now believe a substantial amount of budgeted sales will likely close during the first part of 2007 impacting the results of 2006 and the final budget for 2007. Specifically, at Kukui'ula, we anticipate 2006 closings of $30 million, with the remainder of the budgeted 2006 closings ($70 million) occurring in early 2007. Additionally, we believe that the budgeted sales for The Tower Residences at The Ritz-Carlton, Dallas will occur in 2007, again impacting the budgets for both years.

Traditions Management, LLC

# Consolidated P&L

| | 2007P |
|---|---|
| **Revenues** | |
| **Gross Fee Revenue** | |
| Fees | $29,660,510 |
| Bonus | 3,246,826 |
| Other | 0 |
| **Total Revenues** | $32,907,336 |
| Commissions Paid | $14,098,157 |
| **Net Fee Revenue** | $18,808,979 |
| Reimbursements | $3,165,070 |
| **Net Revenue** | $22,073,049 |
| **Expenses** | |
| **G&A** | |
| Bank Charges | $2,686 |
| Brokerage Fees | 174,000 |
| Company Functions | 70,924 |
| F&E: Computer/Database Expense | 101,250 |
| F&E: Furniture/Equipment | 86,926 |
| Consulting Fees | 120,125 |
| Contract Labor | 0 |
| Contributions | 8,066 |
| Dues/Subscriptions | 4,011 |
| Flower Arrangements | 9,990 |
| Gifts | 160,836 |
| Insurance - Allowance | 0 |
| Insurance - Health | 166,293 |
| Insurance - Key Man | 85,000 |
| Insurance - Professional Liability/E&O | 49,947 |
| Insurance - Property & Casualty | 17,910 |
| Insurance - Worker's Compensation | 80,989 |
| Licenses/Permits | 27,164 |
| Maintenance/Repairs | 2,673 |
| Office Supplies | 136,579 |
| Parking | 19,410 |
| Petty Cash | 0 |
| Postage/Delivery | 67,937 |
| Printing/Reproduction | 8,421 |
| Professional Fees - Accounting | 50,000 |
| Professional Fees - Legal | 169,494 |
| Professional Fees - Other | 250,000 |
| Relocation Expense | 10,000 |
| Rents | 207,734 |
| Sales/Marketing/Website | 30,520 |
| Taxes - Property | 275 |
| Training/Recruiting | 297 |
| TA/ME: Airfare | 313,900 |
| TA/ME: Automobile | 25,521 |
| TA/ME: Meals & Entertainment | 101,546 |
| TA/ME: TM Expenses | 44,374 |
| TA/ME: Travel | 176,566 |
| Utilities | 142,981 |
| Misc | 0 |
| Capitalized Expenses | (23,000) |
| **Total G&A** | $2,901,882 |

Traditions Management, LLC
# Consolidated P&L

|  | 2007P |
|---|---|
| **Payroll** | |
| Salaries/Taxes | $1,758,758 |
| Broker Commissions | 982,533 |
| Sales Bonuses | 332,042 |
| Draws | 360,000 |
| Payroll Taxes - Reimbursable | 77,888 |
| Payroll Taxes - Non-reimbursable | 373,251 |
| **Total Payroll** | $3,892,771 |
| Business Development | $250,000 |
| **Total Expenses** | $7,573,553 |
| **Total EBITDA** | $15,026,418 |

Traditions Management, LLC

# Financial Summary by Project

| | 2007P |
|---|---|
| **Net Real Estate Product Sales** | |
| | |
| **Projects Under Contract** | |
| Capella Residences - Las Vegas | $0 |
| Escondido | 34,555,712 |
| Highgrange | 0 |
| Hill Country Harbor | 50,000,000 |
| Kukui'ula | 200,000,000 |
| Makena Bay Club | 397,058,524 |
| Ocean Club Residences & Marina | 9,000,000 |
| Residences at the Ritz-Carlton - Dallas | 0 |
| Tower Residences at Ritz-Carlton - Dallas | 92,220,000 |
| Silverleaf | 79,000,688 |
| Total Current Projects | $862,834,424 |
| | |
| **Total Net Real Estate Product Sales** | $862,834,424 |
| | |
| **Gross Fee Revenue** | |
| | |
| **Projects Under Contract** | |
| Capella Residences - Las Vegas | $0 |
| Escondido | 3,801,128 |
| Highgrange | 0 |
| Hill Country Harbor | 7,054,000 |
| Kukui'ula | 4,082,938 |
| Makena Bay Club | 7,444,853 |
| Ocean Club Residences & Marina | 2,903,643 |
| Residences at the Ritz-Carlton - Dallas | 3,510,902 |
| Tower Residences at Ritz-Carlton - Dallas | 1,969,675 |
| Silverleaf | 2,199,907 |
| Total Current Projects | $32,907,135 |
| | |
| **Total Gross Fee Revenue** | $32,907,135 |
| | |
| **Commissions** | |
| | |
| **Projects Under Contract** | |
| Capella Residences - Las Vegas | $0 |
| Escondido | 1,624,118 |
| Highgrange | 0 |
| Hill Country Harbor | 3,041,000 |
| Kukui'ula | 2,234,813 |
| Makena Bay Club | 3,673,529 |
| Ocean Club Residences & Marina | 419,623 |
| Residences at the Ritz-Carlton - Dallas | 1,539,044 |
| Tower Residences at Ritz-Carlton - Dallas | 1,268,025 |
| Silverleaf | 0 |
| Total Current Projects | $14,000,157 |
| | |
| **Total Commissions** | $14,000,157 |
| | |
| **Net Fee Revenue** | |
| | |
| **Projects Under Contract** | |
| Capella Residences - Las Vegas | $0 |
| Escondido | 2,177,010 |
| Highgrange | 0 |

Traditions Management, LLC

# Financial Summary by Project

| | 2007F |
|---|---|
| Hill Country Harbor | 4,015,000 |
| Kukui'ula | 1,798,125 |
| Makena Bay Club | 3,871,324 |
| Ocean Club Residences & Marina | 2,464,016 |
| Residences at the Ritz-Carlton - Dallas | 1,671,658 |
| Tower Residences at Ritz-Carlton - Dallas | 691,650 |
| Silverleaf | 2,199,207 |
| **Total Current Projects** | **$16,906,979** |

| **Total Net Fee Revenue** | **$16,906,979** |
|---|---|

## Reimbursements

| Projects Under Contract | |
|---|---|
| Capella Residences - Las Vegas | $271,416 |
| Escondido | 176,243 |
| Highgrange | 558,379 |
| Hill Country Harbor | 230,161 |
| Kukui'ula | 629,793 |
| Makena Bay Club | 714,461 |
| Ocean Club Residences & Marina | 39,146 |
| Residences at the Ritz-Carlton - Dallas | 0 |
| Tower Residences at Ritz-Carlton - Dallas | 384,947 |
| Silverleaf | 131,532 |
| **Total Current Projects** | **$3,166,070** |

| **Total Reimbursements** | **$3,166,070** |
|---|---|

## Net Revenue (Net Fee Rev. plus Reimb. Exp.)

| Projects Under Contract | |
|---|---|
| Capella Residences - Las Vegas | $271,416 |
| Escondido | 2,355,383 |
| Highgrange | 558,379 |
| Hill Country Harbor | 4,243,161 |
| Kukui'ula | 2,427,918 |
| Makena Bay Club | 4,585,784 |
| Ocean Club Residences & Marina | 2,323,161 |
| Residences at the Ritz-Carlton - Dallas | 1,671,658 |
| Tower Residences at Ritz-Carlton - Dallas | 1,076,597 |
| Silverleaf | 2,331,639 |
| **Total Current Projects** | **$22,073,049** |

| **Total Net Revenue** | **$22,073,049** |
|---|---|

## Expenses

| Projects Under Contract | |
|---|---|
| Capella Residences - Las Vegas | $287,435 |
| Escondido | 267,331 |
| Highgrange | 633,735 |
| Hill Country Harbor | 1,300,522 |
| Kukui'ula | 670,326 |
| Makena Bay Club | 509,300 |
| Ocean Club Residences & Marina | 47,176 |
| Residences at the Ritz-Carlton - Dallas | 0 |
| Tower Residences at Ritz-Carlton - Dallas | 434,285 |

Traditions Management, LLC

# Financial Summary by Project

|  | 2007? |
|---|---|
| Silverleaf | 100,317 |
| Total Current Projects | $4,913,426 |

| Total Expenses | $7,024,653 |
|---|---|

**EBITDA**

| Projects Under Contract |  |
|---|---|
| Capella Residences - Las Vegas | ($816,017) |
| Escondido | 2,085,922 |
| Highgrange | (46,356) |
| Hill Country Harbor | 2,933,529 |
| Kukui'ula | 1,467,592 |
| Makena Bay Club | 3,782,484 |
| Ocean Club Residences & Marina | 2,475,986 |
| Residences at the Ritz-Carlton - Dallas | 1,671,869 |
| Tower Residences at Ritz-Carlton - Dallas | 642,313 |
| Silverleaf | 2,171,212 |
| Total Current Projects | $17,159,623 |

| Total EBITDA | $16,625,416 |
|---|---|

**Corp Expenses as % of Net Revenue**

| Projects Under Contract |  |
|---|---|
| Capella Residences - Las Vegas | 1.2% |
| Escondido | 10.7% |
| Highgrange | 2.7% |
| Hill Country Harbor | 19.2% |
| Kukui'ula | 11.0% |
| Makena Bay Club | 20.8% |
| Ocean Club Residences & Marina | 11.4% |
| Residences at the Ritz-Carlton - Dallas | 7.6% |
| Tower Residences at Ritz-Carlton - Dallas | 4.9% |
| Silverleaf | 10.6% |
| Total Current Projects | 100.0% |

**Net Revenue Contribution (%)**

| Projects Under Contract |  |
|---|---|
| Capella Residences - Las Vegas | 1.2% |
| Escondido | 10.7% |
| Highgrange | 2.7% |
| Hill Country Harbor | 19.2% |
| Kukui'ula | 11.0% |
| Makena Bay Club | 20.8% |
| Ocean Club Residences & Marina | 11.4% |
| Residences at the Ritz-Carlton - Dallas | 7.6% |
| Tower Residences at Ritz-Carlton - Dallas | 4.9% |
| Silverleaf | 10.6% |
| Total Current Projects | 100.0% |

---

## TRADITIONS MANAGEMENT, LLC

---

**SUBJECT:**  PROJECTS UNDER NEGOTIATION

**DATE:**  DECEMBER 13, 2006

---

The following is a summary of projects that are currently under negotiation:

### FORBES TRINCHERA RANCH

The Developer of this property will be Kip Forbes of the Forbes publishing family. This has long been their family's ranch for hunting, fishing and entertaining. It is one of the largest tracts in the United States that remains privately held. The project consists of approximately 171,000 acres located in Colorado which Developer intends to develop as a year round outdoorsmen club known as *Trinchera Ranch*. The primary use of this property has been as a big game hunting preserve, however, the multitude of natural amenities on the ranch is impressive. Developer currently intends to initially offer (20) Founder ownership interests at the Property. Included with each Ownership Interest will be unlimited access to the services and amenities offered at the Property, including the Lodge, the Guest Ranch house, at least (2) cabins, on-site transportation, trails for hiking, biking, ATVing and snowmobiling, swimming, hunting and fishing, camping facilities, and other amenities that are in keeping with the proposed lifestyle at the Project. In addition, owners will have the opportunity to build a personal Lodge Residence.

We are in the process of finalizing on a draft of the Sales Agreement. It is currently anticipated that:

- The term will be through June, 2008
- Gross sales revenue is expected to be approximately $70 million – with gross commissions paid at the rate of 6.00% (or $4.2 million).
- A 1.00% bonus will be earned if (16) Ownership Interests are closed by 12/31/2007.

### ROSE ISLAND

The project consists of approximately 230 acres located on Rose Island in the Bahamas which Developer intends to develop as a residential community known as *The Ritz-Carlton, Rose Island*. As currently envisioned, the Project will include (135) waterfront estate homes averaging approximately 3,800 square feet, (50) marina island townhomes ranging in size from 1,800 square feet to 2,300 square feet and (29) marina island villas averaging approximately 2,800 square feet located on the marina island, and (49) whole-ownership, fee simple yacht island condominiums averaging approximately 1,000 square feet, (15) whole-ownership, fee simple marina village condominiums averaging approximately 1,500 square feet, (28) iron shore villas averaging approximately 2,800 square feet and (120) condominiums. Included with the Real Estate Product will be access to luxury hotel services and amenities such as concierge, valet parking and parking spaces, room service, hotel restaurant, a beach club, destination spa and fitness facility, retail village, marina, Ritz-Kids Activity Center & Daycare, dive shop, water sports/dive shop, nature preserve and other amenities consistent with the proposed lifestyle at the Project.

We have forwarded a draft Sales Agreement to Developer for review. It is currently anticipated that:

- The term will be (3) years from the date of the first fully executed Binding Contract of Sale.
- Gross sales revenue is TBD; gross commissions will be paid at the rate of 3.50%.
- A 1.00% bonus will be earned – with the bonus benchmark TBD.

## BAHIA MAROMA

The project is located on the Riviera Maya between Cancun and Playa del Carmen, Mexico. Developer intends to develop as a residential community known as *Bahia Maroma Resort*. As currently envisioned, the Project will consist of (21) luxury beach front residences averaging approximately 3,700 square feet, (8) beachfront villas averaging approximately 3,700 square feet, (27) whole-ownership two and three-bedroom condominiums ranging in size from approximately 2,700 square feet to 3,700 square feet, (45) cottages averaging approximately 3,700 square feet, and (16) fractional condominiums. The Project may also include other real estate product. Included with each Unit will be access to Capella hotel services and amenities such as concierge, valet parking and parking spaces, room service, hotel restaurants, hotel spa/fitness center, outdoor pools and whirlpools, tennis courts and other amenities consistent with the proposed lifestyle at the Project. Capella is the operator of luxury 5-Star boutique hotels consisting of less than 100 suites and representing the pinnacle in personal service. Capella is the brain child of Horst Schultze, the man singularly responsible for the creation of the Ritz-Carlton brand. In addition, each purchaser will have the ability to apply for membership in the Bahia Maroma Club consisting of an 18-hole Championship golf course with a clubhouse with [TBD] memberships to be offered.

We are working on with the Developer to finalize the Services Agreement. It is currently anticipated that:

- The term will be (3) years from the date of the first fully executed Binding Contract of Sale.
- Gross sales revenue is TBD; gross commissions will be paid at the rate of 3.50%.
- A 1.00% bonus will be earned if 70% of the initial offering is sold within (18) months after the first Binding Contract of Sale.

## THE PRESERVE AT SANTA LUCIA

The project consists of approximately 20,000 acres located a short distance inland from Carmel by the Sea with (300) homesites. Approximately (250) homesites have been sold at an average price of $1.75 million. Our assignment will be to help the developer sell the remaining inventory for and average price of between $1.5 and $2.0 million. This community has been rated by Travel and Leisure Golf as the #1 golf community in America. The golf course was designed by Tom Fazio and is set in what may be the most pristine land in the country. The amenities, in addition to golf, include Pool, equestrian, fishing, hiking, fitness, and spa.

We are working on with the Developer to finalize the Services Agreement. It is currently anticipated that:

- The term will be through December, 2007.
- Gross sales revenue is TBD; gross commissions will be paid at the rate of between 3.00% and 6.00% (depending on the product).
- A 1.00% bonus will be earned if (20) homesites are closed by December 31, 2007.

## THE CAPELLA HOTEL AND COMMUNITY

The proposed project is envisioned to be a destination resort property on Providenciales in the Turks and Caicos. Capella is the operator of luxury 5-Star boutique hotels consisting of less than 100 suites and representing the pinnacle in personal service. Capella is the brain child of Horst Schultze, the man singularly responsible for the creation of the Ritz Carlton Brand. The community will consist of all the amenities associated with the Capella brand as well as the natural amenities associated with over a mile of pristine beach and hundreds of acres of beautiful ocean habitat.

We are in initial conversations with the developer. It is currently anticipated that a traditional Services Agreement will be signed.

- The term is anticipated to be from 9/15/2007 through 12/31/ 2009 or 2010.
- Gross sales revenue is TBD; gross commissions will be paid at the rate of between 5.00% and 8.00% (depending on the product).
- A 1.00% bonus will be earned if (20) homesites are closed by December 31, 2007.

**EXHIBIT F**

**Prohibited Transferees**

## EXHIBIT F

## COMPETITORS

East West Partners
Centex Destination Properties (Centex Corp.)
Discovery Land
DR Horton
Equity Marketing Services
Fortune International Realty
Ginn Real Estate Company (The Ginn Company)
IMI Living
KB Homes
Maverick
Intrawest
Realogy
Renning Marketing
Resort Development Insight
Ryness Company
SunBurst Marketing Group
The Communique Group
WCI Communities

## SCHEDULE I

| PLEDGOR | ISSUER | INTERESTS PLEDGED |
|---------|--------|-------------------|
| ABY, LLC | Traditions Management, LLC | 100% preferred membership interest |

## SCHEDULE II

| Pledgor | Chief Executive Office/Principal Place of Business | Type of Entity | Organizational Identification Number | Jurisdiction of Incorporation or Formation | Name under which Pledgor does business, if other than its legal name | Date located at present address if less than six years |
|---------|---------------------------------------------------|----------------|--------------------------------------|---------------------------------------------|----------------------------------------------------------------------|--------------------------------------------------------|
| AEY, LLC | 816 Krystal Building One Union Square Chattanooga, TN 37402 | Limited liability company | Employer/ tax Identification Number: 20-5883934 | Delaware | | Since November 14, 2006 |

84173055_12

## SCHEDULE III

### FORM OF STOCK POWER/ASSIGNMENT OF MEMBERSHIP/LP INTERESTS

       **AEY, LLC,** a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("Assignor"), for Ten Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, hereby sells, transfers, assigns, delivers, sets-over and conveys to _____ a _____, its successors and assigns ("Assignee"), all of its right, title and interest in and to the interests identified on Exhibit A attached hereto (the "Interests") including, without limitation, all of Assignor's rights to, and interests in, any and all profits, distributions and other entitlements allocable to such Interests.

       Assignor represents and warrants to Assignee that none of the Interests has been sold, assigned, transferred, pledged, hypothecated or otherwise encumbered, in whole or in part, other than pursuant to this Assignment, and each of the Interests is being transferred free and clear of all liens, encumbrances, claims, security interest, rights of first refusal, options and liabilities of any kind or nature. No person or entity has asserted any claims in respect of, or claimed any interest in, any of the Interests.

       **IN WITNESS WHEREOF,** Assignor has caused this Assignment to be executed as of _____, _____ by its duly authorized member.

       **ASSIGNOR:**

       **AEY, LLC**

       By:_____
          Name:
          Title:

84173055_12

**EXHIBIT A (to Schedule III)**

Description of the Interests

All of Assignor's right, title and interest in and to Assignor's 100% preferred membership interest in Traditions Management, LLC, a Delaware limited liability company.

# SCHEDULE IV

## Existing Contracts

1.    Sales Agreement between Crescent Plaza Residential, LLC and Traditions Management, LLC dated January 23, 2004, as amended by Letter dated April 5, 2005 and by Letter dated January 23, 2006.

2.    Sales Agreement between Crescent Tower Residences, L.P. and Traditions Crescent Plaza, LLC dated March 31, 2006.

3.    Amended and Restated Contracting Services Agreement between DC Ranch, LLC and Traditions Management, LLC dated January 1, 2003, as amended by the First Amendment to Amended and Restated Contracting Services Agreement dated January 1, 2005.

4.    Marketing and Sales Agreement between Escondido Partnership, LTD and Traditions Management, LLC dated May 2004, as amended by Letter dated February 10, 2006, by Letter dated July 27, 2006, and by Letter October 26, 2006.

5.    Sales Agreement between EWP-LV Residences, LLC and Traditions Management, LLC dated April 21, 2006.

6.    Sales Agreement between Clearview Property Development, LLC and Traditions Management, LLC dated December 27, 2005.

7.    Sales Agreement between Keaka, LLC and Traditions Management, LLC dated July 25, 2005.

8.    Marketing and Sales Agreement between Kukui'ula Development Company (Hawaii), LLC and Traditions Management, LLC dated June 1, 2004 as amended by the First Amendment to Marketing and Sales Agreement dated October 7, 2004, by Letter dated February 22, 2005, and by the Second Amendment to Marketing and Sales Agreement dated May 1, 2006.

9.    Sales Agreement between Paradise Island Condominiums Joint Venture Limited and Traditions Management, LLC dated September 27, 2004.

10.    Sales Agreement between Spring Valley Holdings, LLC and Traditions Management, LLC dated March 1, 2006.

The Sales Agreements and Marketing and Sales Agreements listed in paragraphs 1, 4, 5, 6, 7, 8 and 10 above have been, or are in the process of being, assigned to wholly owned subsidiaries of Traditions Management, LLC. Traditions remains, or will remain, obligated to perform the services under these Agreements.

## SCHEDULE V

Material Defaults under any of the Existing Contracts

and

Disputes, Set-Offs, Counterclaims and Defenses in respect of the Receivables

## SCHEDULE V

1. Sales Agreement between Clearview Property, LLC ("Developer") and Traditions Management, LLC ("Traditions") dated December 27, 2005.    This Sales Agreement has been assigned by Traditions to its wholly-owned subsidiary, Traditions Hill Country Properties, LLC ("Traditions Hill Country").    This Sales Agreement relates to the Hill Country Harbor project in Palo Pinto County, Texas.    Although this Sales Agreement is currently in effect, Developer is in the process of reconfiguring the project away from built product to sales of unimproved lots and the development has been placed "on hold".    Developer and Traditions/Traditions Hill Country are discussing these changes.    It has not been determined at this point whether, or in what form, this project will proceed.    Traditions currently has outstanding invoices totaling $190,000. Although payment is anticipated, non-payment would result in a dispute.

2. Sales Agreement between Spring Valley Holdings, LLC ("Developer") and Traditions Management, LLC ("Traditions") dated March 1, 2006.    This Sales Agreement has been assigned by Traditions to its wholly-owned subsidiary, Traditions Spring Valley Properties, LLC ("Traditions Spring Valley").    This Sales Agreement involves the Highgrange project in Colorado.    Traditions Development, LLC ("Traditions Development"), is leading a group that is pursuing the possibility of buying out Developer and its partners.    Traditions Development is owned by the three limited liability companies which own the common membership interests of Traditions.    Traditions Development believes this buyout may present a good opportunity to participate in the development of Highgrange; however, it is premature to predict the outcome of this process and its effect on Traditions/Traditions Spring Valley. If another party is successful in reaching a buy out agreement, there is no assurance that Traditions/Traditions Spring Valley will continue to have a Sales Agreement with respect to this project.

EXHIBIT E

## SECURED NON-RECOURSE GUARANTY

This **SECURED NON-RECOURSE GUARANTY** dated as of the *15th* day of December, 2006 made by **AEY, LLC**, a Delaware limited liability company having its principal place of business at 816 Krystal Building, One Union Square, Chattanooga, Tennessee 37402 ("**Non-Recourse Guarantor**") to and for the benefit of **BERNARD NATIONAL LOAN INVESTORS, LTD.**, a Cayman Islands partnership having an address at 745 Fifth Avenue, 18th floor, New York, New York 10151 (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H :

**WHEREAS**, Lender is this day making a loan to Traditions Management, LLC ("**Borrower**"), in the principal sum of up to TWENTY-SIX MILLION FIVE HUNDRED THOUSAND AND NO/100 ($26,500,000) DOLLARS (the "**Loan**") pursuant to that certain Loan Agreement and Pledge and Security Agreement dated as of the date hereof among Lender, Borrower and Non-Recourse Guarantor (as it may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**") and evidenced by that certain Promissory Note made by Borrower to Lender (together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**"; the Pledge Agreement, the Note and the other documents evidencing and securing the Loan, collectively, the "**Loan Documents**");

**WHEREAS**, Lender requires, as a condition to making the Loan, that Non-Recourse Guarantor guaranty, subject to the express terms and provisions hereof, the payment of the Loan and performance of Borrower's obligations under the Note, the Pledge Agreement and the other Loan Documents as more particularly set forth herein (collectively, the "**Guarantied Obligations**"), and to secure such guaranty by granting to Lender a security interest in and to the preferred membership interests in Borrower owned by Non-Recourse Guarantor; and

**WHEREAS**, Non-Recourse Guarantor expects to derive a substantial economic benefit from the Loan and, accordingly, Non-Recourse Guarantor desires to guaranty the Guarantied Obligations as provided herein, and to execute and deliver this Guaranty and the Pledge Agreement (the collateral under the Pledge Agreement, consisting of the "Collateral", the "Receivables" and the "Interest Reserve", as such terms are defined in the Pledge Agreement, herein collectively, the "**Collateral**") in order to satisfy the condition described in the preceding paragraph.

**NOW, THEREFORE**, in consideration of the foregoing and other benefits accruing to Non-Recourse Guarantor, the receipt and sufficiency of which are hereby acknowledged, Non-Recourse Guarantor hereby makes the following representations and warranties to the Lender and hereby covenants and agrees with Lender as follows:

84175792_5

# ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1 Guaranty of Obligation.** Subject to the express terms and conditions hereof, Non-Recourse Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.

**1.2 Limitation on Recourse.** (a) Notwithstanding any provision in this Agreement to the contrary, but subject to the qualifications set forth in this Section and to the terms of Section 1.12 hereof, Lender shall not enforce the liability and obligation of Non-Recourse Guarantor to perform and observe the obligations contained in this Guaranty by an action or proceeding wherein a money judgment shall be sought against Non-Recourse Guarantor. Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding solely in order to enable Lender to enforce and realize upon this Guaranty and the Pledge Agreement with respect to the Collateral, and any judgment in any such action or proceeding shall be enforceable against Non-Recourse Guarantor only to the extent of the Collateral. Lender, by accepting this Guaranty and the Pledge Agreement agrees that it shall not sue for, seek or demand any deficiency judgment against Non-Recourse Guarantor in any such action or proceeding, under, by reason of or in connection with this Guaranty or the Pledge Agreement. The provisions of this Section shall not, however: (i) constitute a waiver, release or impairment of any obligation evidenced or secured by the Pledge Agreement or this Guaranty; (ii) impair the right of Lender to name Non-Recourse Guarantor as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement; (iii) affect the validity or enforceability of any other guaranty or indemnity made in connection with the Loan; or (iv) impair the right of Lender to bring suit with respect to fraud or intentional misrepresentation by Non-Recourse Guarantor in connection with the Pledge Agreement or this Guaranty.

(b) Notwithstanding anything to the contrary in any of the Loan Documents, but subject to subparagraph (a) above, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness under the Loan Documents or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with the Loan Documents.

(c) Anything herein to the contrary notwithstanding, this Guaranty shall cease, terminate and be of no further force or effect upon the termination and repayment in full of the Loan together with all amounts payable to Lender under the Loan Documents.

**1.3 Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and not a guaranty of collection. This Guaranty may not be revoked by Non-Recourse Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Non-Recourse Guarantor and after Non-Recourse Guarantor's death (if Non-Recourse Guarantor is a natural person), in which

2

event this Guaranty shall be binding upon Non-Recourse Guarantor's estate and Non-Recourse Guarantor's legal representatives and heirs. The fact that at any time or from time to time the Guarantied Obligations may be increased or reduced shall not release or discharge the obligation of Non-Recourse Guarantor to Lender with respect to the Guarantied Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

1.4 **Guarantied Obligations Not Reduced by Offset.** The Guarantied Obligations and the liabilities and obligations of Non-Recourse Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guarantied Obligations, whether such offset, claim or defense arises in connection with the Guarantied Obligations (or the transactions creating the Guarantied Obligations) or otherwise.

1.5 **Payment By Non-Recourse Guarantor.** If all or any part of the Guarantied Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Non-Recourse Guarantor shall, subject to the provisions of Section 1.2(a) above, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guarantied Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guarantied Obligations and may be made from time to time with respect to the same or different items of Guarantied Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

1.6 **No Duty To Pursue Others.** It shall not be necessary for Lender (and Non-Recourse Guarantor hereby waives any rights which Non-Recourse Guarantor may have to require Lender), in order to enforce the obligations of Non-Recourse Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guarantied Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guarantied Obligations, (iv) join Borrower or any others liable on the Guarantied Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guarantied Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guarantied Obligations.

1.7 **Waivers.** Non-Recourse Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default under, and as

3

such term is defined in the Pledge Agreement, (vi) Lender's transfer or disposition of the Guarantied Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guarantied Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guarantied Obligations and the obligations hereby guarantied.

**1.8 Payment of Expenses.** In the event that Non-Recourse Guarantor should breach or fail to timely perform any provisions of this Guaranty, Non-Recourse Guarantor shall, subject to the provisions of Section 1.2(a) above, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guarantied Obligations.

**1.9 Effect of Bankruptcy.** Subject to the provisions of Section 1.2 above, in the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guarantied Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Non-Recourse Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Non-Recourse Guarantor that Non-Recourse Guarantor's obligations hereunder shall not be discharged except by performance of such obligations and then only to the extent of such performance.

**1.10 Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the repayment in full of the Loan together with all of the amounts payable to Lender under the Loan Documents, Non-Recourse Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Non-Recourse Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guarantied Obligations for any payment made by Non-Recourse Guarantor under or in connection with this Guaranty or otherwise.

**1.11 Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

**1.12 Limitation on Liability.** (a) Notwithstanding anything to the contrary elsewhere contained herein or in any Loan Document to which Non-Recourse Guarantor is a party, but subject to the terms of Section 1.2 hereof, the aggregate liability of Non-Recourse Guarantor under the Guaranty for payment of the obligations guaranteed by this Guaranty shall not exceed an amount which, in the aggregate, is One Thousand Dollars ($1,000) less than the

4

greater of (i) Non-Recourse Guarantor's Net Worth (as such term is defined in paragraph (b) of this Section) calculated as of the date of this Guaranty; and (ii) Non-Recourse Guarantor's Net Worth calculated as of any later date on which (1) Non-Recourse Guarantor expressly reaffirms this Guaranty, (2) demand is made on Non-Recourse Guarantor hereunder, (3) payment is made by Non-Recourse Guarantor hereunder or (4) any judgment, order or decree is entered requiring Non-Recourse Guarantor to make payment hereunder or in respect hereof.

(b)    As used in paragraph (a) of this Section, "**Net Worth**" means the amount, as of the respective date of calculation, by which the sum of the "fair saleable value" of all of Non-Recourse Guarantor's assets is greater than the amount that will be required to pay all of the Non-Recourse Guarantor's debts, in each case matured or unmatured, contingent or otherwise, as of the date of calculation, but excluding liability arising under this Guaranty and excluding, to the maximum extent permitted by applicable law or equity with the objective of avoiding rendering such Non-Recourse Guarantor insolvent, liabilities subordinated to the obligations arising out of loans or advances made by Borrower of any of its Subsidiaries to such Non-Recourse Guarantor. The meaning of the term "fair saleable value" and the calculation of assets and liabilities shall be determined in accordance with Section 548 of 11 U.S.C. § 101 et seq., as amended from time to time (the "**Bankruptcy Code**").   Non-Recourse Guarantor hereby permits the indebtedness of Borrower to exceed Non-Recourse Guarantor's liability under this Guaranty.

**1.13    Additional Waivers.** (a) Non-Recourse Guarantor hereby waives, subject to the provisions of Section 1.2 hereof: (i) any defense based upon any legal disability or other defense of Borrower, any other guarantor or other person, or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment of all sums payable under the Loan Documents; (ii) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower or any defect in the formation of Borrower; (iii) any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Non-Recourse Guarantor; (iv) all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for a guaranteed obligation, may have destroyed Non-Recourse Guarantor's rights of subrogation and reimbursement against Borrower ; (v) any and all rights of subrogation, reimbursement, contribution or indemnification against Borrower or any other person with respect to Non-Recourse Guarantor's obligations under this Guaranty; (vi) any defense based upon Lender's failure to disclose to Non-Recourse Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable under the Loan Documents; (vii) any defense based upon any statute or rule or law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome that that of a principal; (viii) any defense based upon Lender's election, in any proceeding instituted under the Bankruptcy Code, or the application of Section 1111(b)(2) of the Bankruptcy Code or any successor statute; (ix) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code; (x) subject to Section 1.10 hereof, any right of subrogation, any right to enforce any remedy which Lender may have against Borrower and any right to participate in, or benefit from, any security now or hereafter held by Lender; (xi) notice of acceptance of this Guaranty by Lender and of presentment, demand, protest, notice of protest and of dishonor,

5

notice of default and all other notices of every kind or nature now or hereafter provided by agreement or available at law; (xii) the pleading of any statute of limitations as a defense to the obligations hereunder; (xiii) any right to require or compel Lender, prior to exercising its rights hereunder to first proceed against Borrower or any security for the Loan, or to pursue any other remedy available to Lender; and (xiv) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or its failure to proceed promptly or otherwise as against Borrower, Non-Recourse Guarantor or any security. Notwithstanding any foreclosure of Lender's security interest with respect to any or all of the collateral for the Loan, whether by the exercise of the power of sale, by an action for judicial foreclosure or by an acceptance of a deed or assignment in lieu of foreclosure, Non-Recourse Guarantor shall remain bound under this Guaranty. Non-Recourse Guarantor agrees that the payment of all sums payable under the Loan Documents or any part thereof or other act which tolls any statute of limitations applicable to the Loan Documents shall similarly operate to toll the statute of limitations applicable to Non-Recourse Guarantor's liability hereunder. Lender's failure to exercise, or delay in exercising, any right or power hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power.

(b)    Without limiting any rights of Lender or Non-Recourse Guarantor to use any other language to express an intent to waive any or all of the rights and defenses described herein, Non-Recourse Guarantor agrees that, among other things, but subject in any event to the provisions of Section 1.2 hereof: (i) Lender may collect from Non-Recourse Guarantor without first foreclosing on any collateral pledged by Borrower, if any; and (ii) if Lender forecloses on any collateral pledged by Borrower, if any: (A) the amount of the indebtedness evidenced by the Loan Documents may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Lender may collect from Non-Recourse Guarantor even if Lender, by foreclosing on the collateral, has destroyed any right Non-Recourse Guarantor may have to collect from Borrower.

(c)    Non-Recourse Guarantor further agrees that the validity of this Guaranty and the obligations of Non-Recourse Guarantor hereunder shall in no way be terminated, affected or impaired by reason of: (i) the assertion by Lender of any rights or remedies which it may have under or with respect to the Loan Documents, against any person obligated thereunder; (ii) any failure to file or record any of the Loan Documents or to take or perfect any security intended to be provided thereby; (iii) the release or exchange of any collateral for the Loan; (iv) the commencement of a case under the Bankruptcy Code, by or against any person obligated under the Loan Documents, or the death of any Non-Recourse Guarantor; or (v) any payment made in respect of the Loan or any other indebtedness arising under the Loan Documents, whether made by Borrower or Non-Recourse Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Loan, nor shall it have the effect of reducing the liability of Non-Recourse Guarantor hereunder. It is further understood that if Non-Recourse Guarantor shall have taken advantage of, or be subject to the protection of, any provision of the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare

6

the Loan due and payable on the happening of any default or event by which, under the terms of the Loan Documents, the Loan shall become due and payable, Lender may, as against Non-Recourse Guarantor, nevertheless, declare the Guaranteed Obligations due and payable and enforce any and all of its rights and remedies provided for herein, subject in any event to the provisions of Section 1.2 hereof.

      (d)    Non-Recourse Guarantor further covenants: (i) that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Loan Documents; (ii) that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Loan Documents or other collateral for the Loan; and (iii) that other indulgence or forbearance may be granted under any or all of the Loan Documents, without notice to or further consent of Non-Recourse Guarantor.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING NON-RECOURSE GUARANTOR'S OBLIGATIONS

      Non-Recourse Guarantor hereby consents and agrees to each of the following and agrees that Non-Recourse Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Non-Recourse Guarantor might otherwise have as a result of or in connection with any of the following:

      **2.1 Modifications.**  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Pledge Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Non-Recourse Guarantor of any such action.

      **2.2 Adjustment.**  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Non-Recourse Guarantor.

      **2.3 Condition of Borrower or Non-Recourse Guarantor.**  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Non-Recourse Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Non-Recourse Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Non-Recourse Guarantor or any changes in the shareholders, partners or members of Borrower or Non-Recourse Guarantor; or any reorganization of Borrower or Non-Recourse Guarantor.

      **2.4 Invalidity of Guaranteed Obligations.**  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever including, without limitation, the fact that (i) the Guaranteed Obligations or any part thereof exceeds the

7

amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, or (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, it being agreed that Non-Recourse Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5 Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Non-Recourse Guarantor that, subject to Section 1.2 hereof, Non-Recourse Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Non-Recourse Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6 Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7 Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8 Care and Diligence.** The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9 Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall

8

prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Non-Recourse Guarantor that Non-Recourse Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guarantied Obligations.

      **2.10**   **Offset.**  The Note, the Guarantied Obligations and the liabilities and obligations of Non-Recourse Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guarantied Obligations, whether such right of offset, claim or defense arises in connection with the Guarantied Obligations (or the transactions creating the Guarantied Obligations) or otherwise.

      **2.11**   **Merger.**  The reorganization, merger or consolidation of Borrower into or with any other Person.

      **2.12**   **Preference.**  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

      **2.13**   **Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guarantied Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Non-Recourse Guarantor or increases the likelihood that Non-Recourse Guarantor will be required to pay the Guarantied Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Non-Recourse Guarantor that Non-Recourse Guarantor shall be obligated to pay the Guarantied Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guarantied Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

      To induce Lender to enter into the Loan Documents and extend credit to Borrower, Non-Recourse Guarantor represents and warrants to Lender as follows:

      **3.1 Benefit.**  Non-Recourse Guarantor is an affiliate of Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guarantied Obligations.

      **3.2 Familiarity and Reliance.**  Non-Recourse Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guarantied Obligations; however, Non-Recourse Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty. 

9

**3.3 No Representation By Lender.** Other than those representations, warranties and statements expressly set forth in the Loan Documents, neither Lender nor any other party has made any representation, warranty or statement to Non-Recourse Guarantor in order to induce the Non-Recourse Guarantor to execute this Guaranty.

**3.4 Legality.** The execution, delivery and performance by Non-Recourse Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Non-Recourse Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Non-Recourse Guarantor is a party or which may be applicable to Non-Recourse Guarantor. This Guaranty is a legal and binding obligation of Non-Recourse Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.5 Survival.** All representations and warranties made by Non-Recourse Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1 Subordination of All Non-Recourse Guarantor Claims.** As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Non-Recourse Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Non-Recourse Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Non-Recourse Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Non-Recourse Guarantor's payment of all or a portion of the Guarantied Obligations. For so long as any portion of the Guarantied Obligations remain outstanding Non-Recourse Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2 Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Non-Recourse Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Non-Recourse Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guarantied Obligations, any dividend or payment which is otherwise payable to Non-Recourse Guarantor and which, as between

10

Borrower and Non-Recourse Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guarantied Obligations, Non-Recourse Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guarantied Obligations, and such subrogation shall be with respect to that proportion of the Guarantied Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

4.3 **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Non-Recourse Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Non-Recourse Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Non-Recourse Guarantor covenants promptly to pay the same to Lender.

4.4 **Liens Subordinate.** Non-Recourse Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantied Obligations, regardless of whether such encumbrances in favor of Non-Recourse Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Non-Recourse Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Non-Recourse Guarantor.

## ARTICLE V

## MISCELLANEOUS

5.1 **Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2 **Notices.** All notices given hereunder shall be in writing and shall be either hand delivered, mailed by registered U.S. mail, Return Receipt Requested, first class postage

11

prepaid, or sent by overnight courier to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

If to Lender:
_____
_____
_____
Attention: _____
Facsimile No. _____

and a copy to:
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention: Jill D. Block, Esq.
Facsimile No. 212-894-5521

If to Non-Recourse
Guarantor:
AEY LLC
816 Krystal Building
One Union Square
Chattanooga, TN 37402
Attention: Michael M. Aiken
Facsimile No. 423-265-5680

with a copy to:
Traditions Management LLC
816 Krystal Building
One Union Square
Chattanooga, TN 37402
Attention: Lisa T. Reynolds, Senior Vice President
Facsimile No. 423-265-5680

and a copy to:
Chambliss, Bahner & Stophel, P.C.
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402
Attention: William P. Aiken, Esq.
Facsimile No. 423-580-1216

   5.3 **Submission to Jurisdiction.** Any legal suit, action or proceeding against Lender or Non-Recourse Guarantor arising out of or relating to this Guaranty may at Lender's option be instituted in any Federal or State court in the City of New York, County of New York, pursuant to Section 5 1402 of the New York General Obligations Law and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Non-Recourse Guarantor hereby irrevocably submits to

12

84175792_5

the jurisdiction of any such court in any suit, action or proceeding.  Non-Recourse Guarantor does hereby designate and appoint:

> AEY LLC
> 816 Krystal Building
> One Union Square
> Chattanooga, TN 37402
> Attention: Michael M. Aiken
> Facsimile No. 423-265-5680

as its authorized agent to accept and acknowledge on its behalf service of any and all process which may be served in any such suit, action or proceeding in any Federal or State court in New York, New York, and agrees that service of process upon such agent at such address and written notice of said service mailed or delivered to Non-Recourse Guarantor in the manner provided herein shall be deemed in every respect effective service of process upon Non-Recourse Guarantor in any such suit, action or proceeding in the State of New York.

     **5.4 Invalid Provisions**.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

     **5.5 Amendments**.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

     **5.6 Parties Bound; Assignment; Joint and Several**.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Non-Recourse Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Non-Recourse Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

     **5.7 Headings**.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

     **5.8 Recitals**.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

     **5.9 Counterparts**.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature

<div align="center">13</div>

of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10    **Rights and Remedies.** If Non-Recourse Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Non-Recourse Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11    **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Pledge Agreement, unless such term is otherwise specifically defined herein.

5.12    **Entirety.** THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF NON-RECOURSE GUARANTOR AND LENDER WITH RESPECT TO NON-RECOURSE GUARANTOR'S GUARANTY OF THE GUARANTIED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY NON-RECOURSE GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN NON-RECOURSE GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN NON-RECOURSE GUARANTOR AND LENDER.

5.13    **Waiver of Right To Trial By Jury.** NON-RECOURSE GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY NON-RECOURSE GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH

14

THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY NON-RECOURSE GUARANTOR.

5.14    <u>Reinstatement in Certain Circumstances</u>.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Non-Recourse Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

15

84175792_5

**IN WITNESS WHEREOF**, Non-Recourse Guarantor has caused this Guaranty to be duly executed as of the date set forth above.

NON-RECOURSE GUARANTOR:

AEY, LLC

By: _____
Name: _____
Title: _____

EXHIBIT F

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES
Chattanooga, Tennessee

FINANCIAL STATEMENTS

December 31, 2006 and 2005

# TABLE OF CONTENTS

| | Page | |
|---|---|---|
| Independent Auditor's Report | | 1 |
| Consolidated Balance Sheets | | 2 |
| Consolidated Statements of Income and Members' Equity | | 3 |
| Consolidated Statements of Cash Flows | | 4 |
| Notes to Consolidated Financial Statements | | 5 - 12 |



CERTIFIED PUBLIC ACCOUNTANTS

## INDEPENDENT AUDITOR'S REPORT

To The Members
Traditions Management, LLC and Subsidiaries
Chattanooga, Tennessee

We have audited the accompanying consolidated balance sheets of Traditions Management, LLC and Subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income and members' equity, and consolidated statements of cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above presents fairly, in all material respects, the financial position of Traditions Management, LLC and Subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Petty & Landis, P.C.*

Chattanooga, Tennessee
August 15, 2007

1

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

**December 31, 2006 and 2005**

|  | 2006 | 2005 |
|---|---:|---:|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash | $ 3,723,036 | $ 133,807 |
| Trade accounts receivable | 948,831 | 1,489,508 |
| Other receivables | 3,744 | 13,312 |
| Prepaid expenses | 414,358 | 648,353 |
| Total Current Assets | 5,089,969 | 2,284,980 |
| **PROPERTY AND EQUIPMENT** | | |
| Equipment | 87,582 | 63,418 |
| Vehicles | | 46,677 |
| Leasehold improvements | 5,960 | |
| | 93,542 | 110,095 |
| Less accumulated depreciation | 33,874 | 25,809 |
| Property and Equipment, net | 59,668 | 84,286 |
| **OTHER ASSETS** | | |
| Deposits | 5,077 | 9,427 |
| Financing costs | 145,617 | |
| Restricted funds held in escrow | 1,000,000 | |
| Total Other Assets | 1,150,694 | 9,427 |
| Total Assets | $ 6,300,331 | $ 2,378,693 |
| **LIABILITIES AND MEMBERS' EQUITY (DEFICIT)** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 1,857,542 | $ 217,621 |
| Accrued state income taxes | | 7,668 |
| Unearned revenue | 1,411,000 | 1,527,000 |
| Total Current Liabilities | 3,268,542 | 1,752,289 |
| **NOTES PAYABLE, LONG-TERM** | 26,500,000 | |
| **MEMBERS' EQUITY (DEFICIT)** | (23,468,211) | 626,404 |
| Total Liabilities and Members' Equity (Deficit) | $ 6,300,331 | $ 2,378,693 |

The accompanying notes are an integral part of these financial statements.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF INCOME AND MEMBERS' EQUITY

For the years ended December 31, 2006 and 2005

| | 2006 | 2005 |
|---|---|---|
| **REVENUE** | | |
| Gross fee revenue | $    8,623,552 | $    12,060,652 |
| Commissions paid | (3,984,010) | (2,175,690) |
| Net Fee Revenue | 4,639,542 | 9,884,962 |
| Reimbursements | 3,250,689 | 1,672,521 |
| Net Revenue | 7,890,231 | 11,557,483 |
| **OPERATING EXPENSES** | 7,195,270 | 3,754,763 |
| Income From Operations | 694,961 | 7,802,720 |
| **OTHER INCOME (EXPENSES)** | | |
| Interest income | 2,821 | 511 |
| Depreciation expense | (27,864) | (22,646) |
| Interest expense | (99,558) | (196) |
| Total Other Expense | (124,601) | (22,331) |
| Income Before Taxes | 570,360 | 7,780,389 |
| State income taxes | | 5,141 |
| Net Income | 570,360 | 7,775,248 |
| Members' equity, beginning of year | 626,404 | 1,904,227 |
| Distributions to members | (24,664,975) | (9,053,071) |
| Members' Equity (Deficit), End of Year | $    (23,468,211) | $    626,404 |

The accompanying notes are an integral part of these financial statements.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

For the years ended December 31, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | $ 570,360 | $ 7,775,248 |
| Adjustment to reconcile net income to net cash provided by operating activities: | | |
| Depreciation expense | 27,864 | 22,646 |
| Bad debt expense | 20,291 | |
| Loss on equipment transferred to members | 25,261 | |
| Changes in: | | |
| Trade accounts receivable | 520,386 | 1,037,293 |
| Other receivables | 9,568 | (5,215) |
| Prepaid expenses | 233,995 | (297,009) |
| Deposits | 4,350 | (200) |
| Accounts payable and accrued expenses | 1,639,921 | (46,832) |
| Accrued state income taxes | (7,668) | (5,428) |
| Unearned revenue | (116,000) | 526,000 |
| Net Cash Provided by Operating Activities | 2,928,328 | 9,006,503 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of fixed assets | (33,068) | (35,584) |
| Proceeds from disposal of equipment | 4,561 | |
| Net Cash Used by Investing Activities | (28,507) | (35,584) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from long-term borrowings | 26,500,000 | |
| Transfer of loan proceeds to escrow | (1,000,000) | |
| Distributions to members | (24,664,975) | (9,053,071) |
| Financing costs | (145,617) | |
| Net Cash Provided (Used) by Financing Activities | 689,408 | (9,053,071) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 3,589,229 | (82,152) |
| Cash and cash equivalents, beginning of year | 133,807 | 215,959 |
| Cash and Cash Equivalents, End of Year | $ 3,723,036 | $ 133,807 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Cash paid for interest | $ 99,558 | $ 196 |

The accompanying notes are an integral part of these financial statements.

4

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

December 31, 2006 and 2005

## NOTE 1. GENERAL INFORMATION

Traditions Management, LLC (a Delaware limited liability company) and Subsidiaries (the Company) provide marketing and consulting services to developers of high-end resorts in Arizona, Colorado, Hawaii, Nevada, Texas, and the Bahamas,. Corporate offices of the Company are located in Chattanooga, Tennessee. The Company commenced its operations in October of 2002.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Organization

Traditions Management, LLC wholly owns Hideaway Land Company, LLC, Traditions Crescent Plaza, LLC, Kukuiula Realty, LLC, Makena Bay Properties, LLC, Traditions Hill Country Properties, LLC, Traditions Spring Valley Properties, LLC, and Traditions Hughes Center Properties, LLC. The Company typically establishes a subsidiary for each ongoing project. For purposes of these financial statements all balances and results of operations of the subsidiaries have been consolidated; any intercompany balances and transactions have been eliminated.

### Cash Equivalents

For purposes of the statements of cash flows, the Company considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

### Accounts Receivable

The Company utilizes the direct write off method of recognizing bad debt expense. Management routinely monitors the status of open customer accounts, and writes off all accounts considered not collectible. There were bad debt write-offs of $20,291 and $0 for 2006 and 2005, respectively.

### Property and Depreciation

Property is stated at cost and depreciation is computed using the straight-line method, over the estimated useful lives of the individual assets. Repair and maintenance costs are charged to operation when incurred.

### Accounting Basis for Recording Income

The Company utilizes the accrual method of accounting. See Notes 3 and 10 for details regarding revenue recognition.

### Income Taxes

The Company is a limited liability company for tax purposes. Income is generally passed through to its members, therefore, no federal income tax expense has been recognized in these financial statements. State income taxes have been provided for as appropriate. The Company is currently a cash basis taxpayer.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED

For the years ended December 31, 2006 and 2005

---

NOTE 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - CONTINUED

### Use of Estimates

The presentation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

NOTE 3.  CONTRACTS AND REVENUE RECOGNITION

The Company maintains contracts with the project developers. The commission and fee rates, significant terms and revenue recognition features may vary from contract to contract. For purposes of these financial statements all paid or earned amounts are referred to as fees. Following is a summary by project of the significant features:

### Silverleaf

Fees are based on the net sales of lots, homes and golf memberships. Fee rates range from 2.25 to 3.5 percent depending on attainment of specified sales goals. Fee revenue is earned and recognized in the financial statements when the deed of the associated property is recorded. Revenues associated with this project of $1,024,646 and $6,607,448 were recorded for the years ended December 31, 2006 and 2005, respectively.

### Escondido

Fees are based on the net sales of lots. Fee rates range from 9 to 11 percent. Rates for commissions paid to salespersons range between 3.5 and 5.5 percent. Revenue is recorded in the financial statements when received from escrow at closing. Revenues associated with this project of $2,402,739 and $2,472,453 were recorded for the years ended December 31, 2006 and 2005, respectively.

### Crescent

Fees are based on the net sales of units. Fee rate is 5.25% of the net purchase price of the unit. Per the contract, 50% of fee revenue is payable on the date that the buyer delivers a signed binding contract of sale for a unit and a non-refundable deposit of 10% of the net purchase price of the unit. The remaining 50% of fee revenue is payable at the closing of the sale of the unit. Revenues associated with this project of $707,963 and $2,328,763 were recorded for the years ended December 31, 2006 and 2005, respectively. See Note 10, Revenue Recognition Relative to Unit Sales.

6

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED**

**For the years ended December 31, 2006 and 2005**

NOTE 3.    CONTRACTS AND REVENUE RECOGNITION - CONTINUED

*Ocean Club*

Fees are based on the net sales of units. Fee rate is 2.25% of the net purchase price of the unit. Per the contract, 30% of fee revenue is payable on the date that the buyer delivers a signed binding contract of sale for a unit and a non-refundable deposit of 30% of the net purchase price of the unit. An additional 30% of fee revenue is payable when the building construction is complete and the remaining 40% of fee revenue is payable at the closing of the sale of the unit. For certain units in 2006, the schedule changed to 40% of fee revenue payable when the building construction is complete and the remaining 30% of fee revenue is payable at the closing of the sale of the unit. Revenues associated with this project of $2,027,601 and $651,989 were recorded for the years ended December 31, 2006 and 2005, respectively. See Note 10, Revenue Recognition Relative to Unit Sales.

*Kukui'ula*

Fees are based on the net sales of lots, homes/cottages, and golf memberships. Fee rates range from 5.60 to 6.85 percent. Revenue is recorded in the financial statements when received from escrow at closing. Revenues associated with this project of $2,171,288 and $0 were recorded for the years ended December 31, 2006 and 2005, respectively

*Other Projects*

The Company's other projects (Maluaka, Spring Valley Ranch, Hughes Center) are either in the early development stages or are on hold. Sales advances have been received and recorded as unearned revenue; no fees have yet been earned.

The Company recognized fee revenue of $275,000 during 2006 from terminated projects.

NOTE 4.    TRADE RECEIVABLES

Trade receivables consisted of the following as of December 31, 2006 and 2005, respectively:

|  | 2006 | 2005 |
|---|---|---|
| Receivables for fees on lot and membership sales | $      241,573 | $   1,153,697 |
| Receivables for reimbursable expenses | 707,258 | 335,811 |
| Total Trade Receivables | $      948,831 | $   1,489,508 |

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED

For the years ended December 31, 2006 and 2005

## NOTE 5.  LEASES

The Company leases certain real property and equipment under long-term lease agreements. The Company is reimbursed by clients for certain leases, while other leases are not reimbursable. Minimum future rental commitments are as follows:

| Year ending: | Nonreimbursable | | Reimbursable | |
|---|---|---|---|---|
| 2007 | $ | 57,969 | $ | 46,180 |
| 2008 | | 55,920 | | |
| 2009 | | 56,358 | | |
| 2010 | | 57,672 | | |
| 2011 | | 43,254 | | |
| Thereafter | | | | |
| Total Minimum Lease Payments | $ | 271,173 | $ | 46,180 |

Rental expense for operating leases that are nonreimbursable totaled $32,451 and $30,191 for the years ended December 31, 2006 and 2005, respectively. Rental expense for operating leases that are reimbursable totaled $129,093 and $182,489 for the years ended December 31, 2006 and 2005, respectively.

## NOTE 6.  RELATED PARTY TRANSACTIONS

AEY, LLC holds 100% of the Company's Preferred Interests and has no economic rights, capital accounts, or right to receive any allocation of net profits/losses or distributions. AEY, LLC has voting rights and elects the Board of Managers. AEY, LLC has pledged its full interest in the Company as security on the outstanding loan of $26,500,000 at December 31, 2006. The Company's three principal managers are members of AEY, LLC. The Common Interests of the Company are collectively 100% owned by En Theos, LLC, Hideaway Investments, LLC, and Gemini One, LLC which all have full economic rights in the Company.

During the year ended December 31, 2006, the Company distributed equipment and a vehicle with a net book value of $25,261 to one of its members. The book loss on the transfer of this equipment and vehicle has been included in distributions to the member for the year ended December 31, 2006.

## NOTE 7.  LINE OF CREDIT

The Company maintained a $2,500,000 line of credit with a financial institution during 2006. This line called for an interest rate of prime plus 1/2%. This line of credit was secured by a personal guarantee of the managers of the Company. The line of credit was cancelled prior to December 31, 2006. No amounts had been drawn on this line of credit during 2005 or 2006.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED

For the years ended December 31, 2006 and 2005

---

NOTE  8.   **LONG-TERM DEBT**

Long-term debt consisted of a loan payable to a lending institution in the amount of $26,500,000 at December 31, 2006. The original date of this loan was December 18, 2006 and the original principal amount was $26,500,000. The loan is interest only for five years with one balloon principal payment of $26,500,000 due at maturity on January 1, 2012. The loan bears interest at 9.625%, payable in semi-annual payments due on January 1 and July 1 of each year. The loan is secured by all receivables of the Company, funds in an interest reserve escrow account (explained below), and a pledge agreement whereby the 100% owner of the Company has pledged its full interest in the Company to the lender. There are certain restrictive covenants that are associated with this loan. The Company was in compliance with these covenants at December 31, 2006.

Under the terms of the loan agreement, the lender transferred $1,000,000 into an interest reserve escrow account to be used by the lender if the Company misses an accrued interest payment. Otherwise, this amount will be applied toward the outstanding principal balance at maturity. The lender has full control of this escrow account and the Company has no rights to use these funds for any other purposes. The funds in this escrow account have been included in long term other assets on the balance sheet.

The following is a schedule of future maturities of long-term debt:

| | |
|---|---:|
| 2007 | $ - |
| 2008 | |
| 2009 | |
| 2010 | |
| 2011 | |
| Thereafter | 26,500,000 |
| | $ 26,500,000 |

Interest expense incurred for the years ended December 31, 2006 and 2005, totaled $99,558 and $196, respectively.

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED**

**For the years ended December 31, 2006 and 2005**

## NOTE 9.    CONCENTRATION OF CREDIT RISK

### Cash Balances

The Company maintains cash balances at financial institutions located in Hawaii, Tennessee, and Texas. Accounts at these institutions are insured by the Federal Deposit Insurance Corporation up to $100,000. At December 31, 2006 and 2005, the Company had account balances exceeding FDIC insured limits totaling $3,417,977 and $0, respectively.

### Significant Customers

The Company had five customers that accounted for 99% of revenue and eight customers that accounted for 100% of accounts receivable for the year ended December 31, 2006. The Company had four customers that accounted for 100% of sales and 100% of accounts receivable for the year ended December 31, 2005.

### Project Duration

At any given time, the Company has a certain number of projects under contract. Each of these projects typically involves a finite number of units to be sold and therefore represents a finite amount of fees to be earned. As of December 31, 2006 and 2005 the following represents the approximate percentage of units *remaining*, by project.

|  | 2006 | 2005 |
|---|---|---|
| Silverleaf | 34% | 46% |
| Escondido | 35% | 48% |
| Crescent - Phase I | 6% | 17% |
| Crescent - Phase II | 100% | N/A |
| Ocean Club | 6% | 55% |
| Kukui'ula | 99% | 100% |
| Maluaka (formerly Makena) | 100% | 100% |
| Spring Valley Ranch | 100% | N/A |

The Company is continually evaluating the viability of new projects. The above represents only projects that are currently under contract as of the dates of these financial statements.

TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – CONTINUED

For the years ended December 31, 2006 and 2005

## NOTE 10.  REVENUE RECOGNITION RELATIVE TO UNIT SALES

Two of the Company's currently ongoing projects involve the sale of condominium units. Contracts related to these projects, Crescent and Ocean Club, stipulate that a portion of the fee revenue will be payable when the buyer submits a signed binding contract with the required deposit, and the remaining portion of the fee will be payable at the occurrence of later events, the culmination of which is the ultimate sale of the unit.

The Crescent contract stipulates that upon receipt from the buyer of a signed binding contract and a deposit representing 10% of the net sales price, 50% of the fee shall be payable to the Company. The remaining 50% of the fee will become payable upon the closing of the sale of the unit. The initial 50% of the fee is non-refundable.

The Ocean Club contract stipulates that upon receipt from the buyer of a signed binding contract and a deposit representing 30% of the net sales price, 30% of the fee shall be payable to the Company. Upon reaching certain construction benchmarks, another 30% (40% for certain units sold during 2006) of the fee will become payable. The remaining 40% (30% for certain units sold during 2006) of the fee will become payable upon the closing of the sale of the unit.

Under both of these contracts, the Company has performed substantially all work required to entitle them to the full fee once the subsequent events occur. Based on factors such as overall project life, current status of construction, uncertainty of future events outside the Company's control, and interpretation of current accounting standards under Generally Accepted Accounting Principles the Company has recognized 50% of the fee revenue for Crescent on the project life to date and 60% (70% for certain units sold during 2006) of the fee revenue for Ocean Club on the project life to date in these financial statements. To the extent that direct sales commissions would be payable to others, they have been recognized at the same percentages.

Below is a summary of the pro-forma balance sheet and income statement showing the effect of full recognition of 100% of the fee revenue, the associated receivable and any associated direct commissions at December 31, 2006 and for the year then ended.

| Balance Sheet | | |
|---|---|---|
| Total Assets | $ | 11,825,428 |
| Total Liabilities | $ | 31,703,283 |
| Members' equity | $ | (19,877,855) |
| | | |
| Income Statement | | |
| Net Revenue | $ | 9,188,414 |
| Operating Expenses | $ | 7,195,270 |
| Other Expenses | $ | 124,601 |
| Net Income | $ | 1,868,543 |

**TRADITIONS MANAGEMENT, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED**

**For the years ended December 31, 2006 and 2005**

## NOTE  11.    COMMITMENTS AND CONTINGENCIES

The Company derives all of its revenue from contracts with developers of high-end resorts. These contracts contain provisions whereby the developer may terminate the contract with cause and without cause. In the event that the contract is terminated by the developer with cause, no future amounts would be required to be paid to the Company. If the contract is terminated by the developer without cause, there are provisions which provide for the Company to be entitled to certain amounts that would have been earned had the contract not been terminated by the developer.

Certain projects currently under contract have specific requirements that two of the Company's members have a minimum on-site attendance requirement and/or requirements that these members maintain active employment with the Company. If the attendance requirements are not met, or the member(s) are no longer in the active employment of the Company these contracts are subject to termination with cause.

The Company has entered into several contracts for brokerage and consulting services. These contracts have terms that range from one to four years, however, all are cancelable with 30 to 60 days prior notice. The amount that has been expensed under these contracts in 2006 is $525,000. The non-reimbursable amounts that are to be paid under these contracts in 2007 if none are canceled is $264,000.

The Company has entered into service agreements with three of its managers. Under the terms of these agreements, the Company will pay $1,000,000 per year (in the aggregate for all three managers) through 2010.

The Company is set to go into arbitration with a former employee related to settlement of the amount of compensation owed upon termination. The Company has included in accrued commissions any amounts that are due to this former employee. However, the Company will be liable to pay any arbitrator's and attorney's fees associated with the arbitration process, which is expected not to exceed $50,000. These fees are not required to be recorded in these financial statements.

## NOTE  12.    SUBSEQUENT EVENTS

In 2007, the Company entered into contracts for four additional projects from which future revenues will be generated and expenses will be incurred. These projects are The Manning, The Preserve, Oil Nut Bay, and Bahia Maroma. This expanded the states/territories the Company operates in to include Tennessee, California, British Virgin Islands, and Mexico. As a result of these additional contracts, Traditions Management, LLC now also wholly owns Traditions Manning Properties, LLC and Traditions Mexico, LLC.

EXHIBIT G





*A Partnership of Vision and Performance. Traditions Management is a real estate sales and marketing firm. We are not developers, but professionals who help developers define lifestyles and sell communities in a manner consistent with their vision and financial goals.*

## LATEST NEWS

### OCEAN CLUB RESIDENCES & MARINA

Sales Volume surpasses over $240 million in 20 months with 100% of the community and marina slips sold.

Phase I closings began in November 2007, and Phase II closings are expected to start in the first quarter of 2008.

### SILVERLEAF

Traditions Management completed its contract at Silverleaf in 2007. During its management of the project, Traditions oversaw more than $500 million in homesite sales at Silverleaf.

### ESCONDIDO

2007 closings exceed 100 units — in excess of $50 million.

81% of development sold and closed (384 total sites).

100% of Casita and Villa sites sold and closed.

11 half-acre waterfront and waterview homesites sold and closed since December 2006 — prices range from $800 thousand to $2 million.

Construction of the final community's amenities are underway. The Escondido Lake Club is making tremendous progress, with the Grand Opening slated for May 2008 and the Escondido Golf Clubhouse is expecting to open in the Fall of 2008.

Four of eight spec homes under construction have been sold — each at over $2 million.

10 custom homes under construction or completed.

The Dallas Morning News has named Escondido "Best New Golf Course in Texas 2007"

Avid Golfer magazine honored Escondido with "Most Exclusive" and "Best Service".

### THE RESIDENCES AT THE RITZ-CARLTON, DALLAS

The 70 units in Phase 1 are completely sold out, with prices ranging from $895 thousand to $8 million. Accordi g to the November/December 2007 issue of D Home, this is the only sold-out new building in Dallas. Owners are currently moving into these residences

Phase 2 is currently 63% sold. Construction has started on The Tower Residences, which are one- to four-bedroom floor plans ranging from $795 thousand to $6 million. Four manor homes are currently available in Regency Row. These homes are 6,324 to 7,400 square feet and estimated to be $6 million to $8 million. Phase 2 is expected to be complete in mid-2009.

# TRADITIONS
### MANAGEMENT
*Designers of Lifestyle. Purveyors of Land.*

## LATEST NEWS CONTINUED

The Ritz-Carlton Hotel and Dean Fearing's Restaurant opened on August 15th.

### KUKUI'ULA

Buyers are able to purchase cottages at today's guaranteed prices that will be built over the next two years.

Major community development work on infrastructure, roads, golf course and the Plantation core grading is well underway and vertical construction will begin in mid-2008. The Kukui'ula Village will feature over 80,000 square feet of commercial space devoted to boutiques, cafes and exotic restaurants, a local country store and a weekly farmers market. The distinctive island architecture and tree-lined streets will create a relaxed garden setting for the discovery of fashionable clothing, distinctive gifts and gourmet fare.

The first featured builders are signed up. Major inroads have been made with the brokerage community in Northern and Southern California.

### MALUAKA

Maluaka will be the first environmentally sustainable community in Hawaii.

The developer of Maluaka closes on the entire Makena resort community with Morgan Stanley as its partner.

Currently over one-third of the 69 residences have been sold. The location on the coveted Makena shores in Wailea has drawn those looking for incomparable luxury.

Site work construction is well underway on Maluaka, and pre-construction pricing is available.

### OIL NUT BAY

Traditions sees tremendous success accepting Founder Registrations, as construction of roads and a Jewel Box model home on Homesite 16 continues.

Founders have first choice on Estates Sites, Jewel Box Cottages and Ridge Villas.

### THE MANNING AT BELLE MEADE

Reservations for 33% of the units have been accepted, setting new benchmarks for Nashville sales prices.

### CAPELLA BAHIA MAROMA

Founder's Program begins for the Yucatan's first private golf community — 254 acres with one mile of beachfront.

### SANTA LUCIA PRESERVE

The Tom Fazio golf course continues to receive awards from top golf publications, including:

- 2007 Robb Report
  Top 10 "America's Best Golf Course Communities"

- 2007 Golf Digest Index
  "America's 50 Best Modern Golf Clubs"

- 2007 Golf Digest "America's 100 Greatest Golf Courses"

- 2007 Links "America's 100 Premier Properties"

- 2007 Travel and Leisure "America's Top 100 Golf Communities" ranked #3; ranked #1 in 2005 and 2006

- 2007 Golf Magazine Living
  "25 Best Courses You Can Live On"

### VICTORY RANCH

Traditions Management begins a relationship with Victory Ranch, in Park City, Utah. This adventure ranch community will offer members unprecedented opportunities for exciting outdoor activities on the property and in the Park City area. Custom homesites and cottages are available.

### MORE NEWS FROM TRADITIONS

Traditions has a new project in negotiation in Telluride, CO.



**TRADITIONS**

M A N A G E M E N T

*Designers of Lifestyle. Purveyors of Land.*

## OUR VISION

### A PARTNERSHIP OF VISION AND PERFORMANCE

Traditions Management is a real estate sales and marketing firm. We are not developers, but professionals who help developers define lifestyles and sell communities in a manner consistent with their vision and financial goals. Our services are shaped by the vision of a select number of developers who share our commitment to absolute quality. With more than two billion dollars in real estate sales experience, we seamlessly integrate our expertise with each client's unique capabilities to develop properties that exceed the highest expectations of the customer. Simply put, we accelerate sales, simultaneously maximizing value by optimizing inventory, price and time. We streamline the operation by focusing exclusively on the community's sales and marketing efforts, thereby freeing the developer to devote their energies to other community issues. With sales and marketing powered by Traditions and vision guided by experienced developers the opportunity for success is optimized

### THE TIME HAS COME FOR TRADITIONS. DESIGNING LIFESTYLE. PURVEYING LAND.

The dream began simply enough: Create a smart, agile company that specializes in the personal attention necessary to design, develop and execute successful sales and marketing programs. A company flexible enough to provide a level of service incomparable in the industry. In 2002, the dream took root as Traditions Management was born. By working in close collaboration with developers to create truly marketable communities and extraordinary, vibrant lifestyles, the Traditions legacy is just now being written.

### THE VISION TO SEE SUBSTANCE IN DREAMS, THE CONFIDENCE TO MAKE THEM REAL.

The experience of our principals spans North America and the Caribbean. Landscapes, climates, and even the cultures of the communities they helped create vary greatly from one another. Yet each is a success story. And each bears an indelible mark left by the leadership at Traditions Management.

## PROGRAMS

### PROGRAMMED FOR SUCCESS. WORKING WITH DEVELOPERS IN A BETTER, SMARTER WAY.

In marketing and selling real estate, the professionals of Traditions are organized, focused and intensely dedicated to results. Their proven technique of program selling keeps the urgency and the elusive "close" in the developer's hands, all the while motivating the sales team to contact prospective buyers and build relationships with clients, brokers and member/owners. It's a better, smarter way. And it works.

### DEFINING LIFESTYLE

It's not the real estate, it's the lifestyle that motivates buyers. Traditions helps developers define, create and project the right lifestyle messages for their communities. Clear lifestyle messages energize all of the marketing and sales programs. Themed events portray the community's lifestyle for the prospect. When they buy into the community's lifestyle, buying the real estate is easy.

### THE FOUNDERS PROGRAM

The Founders Program launches the community. It presents the community's vision and its lifestyle to influential people, primarily in the local market or in the developer's affinity of prior purchasers. This creates a base of owners who promote the community and act as ambassadors during the critical first stages of the project. Founder contributions also support the community financially in the initial development phases as they inject early capital into the project.



**TRADITIONS**
M A N A G E M E N T

*Designers of Lifestyle. Purveyors of Land.*

## PROGRAMS CONTINUED

### THE RESERVATION CERTIFICATE PROGRAM

The Reservation Certificate Program launches the community and its products in the target market and communicates the ground-floor opportunity available through the initial development phase purchases. The program conveys the community's lifestyle identity and provides incentives to those who appreciate the risk/reward of early involvement. The Reservation Program also gives the developer the ability to go to market ahead of being ready to actually sell and close the product.

### THE REASONS-TO-BUY PROGRAMS

Throughout the life of the project, Traditions builds upon the community's lifestyle identity and drives sales with a series of strategically planned and professionally executed "Reasons-to-Buy" programs. Incentives, price increases and inventory management are key components of these programs.

## PARTNERS

We value our relationships with some of the finest lifestyle community developers in America. Over the years we have learned that this relationship between the developer and Traditions is the foundation for a successful sales and marketing effort and ultimately for a successful community. Finally, the trust we build with our developer partners translates in to the trust the client has with the developer and the community.

### DEVELOPER PARTNERS

DMB Associates, Inc.: A diversified real estate investment and development firm with real estate holdings through affiliated companies where people and their passions unite. From the moment you first experience a DMB community, you feel a difference. Every nuance of the community's design works in harmony with the natural beauty of the land. The charm and character of the neighborhoods echo the history and cultural richness of the region.

Kerzner International Limited: A leading international developer and operator of destination resorts, casinos and luxury hotels, Kerzner's flagship brand is Atlantis, which includes the 2,317-room unique destination resort built around a 34-acre marine habitat on Paradise Island, The Bahamas. Operating under the exclusive luxury resort brand One&Only, Kerzner manages some of the most distinctive resorts in the world.

Crescent Real Estate Equities Company is one of the largest real estate investment trusts in the nation. The firm's portfolio sets it apart. Crescent's dedication to quality and service has earned the firm an enviable reputation as a landlord, partner and investor.

### FINANCIAL PARTNERS

TM Financial, LLC: TM Financial has been formed to provide financing opportunities for qualified buyers in areas that have traditionally been difficult to finance. By working with multiple partners in selective situations, TM Financial is able to efficiently structure and provide loans to qualified buyers in both non-US territory developments and stateside projects.

### DREAMS THAT REACH FROM THE MOUNTAINS TO THE SEA.

The experience of our principals spans North America and the Caribbean. Landscapes, climates, and even the cultures of the communities they helped create vary greatly from one to another. Yet each is a success story. And each bears an indelible mark left by the leadership at Traditions Management.

Ocean Club Residences & Marina
Paradise Island, The Bahamas
Kerzner International & Panda Ltd.

The Residences at the Ritz-Carlton &
The Tower Residences at the Ritz-Carlton
Dallas, Texas
Crescent Real Estate Investment Trust

Escondido
Horseshoe Bay, Texas
Escondido Partnership, Ltd.

Silverleaf
Scottsdale, Arizona
DMB Associates, Inc.



**TRADITIONS**
M A N A G E M E N T
*Designers of Lifestyle. Purveyors of Land.*

Kukui'ula
Kaua'i, Hawaii
DMB Associates, Inc.
and A&B Properties, Inc.

Maluaka
Makena, Maui, Hawaii
Dowling Company, Inc.

Spring Valley Ranch
Roaring Fork Valley, Colorado
Spring Valley Holdings, LLC

Santa Lucia Preserve
Carmel, California
The Preserve Land Company

The Manning at Belle Meade
Nashville, Tennessee
Chartwell Properties, LLC

Capella Bahia Maroma
Playa del Carmen, Mexico
Operadora Punta Maroma, S.A de C.V.

Oil Nut Bay
Virgin Gorda, British Virgin Islands
Victor International Corporation

Victory Ranch
Park City, Utah
Victory Ranch Development, Inc.

Pronghorn*
Bend, Oregon
Hix Rubenstein Companies

Cap Cana*
Punta Cana, Dominican Republic
Grupo del Caribe

Carlton Woods*
The Woodlands, Texas
The Woodlands Operating Company

Cimarron Hills*
Austin, Texas
Paloma Development Group, Inc.

Desert Mountain*
Scottsdale, Arizona
The Lyle Anderson Company & Crescent REIT

Hyatt Main Street Station*
Breckenridge, Colorado
Hyatt Vacation Ownership
& East West Partners

Chattooga Club*
Cashiers, North Carolina
Rivers Enterprises

One Vendue Range*
Charleston, South Carolina
Dolphin Builders and Architects
& East West Partners

Lahontan*
North Lake Tahoe, California
Highlands Management Group
& DMB Associates, Inc.

Ocean Club Estates*
Paradise Island, The Bahamas
Kerzner International

Superstition Mountain*
Phoenix, Arizona
The Lyle Anderson Company

Main Street Station*
Breckenridge, Colorado
East West Partners

Buffalo and Dakota*
Keystone, Colorado
Intrawest

Snowbridge*
Stratton Mountain, Vermont
Intrawest

Chateau Mont Tremblant*
Mont Tremblant,
Quebec, Canada
Intrawest & Canadian Pacific Hotels

Le Kandahar*
Mont Tremblant
Quebec, Canada
Intrawest

Silver Mill*
Keystone, Colorado
Intrawest

The Cliffs Communities*
Greenville, South Carolina
Cliffs Development Corporation



**TRADITIONS**
M A N A G E M E N T
*Designers of Lifestyle. Purveyors of Land.*

Reynolds Plantation*
Lake Oconee, Georgia
Linger Longer Development

Haig Point*
Daufuskie Island, South Carolina
International Paper

The Islands of Beaufort*
Beaufort, South Carolina
Renaissance Communities

* Projects performed as IMI Management Executives

**REFERENCES**

Jim Hoselton
Vice President
DMB, Inc.
480-367-7000

Bill Mabus
Vice President, Development
The Residences at the Ritz Carlton Dallas
214-880-4588

Giselle Pyfrom
Executive Vice President & General Counsel
Kerzner International
242-363-6019

Drew Brown
Managing Director & CEO
DMB Associates, Inc.
480-367-7000

Harry Frampton
Partner
East West Partners
970-748-7580

Everett Dowling
President
Dowling Company, Inc.
808-244-1500

David Johnson
Chairman
Victor International Corporation
248-364-2400

Philip Keb
Executive Vice President, Development
The West Paces Hotel Group
404-842-7280

Fausto Barba
Vice President, Finance
The West Paces Hotel Group
404-842-7280

Tom Gray
Managing Principal
Santa Lucia Preserve
831-620-6700

Toni Alexander
President
Intercommunications, Inc.
949-644-7520

Chris Hill
President
Hill Creative
713-523-7364



**TRADITIONS MANAGEMENT**

*Designers of Lifestyle. Purveyors of Land.*

## TRADITIONS MANAGEMENT

Traditions Management, LLC was founded in October, 2002 by three people committed to providing the best service to our clients. Our sole purpose for being in business is to make these clients successful - for their success translates into our success in a very tangible fashion. With that as our mission, we work hard to be very selective of the clients we choose to work with and limit the number so that we can be certain their individual and project needs are being met.

### MARK ENDERLE, PRESIDENT & CEO

Although originally trained as an accountant, over the past twenty years Mark Enderle has enjoyed an outstanding career in the real estate industry. Prior to co-founding Traditions, Mark helped shape the high-end segment of the industry as President of IMI Resort Sales for three years. Mark specializes in helping developers envision and design custom sales and marketing programs that accelerate sales and enhance value. During his productive career, he has developed numerous relationships in the development community. Through working closely with developers, Mark has been a leader in building highly specialized programs to convert market potential into sales performance that exceeds financial goals. Mark is a member of the Urban Land Institute.

### MARK YARBOROUGH, VICE CHAIRMAN & CSO

Mark Yarborough has fifteen years experience in the real estate industry with a long and outstanding history of success in multiple senior positions. Prior to co-founding Traditions, Mark had been involved with IMI Resort Sales in several capacities from Vice President Sales to Partner. Mark's strengths include an ability to recruit sales teams with the chemistry that produces exceptional results. He is also proficient in sales training, developing long-term client relationships and managing product inventory.

He is one of those rare marketing/sales specialists who knows exactly how to motivate and direct teams to perform at maximum efficiency and produce optimum results. Mark is a member of the Urban Land Institute.



☆ ACTIVE PROJECTS  ☆ PAST PROJECTS

## TRADITIONS MANAGEMENT cont.

### MIKE AIKEN, CHAIRMAN

Mike Aiken joined Traditions in 2002. His responsibilities include strategic planning, corporate finance and overseeing the Company's organizational structure. Originally trained as a physician, he has been focused on a business career for the past twenty years, including a role as a consultant for IMI Resort Holdings and senior executive and non-executive positions at a number of companies. Mike is a member of the Urban Land Institute.

### LISA REYNOLDS, SENIOR VICE PRESIDENT & CHIEF OPERATING OFFICER

In her capacity as Chief Operating Officer, Lisa Reynolds manages all aspects of the business operations of the company. Prior to joining Traditions in 2003, she held finance and accounting positions for a private management company. Prior to that, she held a senior operations role in a private high-end residential development company. She has over fifteen years of professional experience in various senior management responsibilities. Lisa is a member of the Urban Land Institute.

### MIKE LORENCE, SENIOR VICE PRESIDENT, SALES

Mike Lorence is primarily responsible for overseeing the on-site sales and training effort on Traditions' projects. He specializes in training and leading sales people and teams and has been involved in the high-end real estate industry over the past twenty years. Previously, he held senior sales positions at Discovery Land Company and IMI Resort Sales. Mike is a member of the Urban Land Institute.



**TRADITIONS**

MANAGEMENT

*Designers of Lifestyle. Purveyors of Land.*

## LOCATIONS

### ACROSS THE WESTERN HEMISPHERE

From Hawaii to the Caribbean, from Texas to Quebec, the Traditions Management team has a very diverse and deep portfolio. View more detail on our active projects by clicking on the gold stars in the map.

### ☆THE RESIDENCES AND THE TOWER RESIDENCES AT THE RITZ-CARLTON

Dallas, Texas

Warm, welcoming, exquisitely appointed, well-trained staff anticipating your every need: this describes a lifestyle enjoyed by only a fortunate few. Living at The Residences at The Ritz-Carlton, Dallas affords you the privilege of access to legendary Ritz-Carlton service including concierge, valet, gourmet dining, butler service and more. Come home every day to a five-star address where your privacy is respected, your preferences are considered, and your needs are anticipated.

http://www.theresidencesdallas.com

### ☆ESCONDIDO

Horseshoe Bay, Texas

Old oaks, clear creeks and a big shady pond where great blue herons nest every spring. A championship course conceived by Tom Fazio, America's foremost golf course architect. A world of consideration and service. It all comes together at Escondido, Texas' premier second home community where the private club lifestyle and an unprecedented level of concierge service are creating a prestigious enclave in the heart of the Texas Hill Country.

http://www.escondidotexas.com

### ☆OCEAN CLUB RESIDENCES & MARINA

Paradise Island, The Bahamas

The exquisitely appointed Ocean Club Residences feature expansive views, lush tropical gardens and a fully appointed beach club as well as a Tom Weiskopf-designed private golf course and a private yacht marina on Nassau Harbour. The four six-story buildings are arranged to take full advantage of prevailing breezes and panoramic views. Each of the 88 spacious, well-designed homes has abundant natural light, high ceilings, exciting views, expansive balconies, and extraordinary interior finishes and appointments–everything you would expect in a premier island residence. Construction began in Fall 2005 with completion slated for January 2008.

http://www.oceanclubresidences.com

### ☆KUKUI'ULA

Kaua'i, Hawaii

Tucked between old Koloa Town and the National Tropical Botanical Garden, on Po'ipu's sunny southern shores, Kukui'ula will be an invigorating and rejuvenating world that embraces the essence of all that is Kaua'i - secluded, exotic, wrapped in her refreshing spirit of aloha. Whether Tom Weiskopf golf, boutique plantation shops, a transcendent spa or exhilarating outdoor experiences, this seductive setting will capture Kaua'i's unique mauka-makai way of life, from serrated mountains to majestic seas. Founder homesite selections began in the summer of 2006 – with closings the Fall of 2006 and Spring of 2007. Sales continue to set new records.

http://www.kukuiula.com

### ☆SILVERLEAF

Scottsdale, Arizona

Being the best in Scottsdale takes some doing, but Silverleaf is realizing that objective magnificently. The Silverleaf lifestyle, centering on beautiful amenities and events like The Discovery Series, offers members incomparable opportunities for recreational, social and educational interaction. Developed by DMB Associates, Inc., Silverleaf is an exclusive 2,000-acre community bordered by the breathtaking McDowell Mountains. It offers approximately 250 developer-designed homes situated among 11 handsomely landscaped parks and an enclave of fewer than 350 large estate homesites. Amenities include a traditionally designed Tom Weiskopf golf course and a multi-faceted clubhouse. The club, with golf membership limited to 350, features a luxurious full service spa, fitness facilities, well-appointed mens and womens locker rooms and a variety of dining venues with a mix of cuisines and decors.

http://www.silverleaf.com

### ☆SPRING VALLEY RANCH

Roaring Fork Valley, Colorado

Spring Valley Ranch is a private ranch community of astounding natural beauty. Covering more than 6,000 acres in Colorado's beautiful Roaring Fork Valley less than a 45-minute drive from Aspen or Vail, the ranch offers three distinct environments: a summit graced by stands of Aspen and Spruce and punctuated by sunny sub-Alpine glades; a middle plateau that offers spectacular views of Mt. Sopris; and a meadow with gently rolling grassland and serene ponds. All three levels are bathed in sunlight through all seasons. Families will thrive at Spring Valley Ranch. A wealth of outdoor activities are provided ranging from hiking, biking, horseback riding, ice skating, tobogganing, golf and swimming. Trained ranch staff will create

**TRADITIONS**
MANAGEMENT

*Designers of Lifestyle. Purveyors of Land.*



☆ ACTIVE PROJECTS ☆

## LOCATIONS CONTINUED

personalized adventures and oversee an active youth program. Spring Valley Ranch will also feature a world-class Coore/Crenshaw-designed golf course complete with a practice range, pro shop and barefoot course; a fabulous ranch house serving incredible regional cuisine in a comfortable, family-friendly setting; a lounge and wine cellar; a full-service spa; a fitness center; an aquatic center with adult and children's pools; a park for fun winter activities; an extensive network of trails that provide access to the adjacent White River National Forest; and a wonderful equestrian center.

### ☆ SANTA LUCIA PRESERVE
Carmel, California

Less than three miles inland from Carmel by the Sea, the Santa Lucia Preserve promises a rare combination of expansive natural beauty and an intimate sense of community. Sitting on 20,000 acres of pristine, coastal foothills in the Santa Lucia Mountains, the preserve is home to a rich diversity of plant and wildlife along with 300 fortunate families who share the enjoyment and protection of the majestic landscape that surrounds them.

Homesites will average 20 to 30 acres. Community amenities include an award-winning Tom Fazio golf course, 100 miles of hiking and biking trails, equestrian facility and an early 1900s Hacienda that has been updated for Club functions.

http://www.santaluciapreserve.com

### ☆ MALUAKA

Maui is one of the most sought-after destinations on earth. It has repeatedly been ranked the "Best Island in the World" by *Conde Nast*. While the lure of Maui is legendary, some of the island's most beautiful places have been a closely held secret. One of these places is Makena on the southwest coast.

Makena encompasses some of the island's most spectacular scenery, incredible beaches and natural preserves all within three minutes of world-class shopping and Wailea resorts. Makena is also home to an exciting new oceanfront private club community, Maluaka. With only 69 spectacular residences, Maluaka is an exceptional and limited residential opportunity.

http://www.maluaka.com

### ☆ OIL NUT BAY
Virgin Gorda, British Virgin Islands

White sand beaches, turquoise water and amiable island living. This is Oil Nut Bay, an extraordinary destination of enhanced value featuring stunning views of the Caribbean, world-class architecture and unparalleled natural beauty. Accessible only by boat or helicopter, this low density community allows for only 88 families to enjoy this rare ownership opportunity.

http://www.oilnutbaybvi.com

### ☆ THE MANNING AT BELLE MEADE
Nashville, Tennessee

Upon entering the gates of The Manning at Belle Meade, you enter a world of unrivaled ease, comfort and privacy. Ideally positioned at the gateway of Nashville's exclusive Belle Meade neighborhood, the classically styled building with its large open-air loggia and two adjoining Brownstones is surrounded by formal gardens replete with playing fountains, an exquisite pool and pavilion, a croquet lawn and a walking path. Residents will enjoy a full array of concierge services provided by a highly trained professional staff. The 34 residences are offered in an array of sizes ranging from an intimate 1,800-square-foot one-bedroom to an expansive penthouse of 6,000 square feet. Pricing begins at $950 thousand.

http://www.manningbellemeade.com

### ☆ CAPELLA BAHIA MAROMA
Playa del Carmen, Mexico

Ideally situated along Mexico's Riviera Maya on a mile of pristine beachfront, Capella Bahia Maroma is truly a one-of-a-kind place where most of the premium residences will be located along the ocean in a very low density setting. The community will feature 127 luxury beachfront residences and villas, condominiums, golf estates and haciendas within a secure gated enclosure in a region known for its natural beauty and stunning white sand. Capella Bahia Maroma will be home to the only private golf course on the Yucatan Peninsula, an 83-room ultra-luxury hotel, a signature restaurant, a three-meal restaurant, a beach bar and grill, a spa, an outdoor pool, an outdoor whirlpool, an exercise room, a business center, tennis courts, 1,500 square feet of meeting space and a gift shop.



# TRADITIONS
**MANAGEMENT**

*Designers of Lifestyle. Purveyors of Land.*

http://www.capellalivingaroma.com

## ☆VICTORY RANCH

Park City, Utah

A private adventure ranch community, Victory Ranch offers something no other community in Park City does: the ability to reconnect with self, family, friends and the outdoors. An abundance of challenging activities will be available within this 5,800-acre community, for all members of the family, along with professional guides to instruct and share knowledge. A Rees Jones-designed golf course and five miles on the Upper Provo River are available for creating memories that will last a lifetime. Custom homesites range from one to four acres, with cottages from 2,500 to 3,000 square feet.

## ☆SUPERSTITION MOUNTAIN

Phoenix, Arizona

## ☆DESERT MOUNTAIN

Scottsdale, Arizona

## ☆PRONGHORN

Bend, Oregon

## ☆CIMARRON HILLS

Austin, Texas

## ☆CARLTON WOODS

The Woodlands, Texas

## ☆GLENWILD

Park City, Utah

## ☆HYATT MAIN STREET

Breckenridge, Colorado

## ☆ONE VENDUE RANGE

Charleston, South Carolina

## ☆BUFFALO AND DAKOTA

Keystone, Colorado

## ☆SNOWBRIDGE

Stratton Mountain, Vermont

## ☆CHATEAU MONT TREMBLANT

Quebec, Canada

## ☆CHATTOOGA

Cashiers, North Carolina

## ☆LAHONTAN

Lake Tahoe, California

## ☆CAP CANA

Punta Cana, Dominican Republic

## CONTACT US

**TRADITIONS MANAGEMENT OFFICES**

Traditions Management, LLC
One Union Square, Suite 816
Chattanooga, TN 37402
(423) 267-5003

*Mark Enderle, President and CEO*
*Mark Yarborough, Vice Chairman and CSO*
*Mike Aiken, Chairman*
*Lisa Reynolds, Senior Vice President and COO*
*Mike Lorence, Senior Vice President of Sales*
*Lisa Papenfus, Vice President of Marketing*
*Tom Potter, Controller*
*Jim Buckley, Regional Manager*
*Al Sneeden, Regional Manager*
*Amy Bott*
*Amanda Coram*
*Barbara Gephart, Office Manager &*
*Human Resources Coordinator*
*Tammy Henderson, Accounting Manager*
*Angie Snyder*

The Residences at The Ritz-Carlton, Dallas and The Tower Residences at The Ritz-Carlton, Dallas
500 Crescent Court, Suite 140
Dallas, TX 75201
(214) 855-2020

*Steve Farmer*
*Sandra Baber-Sandefur*
*Josh Ellis*
*Todd Lorbach*
*Jennifer Martinson*
*Candice Van Cleave*



**TRADITIONS**
MANAGEMENT

*Designers of Lifestyle, Purveyors of Land.*

## CONTACT US
CONTINUED

**Escondido**
9090 Highway 2147
Horseshoe Bay, TX 78657
(830) 598-6311

*Chris Munnerlyn*
*Leslie Baugh*
*David Corry*
*Cindy Olson*

---

**Kukui'ula**
2909 Poipu Road
Koloa, HI 96756
(808) 742-0234

*Hannah Sirois*
*Charlotte Addiss*
*Rolf Benirschke*
*Kip Boatcher*
*Joni Brooks*
*Kristy Moore*
*Stewart Munroe*
*Ellen O'Connell*
*Suzanne Olson*
*Chantal Ono*
*Scott Reed*
*Nani Sadora*

---

**Silverleaf**
19890 North 101st Way,
Scottsdale, AZ 85255
(480) 502-6902

*Jeff Beardsley*
*Debbie Beardsley*
*Mike Lehman*
*Todd Moen*
*Cindy Penwell*
*Shawn Shackelton*
*Jacquie Stotler*

**Ocean Club Residences & Marina**
Kerzner International
Executive Offices
Nassau, The Bahamas
(242) 363-6645

*John Hillman*
*Chris Bowers*
*Natasha Vythoulkas*

---

**Maluaka**
100 Wailea Ike Drive
Wailea, Maui, Hawaii 96753
(808) 879-0009

*Nancy J. Callahan*
*Cathy Cox*
*Lisa Judge*
*Jamie Kawamoto*
*Maile Lazo*

---

**The Santa Lucia Preserve**
One Rancho San Carlos Road
Carmel, CA 93923
(831) 626-8200

*Mark Baxter*
*Greg Kraft*
*Kris McAulay*

---

**The Manning at Belle Meade**
120 Woodmont Boulevard
Nashville, TN 37205
(615) 460-1223

*Kirby Baker*
*Jessica Douglass*

**Capella Bahia Maroma**
Decima Avenida con Calle 14
bis #250
Playa del Carmen, Q. Roo 77710
Municipio de Solidaridad, Estado de
Quintana Roo
Mexico
(866) 248-8466 (from US)

*Jerry Lewless*
*Ewa Carlsson*
*Ed Eakin*
*Wheeler Hill*
*Isa Mora*
*Mauricio Salome*
*Michael Thacker*

---

**Oil Nut Bay**
Virgin Gorda, British Virgin Islands
(800) 761-0377 (from US)
(284) 495-5400

*Chad DeVries*

---

**Victory Ranch**
Park City, Utah
(435) 659-9947

*George Berkey*
*Kirk Lowry*
*Kate Weinberg*

EXHIBIT H



THE RESIDENCES®
AT THE RITZ-CARLTON, DALLAS



**First Phase Of The Residences At The Ritz-Carlton, Dallas Sold Out**

*Phase II Now Under Construction, To Be Completed In 2009, 65% Pre-Sold*

DALLAS (October 19, 2007) – After recently debuting Dallas' first residences under the famous Ritz-Carlton brand, Crescent Real Estate Equities Company announced that all units in Phase I of The Residences at The Ritz-Carlton, Dallas have been sold.

The first phase of the 4.9-acre neighborhood opened on August 15, encompassing The Ritz-Carlton, Dallas and The Residences. Valued at $130 million, Phase I of The Residences comprises 70 private condominiums on floors nine through 21 above the 218-room hotel.

"The tremendous success we've had with Phase I further underscores the demand for a second phase," said Bill Mabus, vice president of development for Crescent. "By bringing together the best of the best, we have realized our vision of creating a new sophisticated urban lifestyle in Dallas."

In addition to Crescent and The Ritz-Carlton components, the world-class team who collaborated on the project includes renowned architect Robert A.M. Stern, award-winning designer Sherry Hayslip, A.S.I.D., IIDA, and internationally-acclaimed Chef Dean Fearing whose bustling new signature restaurant in The Ritz-Carlton, Dallas was just named 'Restaurant of the Year' by *Esquire* magazine.

"Sales for the new development have exceeded our expectations, and all but a few condos in Phase I were sold prior to opening in August," commented Steve Farmer, sales manager for the project. "Over 65 percent of the units in Phase II are also pre-sold, the majority of which were purchased prior to breaking ground."

Phase II, comprising The Tower Residences and unique Regency Row homes, broke ground on July 26. With a projected value of $175 million in sales, the Tower Residences will feature a 23-story Regency-style tower consisting of 96 residences with a variety of floor plans, ranging from one- to three-bedroom residences to penthouses. Four freestanding elegantly-appointed Regency Row manor-style homes will be the crown jewel of the neighborhood. Prices range from $700,000 to $8 million. Upon final completion, The Residences at the Ritz-Carlton, Dallas will be valued at $300 million.

The Tower Residences will be adjacent to The Ritz-Carlton, Dallas and connected to the hotel by way of a glass and cast stone, air-conditioned walkway on the second floor, making many of the hotel's personalized services and amenities an extension of each resident's home. Both Tower and Regency Row residence owners will have full access to Fearing's Restaurant; a 12,000-square-foot, world-class spa; 24-hour valet and concierge; in-room dining; and housekeeping service. The homes will also include a private auto court; underground parking with individual storage spaces; a private pool with lush landscaping; an exclusive resident fitness center on the ground floor; and a private dining/meeting room.

For more information and to preview the Phase II floor plans that are currently available, visit www.theresidencesdallas.com and select 'Residences Availability.'

# # #

**Images available upon request

**About The Residences at The Ritz-Carlton, Dallas**

The Residences at The Ritz-Carlton, Dallas is an urban oasis unlike any other. Conceptualized by the renowned architect Robert A.M. Stern and Hayslip Interior Design Company, this well-appointed, exclusive 4.9-acre neighborhood offers an unparalleled elegant lifestyle enhanced by the finest personal service and all the legendary amenities synonymous with The Ritz-Carlton brand. Phase I of The Residences encompasses 70 private condominiums located on floors nine through 21 above the 218 spacious rooms and suites of The Ritz-Carlton Hotel. Phase II includes The Tower Residences and Regency Row homes, scheduled for completion in 2009. The 23-story Tower Residences, connecting to the hotel by way of a glass and cast stone, air-conditioned walkway on the second floor, will feature 96 luxury homes ranging from one to three bedrooms and two spacious penthouses. Four freestanding manors will comprise the Regency Row homes and will be designed and configured to the individual preferences of their owners. The privacy offered by these handsome brownstone-style homes — along with The Ritz-Carlton standard of service — will make Regency Row the most prestigious address in Dallas.

EXHIBIT I

# ReedSmith

Lance Gotthoffer
Direct Phone: +1 212 549 0289
Email: lgotthoffer@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
www.reedsmith.com

April 14, 2008

**Via Overnight Courier and Electronic Mail**

Traditions Management, LLC
816 Krystal Building
One Union Square
Chattanooga, Tennessee 37402

Attn: Michael M. Aiken
maiken@traditionsmgt.com

**Secured Loan Transaction Dated 18 December 2006**

Dear Mr. Aiken:

We are counsel for Bernard National Loan Investors, Ltd. Your attention is directed to the Loan Agreement and Pledge and Security Agreement dated December 18, 2006 (the "LPS Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings ascribed thereto in the LPS Agreement.

As we have heretofore advised you, facts have come to Lender's attention showing a default by you and your related parties under the Loan Documents. We have, over the past months, repeatedly given you an opportunity to refute or explain those facts. You, and your counsel, have steadfastly refused to do so, through and including your counsel's letter of April 10, 2008. Thus, these facts stand unrebutted and in those circumstances, Lender has no choice but to act upon them.

Although such Notice is not required and is provided solely as a courtesy, notice is hereby given that at least the following defaults and Events of Default under the LPS Agreement have occurred and are continuing.

   1.    Traditions Management, LLC ("Borrower"), AEY, LLC ("Pledgor"), and/or the individual Principals caused a fourth quarter distribution of one million five hundred thousand dollars ($1,500,000) from working capital (the "Excess Distributions"). Either the Excess Distributions resulted from misapplying Revenues in violation Section 3(d), and thereby also breaching covenants of Borrower, Pledgor and the Principals (see LPS Agreement §§ 5(s), 10(a)(iii), 10(a)(iv)), or Borrower and/or Pledgor have created a prohibited reserve on their books, violating the covenant in Section 5(m).

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH

OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

Michael M. Aiken
April 14, 2008
Page 2

**ReedSmith**

2.  Borrower and/or Pledgor have spent approximately double the travel/meals/entertainment ("T/M/E") expenses in the Approved Budget, in violation of their covenant not to incur expenses materially in excess of that Approved Budget.  See LPS Agreement § 5(t).

3.  Lender provided Borrower and Pledgor with the opportunity to explain the Excess Distributions and expenses, but they have chosen to remain silent in violation of Section 5(c) of the LPS Agreement.

Therefore, take further notice that Lender is now entitled to exercise its Remedies, and may elect to do so at its sole option in accordance with the Loan Documents.

Lender does not waive any default or Events of Default that may have occurred under the Loan Documents and further reserves all its rights and remedies as a result thereof, including, but not limited to, the right to accelerate amounts owed under the Loan Documents, and the right to foreclose upon the Pledged Interests or any other component of Lender's Collateral.

Very truly yours,

*Lance Gotthoffer/al*

Lance Gotthoffer

cc:    Chambliss, Bahner & Stophel, P.C.  (via overnight courier and electronic mail)
       1000 Tallan Building
       Two Union Square
       Chattanooga, TN 37402
       Attn:  William P. Aiken, Jr., Esquire
       waiken@cbslawfirm.com

       Covington & Burling LLP  (via overnight courier and electronic mail)
       620 Eighth Avenue
       New York, New York  10018
       Attn:  C. William Phillips, Esq.
       cphillips@cov.com

# ReedSmith

Lance Gotthoffer
Direct Phone: +1 212 549 0289
Email: lgotthoffer@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
www.reedsmith.com

April 14, 2008

**<u>Via Overnight Courier and Electronic Mail</u>**

AEY, LLC
816 Krystal Building
One Union Square
Chattanooga, Tennessee  37402

Attn:  Michael M. Aiken
maiken@traditionsmgt.com

**<u>Secured Loan Transaction Dated 18 December 2006</u>**

Dear Mr. Aiken:

We are counsel for Bernard National Loan Investors, Ltd. Your attention is directed to the Loan Agreement and Pledge and Security Agreement dated December 18, 2006 (the "LPS Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings ascribed thereto in the LPS Agreement.

As we have heretofore advised you, facts have come to Lender's attention showing a default by you and your related parties under the Loan Documents. We have, over the past months, repeatedly given you an opportunity to refute or explain those facts. You, and your counsel, have steadfastly refused to do so, through and including your counsel's letter of April 10, 2008. Thus, these facts stand unrebutted and in those circumstances, Lender has no choice but to act upon them.

Although such Notice is not required and is provided solely as a courtesy, notice is hereby given that at least the following defaults and Events of Default under the LPS Agreement have occurred and are continuing.

1.  Traditions Management, LLC ("Borrower"), AEY, LLC ("Pledgor"), and/or the individual Principals caused a fourth quarter distribution of one million five hundred thousand dollars ($1,500,000) from working capital (the "Excess Distributions"). Either the Excess Distributions resulted from misapplying Revenues in violation Section 3(d), and thereby also breaching covenants of Borrower, Pledgor and the Principals (<u>see</u> LPS Agreement §§ 5(s), 10(a)(iii), 10(a)(iv)), or Borrower and/or Pledgor have created a prohibited reserve on their books, violating the covenant in Section 5(m).

NEW YORK ◆ LONDON ◆ HONG KONG ◆ CHICAGO ◆ WASHINGTON, D.C. ◆ BEIJING ◆ PARIS ◆ LOS ANGELES ◆ SAN FRANCISCO ◆ PHILADELPHIA ◆ PITTSBURGH

OAKLAND ◆ MUNICH ◆ ABU DHABI ◆ PRINCETON ◆ NORTHERN VIRGINIA ◆ WILMINGTON ◆ BIRMINGHAM ◆ DUBAI ◆ CENTURY CITY ◆ RICHMOND ◆ GREECE

Michael M. Aiken
April 14, 2008
Page 2

**ReedSmith**

2.   Borrower and/or Pledgor have spent approximately double the travel/meals/entertainment ("T/M/E") expenses in the Approved Budget, in violation of their covenant not to incur expenses materially in excess of that Approved Budget. <u>See</u> LPS Agreement § 5(t).

3.   Lender provided Borrower and Pledgor with the opportunity to explain the Excess Distributions and expenses, but they have chosen to remain silent in violation of Section 5(c) of the LPS Agreement.

Therefore, take further notice that Lender is now entitled to exercise its Remedies, and may elect to do so at its sole option in accordance with the Loan Documents.

Lender does not waive any default or Events of Default that may have occurred under the Loan Documents and further reserves all its rights and remedies as a result thereof, including, but not limited to, the right to accelerate amounts owed under the Loan Documents, and the right to foreclose upon the Pledged Interests or any other component of Lender's Collateral.

Very truly yours,

*Lance Gotthoffer/al*

Lance Gotthoffer

cc:   Chambliss, Bahner & Stophel, P.C.  (via overnight courier and electronic mail)
      1000 Tallan Building
      Two Union Square
      Chattanooga, TN 37402
      Attn:  William P. Aiken, Jr., Esquire
      waiken@cbslawfirm.com

      Covington & Burling LLP  (via overnight courier and electronic mail)
      620 Eighth Avenue
      New York, New York  10018
      Attn:  C. William Phillips, Esq.
      cphillips@cov.com