UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
BERNARD NATIONAL LOAN INVESTORS, LTD.,  :
                                        :
                 Plaintiff,             :
                                        :      08 Civ. 3573 (DLC)
        -v-                             :
                                        :      OPINION & ORDER
TRADITIONS MANAGEMENT, LLC, AEY, LLC,   :
MICHAEL AIKEN, MARK ENDERLE, and        :
MARK YARBOROUGH,                        :
                                        :
                 Defendants.            :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:

Lance Gotthoffer
Casey D. Laffey
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022

For Defendants:

C. William Phillips
Mark P. Gimbel
Ethan Jacobs
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018


DENISE COTE, District Judge:

    This dispute arises out of a $26.5 million loan that

plaintiff Bernard National Loan Investors, Ltd. ("Bernard")

extended to defendant Traditions Management, LLC ("Traditions")

in December 2006.  A bench trial on Bernard's claims for breach

of contract, breach of the covenant of good faith and fair
dealing, and indemnification was held February 22-24, 2010.
Based on the following findings of fact and conclusions of law,
judgment is entered for the defendants on all claims.


FINDINGS OF FACT[1]

1.   The Parties

Traditions is a real estate marketing firm that specializes
in the sale and marketing of high-end luxury residences.  The
company was founded in late 2002 by Michael Aiken ("Aiken"), its
Chairman, Mark Enderle ("Enderle"), its President and Chief
Executive Officer, and Mark Yarborough ("Yarborough"), its Vice
Chairman and Chief Sales Officer (collectively, the
"Principals").  Traditions is owned by the Principals through
three separate limited liability companies ("LLCs"), which
collectively hold all of the common membership interests in
Traditions.  AEY, LLC ("AEY") is owned indirectly by the
Principals and holds all of the preferred membership interests
in Traditions.

Bernard is a specialized investment group based in the
Cayman Islands that provides loans to commercial ventures.  At
the time of the loan transaction at issue in this dispute,

---

[1] Although the findings of fact can be found throughout the
Opinion, they are principally contained in the Opinion's first
section.

Bernard was serviced by a hedge fund, D.B. Zwirn & Co. ("Zwirn").  Bernard is now serviced by Fortress Investment Group, LLC ("Fortress").

2.  The Loan Transaction and Services Agreements

In the summer of 2006, the Principals engaged investment bank Dresdner Kleinwort Wasserstein LLC ("Dresdner") to obtain an equity investment, financing, or other structured transaction to monetize their ownership interests in Traditions.  Dresdner approached Zwirn, among other potential investors.  Although originally conceived as an equity investment, Zwirn, through Bernard, ultimately extended a $26.5 million non-recourse loan to Traditions (the "Loan").

On December 18, 2006 (the "Closing Date"), Traditions and Bernard executed a Loan Agreement and Pledge and Security Agreement (the "LPS Agreement").[2]  The Loan retains many of the hallmarks of an equity investment, including the right of Traditions' members (i.e., the Principals) to receive loan proceeds, rather than requiring them to be used to fund Traditions' operations,[3] and the right of Bernard to convert its

---

[2] A Promissory Note and a Secured Non-recourse Guaranty were also executed.

[3] Section 5 of the LPS Agreement states, in pertinent part, that "the Loan proceeds either have been or will be distributed to [Traditions'] members" and "that such distribution is approved

debt investment into a ten percent equity interest.  The Loan carries a 9.625 percent interest rate payable on outstanding principal semi-annually.  The Loan is secured by, <u>inter alia</u>, Traditions' preferred membership interests (held by AEY, the "Pledgor" under the LPS Agreement), gross revenue received by Traditions (including all revenues generated from Traditions' contracts with developers), and any additional assets owned or acquired by Traditions (the "Collateral").

In addition to the Loan Documents, Bernard and Traditions executed three Service Agreements governing the services to be provided to Traditions by the Principals (the "Service Agreements").  Under the terms of the Service Agreements, each of the Principals is entitled to receive compensation in the form of an Annual Fee of $333,333 per calendar year (the "Service Fees") during the "Service Period."  The Service Agreements provide that the Service Period commences on the Closing Date.  The payment of Service Fees is "subject to applicable restrictions contained in the [LPS Agreement] and the LLC Agreement."

---

and shall not constitute a violation of this Agreement or any other Loan Documents."

3.   Relevant Provisions of the LPS Agreement

The LPS Agreement contains several provisions relevant to this dispute.  Under Section 3(a) of the LPS agreement, Traditions must repay Bernard "the aggregate outstanding principal amount of Loan together with all accrued interest" on or before the Maturity Date in 2012.  Although nothing in the LPS Agreement prohibits Traditions from prepaying the outstanding principal in advance of the Maturity Date, Traditions is under no obligation to do so except as required by Section 3(d).  Section 3(d), referred to as the "Use of Revenues" or "Waterfall" provision, provides in pertinent part:

> All net Revenues received by [Traditions], net of budgeted overhead and operating expenses . . . to the extent such operating expenses are provided for in an Approved Budget, shall be used, disbursed and applied in the following order of priority:
>
> (i)   First, to Pledgee [Bernard] to the extent, and for the payment of, all accrued and unpaid interest on the Loan . . .;
>
> (ii)  Second, the balance, if any (but only as and when no accrued and unpaid interest on the Loan remains outstanding), for the payment of the Annual Fees payable under and in accordance with the Service Agreements, in no event to exceed $1,000,000 per annum in the aggregate . . . ; and
>
> (iii) Third, 80% of the balance, if any, to Pledgee [Bernard] for application in reduction of the outstanding principal balance of the Loan and the remaining 20% thereof to Pledgor [AEY] for distribution to the Principals for the payment . . . of taxes incurred by Pledgor [AEY], Issuer [Traditions], or Principals by reason of such application in reduction of principal.

The LPS Agreement contains several covenants related to the Use of Revenues provision.  Section 5(l) provides that neither AEY nor Traditions "shall make any distributions of Revenues in any manner that is inconsistent with this Agreement or with [Traditions'] limited liability company agreement.  In no event shall [Traditions] pay any portion of the Annual Fees accrued in any prior year or otherwise in any manner inconsistent with Section 3(d) hereof."  Under Section 5(s), the Principals are personally liable for any violation of the Use of Revenues provision.  Section 5(s) also provides that the "Principals shall not, and shall not permit [AEY] or [Traditions] to, knowingly misappropriate any Revenues, nor shall Principals intentionally cause or permit [Traditions] to make any payment or distribution of Revenues in any manner inconsistent with the terms of Section 3(d) hereof."

Section 4 of the LPS Agreement contains representations and warranties made by the defendants in connection with the loan transaction.  Most importantly for this dispute, Section 4(k) provides, in pertinent part:

> Schedule IV lists all of the existing sales and
> marketing agreements in effect as of the date hereof,
> including any modifications and amendments thereto . .
> . . Each of the Existing Contracts is in full force
> and effect as of the date hereof, and neither
> [Traditions] nor [AEY] has received any notice, or has
> any actual knowledge, that there has occurred a
> material default under any of the Existing Contracts

6

by any party thereto, except as disclosed on Schedule
V.
Under the LPS Agreement, the Principals are individually liable

for any misrepresentation made under Section 4(k).

Section 7 of the LPS Agreement requires that for "the

twelve-month period commencing on January 1, 2007, the budget

attached as Exhibit E" to the LPS Agreement shall be the

operating budget for Traditions for that fiscal period.  For

subsequent years, Section 7 requires that an annual budget

containing "revenues and operating and other expenses" be

submitted for Bernard's approval at least sixty days prior to

the end of the prior fiscal year.  Once approved, the budget is

referred to as the "Approved Budget."  As noted above, under

Section 3(d), the aggregate expenses included in the Approved

Budget are subtracted from actual net revenues to determine the

amount of revenues available for distribution under the Use of

Revenues provision.  Section 5(t) of the LPS Agreement provides

that AEY shall not, and shall not permit Traditions to, "incur

any expense materially in excess of that which is reflected on

the then-current Approved Budget."  The Principals are not

personally liable for a violation of Section 5(t).

Aside from the requirement in Section 7 that Traditions

supply Bernard with a proposed annual budget each year, the only

other provision in the LPS Agreement that obligates any of the

defendants to provide any documentation to Bernard is Section 5(c).  This provision states, in pertinent part:

> At any time and from time to time, upon the reasonable written request of [Bernard], and at the sole expense of Pledgor [AEY], Pledgor [AEY] shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as [Bernard] may reasonably request for the purposes of obtaining creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including, without limitation, filing UCC financing or continuation statements, provided that the amount of indebtedness secured hereby is not increased thereby.

By its terms, Section 5(c) applies only to AEY, not the other defendants.

Section 10 defines Bernard's remedies when there is an Event of Default under the LPS Agreement.  Under Section 10(a), an Event of Default occurs, inter alia, if:

> (iii) Pledgor [AEY] or Issuer [Traditions] violates any of the covenants set forth herein [including, inter alia, Sections 5(c), 5(l), 5(s) and 5(t)];

> (iv)  any of the Principals, Issuer [Traditions], or Pledgor [AEY] knowingly misappropriates any Revenues, or if Issuer intentionally makes any payment or distributions of Revenues in any manner inconsistent with the terms of Section 3(d) hereof; . . .

> (vi)  any representation or warranty made by Issuer [Traditions] or Pledgor [AEY] herein [including, inter alia under Section 4(d)] shall have been false or misleading in any material respect as of the date hereof.

Under Section 10(b), upon the occurrence of an Event of Default, Bernard may declare the Loan to be immediately due and payable.

For an Event of Default based on Sections 10(a)(iii) or 10(a)(iv), however, the Loan and all obligations of AEY under the LPS Agreement automatically become immediately due and payable without notice or demand by Bernard.

Because the Loan is non-recourse, Bernard's sole remedy if an Event of Default occurs is to foreclose upon the Collateral; with one exception, Bernard may not bring an action for a money judgment.  Section 18 of the LPS Agreement provides, in pertinent part:  "[Bernard] shall not enforce the liability and obligation of Pledgor [AEY] or Issuer [Traditions] to perform and observe the obligations contained in the Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against [AEY] or [Traditions]."  The only exception is that under Section 11(f), each of the Principals is personally liable if and to the extent he is responsible for "the breach, violation or failure of a representation, warranty or covenant under Section 4(k), 5(q), 5(s) or 5(v) . . . [up to] $25,500,000 in the aggregate."

Finally, the LPS Agreement contains an indemnification provision.  Section 19(a)(iv) provides that, subject to the non-recourse provision in Section 18, AEY has a duty to indemnify Bernard up to the value of Bernard's interest in the Collateral for losses arising from "any failure on the part of [AEY] to perform or be in compliance with any of the terms of the

9

Agreement."  AEY is not obligated, however, "to indemnify [Bernard] for Losses directly or indirectly arising out of or relating in any way to the willful misconduct, bad faith or gross negligence of [Bernard]."

4.   Hill Country Harbor

Among the contracts listed in Schedule IV of the LPS Agreement as being "in full force and effect" as of the Closing Date was a sales agreement between Traditions and Clearview Property Development, LLC ("Clearview") dated December 27, 2005, relating to a real estate development project known as Hill Country Harbor (the "Clearview Sales Agreement").[4]  In early November 2006, prior to the close of the loan transaction between Traditions and Bernard, Clearview informed Traditions that Hill Country Harbor was experiencing funding problems and was being placed "on hold" until additional financing could be secured.  By the time the project was placed on hold, Traditions had persuaded nineteen prospective purchasers to make reservations to buy into the Hill Country Harbor project as so-called "founders," and had secured approximately eighty additional reservations to purchase properties in the project.

---

[4] The Hill Country Harbor property was owned by Hill Country Harbor, L.P., an entity owned and operated by the same two individuals who controlled the developer, Clearview.  The owner and developer of the Hill Country Harbor project were thus closely linked.

On November 3, Lisa Reynolds ("Reynolds"), Traditions' Chief
Operating Officer, notified Clearview that it owed Traditions
$101,772 on a past-due invoice.  Reynolds informed Clearview
that the failure to pay the outstanding invoice constituted a
breach of the Clearview Sales Agreement and requested that
Clearview cure the breach.  On November 7, Clearview notified
Reynolds that it had wired the past due amount to Traditions.

On November 9, Clearview informed Traditions that it had
"decided not to move forward with the project at this time."
Traditions proceeded to withdraw its sales force from the Hill
Country Harbor project site.  On November 30, Enderle,
Yarborough, and Reynolds were informed by Traditions' sales
manager, Al Sneeden, that the Hill Country Harbor sales team had
had an "exit meeting" with Clearview.  Sneeden reported that
Clearview "was discontinuing the [project] because [it] did not
have financing," that it had "pulled the plug," and that the
Traditions sales force was "effectively off the premise."
Clearview had requested, however, that Traditions continue to
provide it with "all leads."  In a December 1 e-mail, Reynolds
informed Aiken, Enderle and Yarborough that she was working on
preparing a "mechanics lien" and "letters to Clearview."  In
response to Reynolds' e-mail, Enderle suggested that Traditions
needed "to perfect [its] claim [as soon as possible] and then
pursue whatever means possible to collect."

In a letter to Traditions dated December 13, Clearview indicated that the owner of Hill Country Harbor had terminated its development contract with Clearview effective as of November 1, 2006; was "not prepared to further fund the project or go forward with the current sales plan"; was "seeking replacement and additional equity, along with development financing"; and was "redesigning, re-phasing and re-pricing infrastructure development, amenity and product inclusion."  Clearview suggested that these constituted "material changes in project scope and funding" that would permit Traditions to unilaterally terminate the Clearview Sales Agreement.  Although Traditions had the right to unilaterally terminate based on a "material change," the Principals were concerned that if Traditions did so, it might not receive the commissions on future sales to the prospective buyers it had already lined up for Hill Country Harbor.

In a letter dated December 18, Traditions rejected Clearview's invitation to terminate the agreement.  The letter indicated that Clearview owed Traditions approximately $216,000 in outstanding invoices and that Traditions "would like to work out the details of transitioning the Hill Country Harbor project as fairly and quickly as possible."  Clearview replied to Traditions later that day, stating that it would not pay certain invoices because "it was clear in the field that everyone was

done [on November 30, 2006]."  None of the correspondence between Traditions and Clearview concerning Hill Country Harbor was provided to Bernard.

On the same day that Traditions rejected Clearview's invitation to unilaterally terminate the agreement, the loan transaction with Bernard closed.  Traditions included the following disclosure on Schedule V of the LPS Agreement concerning the Clearview Sales Agreement and the Hill Country Harbor project:

> Although this Sales Agreement is currently in effect, [Clearview] is in the process of reconfiguring the project away from built product to sales of unimproved lots and the development has been placed "on hold." [Clearview] and Traditions . . . are discussing these changes.  It has not been determined at this point whether, or in what form, this project will proceed. Traditions currently has outstanding invoices totaling $190,000.  Although payment is anticipated, non-payment would result in a dispute.

The 2007 budget attached as Exhibit E to the LPS Agreement projected gross revenues of $7,054,000 from the Hill Country Harbor project for 2007.  The cover memorandum to the budget, however, states that the 2007 budget "will be amended and updated by January 1, 2007, by which time [Traditions] believes it will be able to more accurately reflect the upcoming fiscal year."  The memorandum also specifically disclosed that "the contracts for Hill Country Harbor and Spring Valley Ranch/High Grange are 'fluid'" and that the "amended and updated budget for

2007 will be adjusted once the various issues relating to these
contracts are resolved."  On January 3, 2007, Traditions
notified Bernard:

> At this time, we do not have any updated [2007 budget]
> information from that submitted as per our agreement.
> We do believe that there will be changes and related
> recommendations over the next 30 to 60 days and will
> provide this information for discussion and review as
> soon as available.  For example, we anticipate
> finalizing decisions/recommendations on several
> additional contracts and hope to also have reached
> resolution on the issues involving Hill Country
> Harbor."

Traditions never provided Bernard with an updated budget for
2007.

From November 2006 through the first quarter of 2007,
Enderle met with Clearview on several occasions to address the
Hill Country Harbor project's funding problems and to discuss
strategies to reconfigure the development to make it less
capital intensive.  On a separate track, Reynolds began drafting
a termination letter to be sent to Clearview.  On January 14,
she advised Aiken that she was going "to finalize and send" the
termination letter, but the letter was not sent.  On January 17,
Clearview sent Traditions a proposed termination agreement.
Approximately two months later, Traditions responded with
suggested revisions to Clearview's proposed termination
agreement.  On March 26, Clearview informed Traditions that it
was withdrawing its prior termination offer and instead

unilaterally terminating the Clearview Sales Agreement based on an alleged breach by Traditions.

By April 2007, it was clear that no new source of financing for the Hill Country Harbor project would be found.  Traditions placed a lien on the Hill Country Harbor project.  In late June 2007, Traditions and Clearview executed a settlement agreement that terminated the Clearview Sales Agreement, withdrew the lien, and provided for the payment of certain outstanding invoices owed to Traditions.  On July 13, Traditions notified Bernard of the settlement agreement and the termination of the Clearview Sales Agreement.  It reported that "Clearview has failed to pay several invoices (totaling approximately $245,000) . . . and has made the decision to not move forward with the project as originally envisioned.  As such, Traditions has decided to terminate the Sales Agreement and to accept payment in the amount of $175,000."  Upon receiving this notice, Bernard made no objection that Traditions had breached the LPS Agreement by including the Clearview Sales Agreement in the list of Existing Contracts on Schedule IV of the LPS Agreement.

5.   Distributions in 2006 and 2007

On the Closing Date, Traditions had approximately $545,722 in cash on its balance sheet.  Upon the closing of the loan transaction, Bernard wired $26.5 million in loan proceeds to

Traditions.   Traditions immediately wired back $1.0 million to Bernard to establish an interest reserve account, as required by the LPS Agreement.   An additional $21.0 million of loan proceeds were distributed to the Principals.   The Principals elected to use a portion of the remaining $4.5 million of loan proceeds to cover various expenses incurred by Traditions, including $1.2 million in fees for Dresdner, $1.0 million in bonuses for Traditions' employees, and approximately $375,000 for attorneys and consulting fees incurred in connection with the loan transaction.   Thus, as of the end of January 2007, approximately $1.85 million in undistributed loan proceeds remained.   At the end of 2006, Traditions paid the Principals a pro-rated amount of $37,634 in Service Fees for the two-week period following the Closing Date.   Traditions did not make any interest or principal payments to Bernard in 2006.

In 2007, Traditions began paying Service Fees to the Principals on an estimated basis in monthly installments.   The Principals were each paid a total of $333,333 in Service Fees in 2007 pursuant to the Service Agreements.   Bernard was advised of the 2007 Service Fees in financial statements provided by Traditions in November 2007 and in February 2008.   In the fourth quarter of 2007, Traditions distributed an additional $1.5 million in loan proceeds to the Principals, leaving

approximately $350,000 available for distribution as of the end of 2007.

Traditions paid a total of $2,540,292 in interest and $1,600,000 in principal to Bernard in 2007.  Traditions made the principal payments in three installments:  $200,000 in May 2007; $1,000,000 in August 2007; and $400,000 in January 2008.[5] Traditions made the interim principal payments based on its revenue projections for the year.  In 2007, Traditions generated $11,559,995 in actual net revenues and there were aggregate expenses of $7,044,633 in the Approved Budget.  After deducting the $2,540,292 in interest paid to Bernard, and the $1,000,000 in Service Fees paid to the Principals, Traditions was obligated to distribute $975,070 pursuant to the Use of Revenues provision.  Under Section 3(d)(iii) of the LPS Agreement, the minimum principal payment due Bernard was eighty percent of the distributable amount, or $780,056.  Since Traditions had paid Bernard $1,600,000 in principal payments during 2007, it paid $819,944 more than was required under Section 3(d).

---

[5] Traditions decided to make the $400,000 principal payment to Bernard in 2007, but the money was not wired until January 2008. For each principal payment, the Principals received a corresponding distribution based on the 80%/20% split in Section 3(d)(iii) of the LPS Agreement to cover taxes incurred due to the paydown of outstanding principal on the Loan.

6.    Failure to Collect Two Commissions in 2007

In 2007, Traditions did not collect commissions in connection with the sale of two properties at the Kukui'ula development.  In April 2007, a $549,000 "home/cottage" in the Kukui'ula development was sold to Hanna Sirois ("Sirois"), an independent contractor employed by Traditions, and Sirois' sister.  Under the First Amendment to the Sales and Marketing Agreement for the Kukui'ula development (the "Kukui'ula Sales Agreement"), Traditions would normally have earned a 1.75 percent net commission on the sale of any such "home/cottage." Under the terms of Sirois' Contracting Services Agreement with Traditions -- a document that predates the LPS Agreement and that was provided to Bernard in the data room during due diligence on the Loan -- Sirois was entitled to purchase a home/cottage without having to pay a commission to Traditions.[6] Traditions collected only half of its normal commission on the sale of the home/cottage to Sirois.[7]  As a result, Traditions collected $4,804 less than it normally would have from the sale.

---

[6] Bernard points out that Traditions' Contracting Services Agreement with Sirois was through Wai Wai Real Estate Services Hawaii, LLC, of which Sirois was the sole member.  The home/cottage, however, was purchased through PJS Holdings, LLC and Walker Holdings, LLC.  Bernard does not dispute, however, that the home/cottage was, in fact, purchased by Sirois and her sister.

[7] Traditions did not waive the full commission because Sirois purchased the property with another person.

In May 2007, a $1.9 million "homesite" at the Kukui'ula development was sold to Yarborough, Traditions' Vice Chairman and Chief Sales Officer.  This was the second homesite sold to Yarborough in the Kukui'ula development.  Under the Kukui'ula Sales Agreement, Traditions would normally have earned a 2.50 percent commission on the sale of any such "homesite," or $47,500.  Traditions, however, collected no commission on the Yarborough sale.  Had Traditions collected its normal commissions on both the Sirois and Yarborough sales, it would have realized an additional $52,304 in net revenues in 2007.[8]

7.    2007 Budget Overruns

In 2007, Traditions incurred actual expenses totaling $6,385,573, which was less than the $7,044,635 included in the 2007 Approved Budget.  Bernard alleges, however, that there were eight individual line items where Traditions experienced overruns in 2007:  (1) consulting fees ($184,002 actual versus $120,135 budgeted); (2) office supplies ($194,530 actual versus $138,679 budgeted); (3) postage/delivery ($124,635 actual versus $67,937 budgeted); (4) professional fees – legal ($353,475

---

[8] Bernard contends that the uncollected commissions totaled $224,267, not $52,304.  Bernard's calculation, however, is based on gross commission rates in the Kukui'ula Sales Agreement, rather than the net commission received by Traditions.  In any event, as discussed below, even if the gross commission rates were used, Bernard fails to establish that the uncollected commissions constituted a material breach of the LPS Agreement.

versus $169,494 budgeted); (5) taxes - excise/use ($240,015 actual versus $0 budgeted); (6) airfare ($545,129 actual versus $313,900 budgeted); (7) meals and entertainment ($249,679 actual versus $101,646 budgeted); and (8) travel ($299,491 actual versus $176,586 budgeted). The budget overruns in these eight categories totaled $1,102,589.[9]

With respect to the last three categories for airfare, meals and entertainment, and travel -- for which budget overruns totaled approximately $500,000 -- Traditions received more than $925,000 in reimbursements from developers.[10] As such, Traditions' travel-related expenses in 2007 actually came in below budget. In fact, Bernard's expert could only identify $52,511 of unreimbursed travel-related expenses for 2007.

8.   Distributions in 2008

In 2008, Traditions continued to make monthly payments of Service Fees to the Principals based on its revenue projections for the year. These payments totaled $250,000 for the first quarter. Traditions ceased paying Service Fees after the first

---

[9] The budget overruns in 2007 were related, at least in part, to five new development projects that were not included in the 2007 Approved Budget. These new projects generated additional net revenues for Traditions in 2007 that flowed through the Waterfall provision.

[10] The travel-related reimbursements were accounted for by Traditions as revenues, which thereby increased the amount of net revenues flowing through the Waterfall provision.

quarter, however, when it became unclear whether Traditions would meet its revenue target for 2008.  At the end of 2008, Traditions classified $50,000 in health insurance expenses that the company had paid on behalf of the Principals during 2008 as Service Fees.  During 2008, Traditions paid $2,436,890 in interest to Bernard in 2008.  Traditions did not, however, make any principal payments to Bernard.

For 2008, Traditions generated actual net revenues of $8,158,393 and there were total expenses of $7,293,805 in the 2008 Approved Budget.  After paying the interest due on the Loan, Traditions did not have sufficient net revenue in 2008 to support the $300,000 in Service Fees paid to the Principals, or to make any principal payments to Bernard.  In connection with Traditions' 2008 audit, the $300,000 Service Fees were rescinded by reclassifying the payments as distributions of loan proceeds to the Principals.  Pursuant to this "true-up" adjustment, the remaining loan proceeds available for distribution were reduced by $300,000 to $46,857.91 at the end of 2008.[11]  Traditions'

---

[11] After the Loan closed in 2006, Traditions placed the proceeds in a separate cash account.  On June 30, 2008, Traditions used $120,000 from this account to pay interest on the Loan.  On July 11, 2008, Traditions used $150,000 from this account to cover payroll expenses.  Although these transfers reduced the available cash in the loan proceeds account, they were not distributions to the Principals, and therefore did not actually reduce the amount of loan proceeds available for distribution.

auditors signed off on the true-up in December 2009 and gave the company a clean audit opinion.

9.   Bernard's Requests for Additional Information

In 2007 and 2008, Traditions provided Bernard with certain financial information in addition to the proposed annual budget required by Section 7 of the LPS Agreement.  For instance, on November 1, 2007, Reynolds sent to Bernard a consolidated income statement and balance sheet for the nine months ending September 30, 2007.  On November 12, Bernard requested that Traditions provide "regular monthly reports of sales activity and a more robust quarterly reporting package."  Bernard also requested "the earned fee backlog, the financial summary by project, and the statement of cashflows for the nine months ended September 30, 2007."  On November 26, Traditions responded to Bernard's request by sending sales and revenue information by project, a cash flow statement, and the earned fee backlog for the nine months ended September 30, 2007.  On February 5, 2008, Traditions provided Bernard with the same types of financial information for the twelve months ended December 31, 2007. Unsatisfied with the information provided by Traditions, Bernard requested additional financial information.  Traditions refused Bernard's requests.

10.  This Litigation

In a letter dated April 14, 2008, Bernard notified defendants that they were purportedly in default under the LPS Agreement.  Bernard filed a complaint against Traditions, AEY, and Aiken the same day.  The original complaint alleged only that Traditions had failed to provide certain information pursuant to the LPS Agreement.  On May 23, defendants moved to dismiss the complaint.  On June 23, Bernard mooted defendants' motion by filing a first amended complaint.  The first amended complaint included claims for fraud, conversion, breach of contract, breach of the covenant of good faith and fair dealing, specific performance, and indemnification.  The complaint alleged, inter alia, that the Principals had misappropriated $1.5 million in "excess distributions" in the fourth quarter of 2007 and that Traditions had "concealed" revenues generated from its contracts with developers.  On July 29, defendants moved to dismiss the first amended complaint.

At a pretrial conference held with Bernard and defendants on August 1, Bernard was granted leave to amend, but was warned that no additional parties could be joined or pleadings amended after August 8.  On August 8, Bernard filed a second amended complaint (the "SAC"), adding defendants Enderle and Yarborough. The SAC asserted the same claims as the first amended complaint. On September 19, the defendants moved to dismiss the SAC.  By

Opinion dated February 17, 2009, the defendants' motion was granted in part, and the fraud claim was dismissed.  See Bernard Nat'l Loan Investors, Ltd. v. Traditions Mgmt., LLC, 08 Civ. 3573 (DLC), 2009 WL 382720 (S.D.N.Y. Feb. 17, 2009).  The motion to dismiss was denied as to the other claims in the SAC.

On January 29, 2010, after the close of discovery and less than a week before pretrial submissions were due, Bernard filed a motion to amend and supplement the SAC.  In the proposed third amended complaint, Bernard abandoned its claims for conversion and specific performance, as well as its allegation that Traditions had concealed any revenues generated from the contracts with developers.  Bernard sought, however, to add three new allegations in connection with its breach of contract claim, as well as additional facts to support existing allegations in the SAC.  At the final pretrial conference held on the record on February 18, Bernard's motion to amend was denied with respect to the addition of three new allegations, but otherwise granted.  The Court also granted in part motions in limine filed by Bernard and the defendants.  The parties were advised that the trial would be limited to Bernard's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and indemnification, as well as the issue of whether Traditions' Principals were personally liable for any violations of the LPS Agreement.

A bench trial was held February 22 through February 24.   In
accordance with the Court's rules, both parties submitted direct
witness testimony by written affidavit.   Bernard's witnesses
included:   Charles Mathews, Vice President of Fortress and the
primary account officer managing the Loan; Driss Benkirane,
former Vice President of Zwirn and the principal negotiator of
the Loan; and Basil Imburgia, a Certified Public Accountant who
provided expert testimony on behalf of Bernard.   Defendants'
witnesses included:   Michael Aiken, the Chairman of Traditions;
Mark Enderle, the President and Chief Executive Officer of
Traditions; Mark Yarborough, the Vice Chairman and Chief Sales
Officer of Traditions; Lisa Reynolds, the Senior Vice President
and Chief Operating Officer of Traditions; and Mark Farrell, a
Certified Public Accountant who provided rebuttal expert
testimony on behalf of defendants.   At trial, each party was
permitted to introduce evidence, to cross examine the other
party's witnesses, and to make opening statements and closing
summations.


CONCLUSIONS OF LAW

1.   Breach of Contract

Bernard alleges five breaches of the LPS Agreement:   first,
that defendants included the Clearview Sales Agreement on
Schedule IV despite knowing that the contract had been

terminated, could not be performed, or was in material default in violation of Section 4(k) of the LPS Agreement; second, that defendants paid excess Service Fees to the Principals in 2006 and 2008 in violation of Sections 3(d), 5(l), and 5(s) of the LPS Agreement; third, that defendants waived two commissions for the benefit of Traditions insiders that should have been collected and allocated for the benefit of Bernard in violation of Sections 3(d), 5(l), and 5(s) of the LPS Agreement; fourth, that defendants incurred expenses materially in excess of the amounts in the 2007 Approved Budget in violation of Section 5(t) of the LPS Agreement; and fifth, that defendants failed to provide certain financial information requested by Bernard in violation of Section 5(c) of the LPS Agreement.

The parties agree that New York law applies. "To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004). Under New York law, when a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is "material." New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006). "For a breach of contract to be material, it must go to the root or essence of the agreement between the

parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." Id. (citation omitted); see also Frank Felix Associates, Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997).

"It is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009); accord JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." MHR Capital Partners, 912 N.E.2d at 47. The parties do not dispute the existence of a contract or that the LPS Agreement is an integrated contract that contains the full and complete terms of the parties' agreement.

The question of whether any term of a contract is ambiguous is a question of law for the court. JA Apparel, 568 F.3d at 396. Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." White v. Continental Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007) (citation omitted). "Language whose meaning is otherwise plain

does not become ambiguous merely because the parties urge
different interpretations in the litigation." <u>JA Apparel</u>, 568
F.3d at 396.  If the contract is unambiguous, its meaning is
likewise a question of law for the court.  <u>Id.</u> at 397.  "In
interpreting a contract under New York law, words and phrases
should be given their plain meaning, and the contract should be
construed so as to give full meaning and effect to all of its
provisions."  <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital
Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).


        a.   Representations Regarding Hill Country Harbor
     The defendants did not breach Section 4(k) of the LPS
Agreement by including the Clearview Sales Agreement in the list
of Existing Contracts in Schedule IV of the LPS Agreement.
Pursuant to Section 4(k), defendants were obligated to disclose
on Schedule V any "material defaults under any of the Existing
Contracts" as well as any "disputes, set-offs, counterclaims and
defenses in respect of the Receivables."  The disclosures on
Schedule V regarding the Clearview Sales Agreement and the
status of the Hill Country Harbor project satisfied defendants'
obligations under Section 4(k).
     Bernard argues that the Schedule V disclosures concerning
the status of the Hill Country Harbor project were misleading,
or at least incomplete, and that defendants knew that the

project was in fact "dead" as of the Closing Date.[12]  Bernard's
bald assertion that the project was "dead" is belied by the
evidence.  On the Closing Date, the Clearview Sales Agreement
was still in effect.  As for the project itself, although it was
experiencing funding problems, had been placed "on hold," and
was being reconfigured, these facts were adequately disclosed to
Bernard in Schedule V.  Schedule V explicitly states that the
Hill Country Harbor project had been placed "on hold" and that
it had "not been determined at this point <u>whether, or in what</u>
<u>form</u>, this project will proceed."  (Emphasis added.)

     Bernard points to the withdrawal of the Traditions sales
force from the Hill Country Harbor project site in support of
its argument that the project was effectively over as of the
Closing Date.  Bernard's reliance on this fact is misplaced.
Traditions' decision to reallocate its sales force away from the
Hill Country Harbor project makes perfect sense given that the
project had been placed "on hold."  The evidence shows that
Traditions was prepared to reinsert its sales team if and when
the Hill Country Harbor project found additional financing to
move forward.  The withdrawal of Traditions' sales force
therefore does not support a finding that the Clearview Sales

_____

[12] While Bernard originally alleged that the defendants breached
the LPS Agreement by listing the Clearview Sales Agreement on
Schedule IV, by the end of trial it had abandoned that claim and
was arguing instead that the Schedule V disclosures were
inadequate.

Agreement was "dead."  Clearview's request for any "leads" Traditions developed for potential purchasers is a testament to Clearview's own desire to complete the project.

Bernard speculates that even if the Clearview Sales Agreement was technically still "in effect," Traditions had in fact decided to terminate the agreement prior to the Closing Date.  Clearview suggested in its December 13 letter that Traditions could unilaterally terminate the Clearview Sales Agreement given that there had been a "material change."  The evidence is clear, however, that Traditions rejected Clearview's invitation.  Instead, Enderle continued to work with Clearview through the first quarter of 2007 to identify possible alternative sources of financing.  Such efforts would have been futile had the Clearview Sales Agreement been terminated prior to December 18, as Bernard alleges.  Similarly, it would have been unnecessary for Reynolds to draft a proposed termination letter in January 2007, or for Clearview to send its own notice of termination based on an alleged breach by Traditions in March 2007, if the agreement had already been terminated.  Contrary to Bernard's allegation, the evidence demonstrates that the Clearview Sales Agreement was not actually terminated until the settlement agreement between Traditions and Clearview was executed in late June 2007.

Finally, Bernard quibbles with the wording of Schedule V.
While Schedule V disclosed that "Traditions currently has
outstanding invoices totaling $190,000," Bernard complains that
it did not say that the outstanding invoices were "past-due" or
that Clearview's failure to pay the invoices would constitute a
"material default" under the Clearview Sales Agreement.
Similarly, where Schedule V indicates that "non-payment would
result in a dispute," Bernard argues that Traditions should have
reported that the non-payment of the invoices had in fact
already resulted in a dispute.  These line-edits of the Schedule
V disclosures do not identify any misleading statements or
omissions that constitute a material misrepresentation in
violation of Section 4(k).  The Schedule V disclosures gave
Bernard ample notice that the Hill Country Harbor project might
collapse.  As such, Bernard has not shown that the defendants
breached Section 4(k) of the LPS Agreement by including the
Clearview Sales Agreement in Schedule IV.


    b.   Payment of Service Fees in 2006 and 2008

The defendants did not breach Sections 3(d), 5(l), or 5(s)
of the LPS Agreement by paying Service Fees to the Principals in
2006 or 2008.  The Service Agreements provide that, subject to
"applicable restrictions" in the LPS Agreement, each of the
Principals shall be paid $333,333 per calendar year during the

Service Period.  Since the Service Period commenced on December 18, 2006, the Principals were entitled to a pro-rated payment of Service Fees for the two-week period after the Closing Date in 2006.  Bernard points to no "applicable restriction" in the LPS Agreement that explicitly prohibited Traditions from making these payments.

Bernard argues that the 2006 Service Fees violated Section 3(d) because Traditions generated insufficient net revenues during the period to pay the Service Fees and because there was accrued interest on the Loan that had not been paid.  Bernard's argument is unavailing.  By its terms, the Use of Revenues provision only applies to distributions of net revenues for years in which there is an "Approved Budget," that is 2007 and beyond.  As Bernard's expert witness conceded, it is impossible to perform a Use of Revenues calculation without the total expenses figure from an Approved Budget.  Because Traditions had more than sufficient cash on its balance sheet as of the Closing Date to pay the Service Fees, and because Bernard has provided no evidence to show that the Service Fees were actually paid out of post-Closing Date net revenues, the Service Fee payments in 2006 were permissible under the LPS Agreement.

The payment of Service Fees to the Principals in 2008 also did not violate the LPS Agreement.  Although Traditions generated insufficient net revenues in 2008 to pay Service Fees

to the Principals, it rescinded the payments by reclassifying them as distributions of loan proceeds in connection with its 2008 audit.  Bernard argues that this "true-up" adjustment was improper and insufficient to cure the breach.  Bernard's argument is unavailing.

In 2008, Traditions made interim payments of Service Fees to the Principals based on its revenue projections for the year, as it had done during 2007.  Bernard never objected to Traditions' practice of making interim payments of Service Fees on an estimated basis, and in fact accepted interim payments of principal during 2007 without complaint.  Under the Use of Revenues provision, whether the Service Fees paid in 2008 were permissible could only be determined after Tradition's final revenue figures became available.  In connection with the 2008 audit, Traditions determined that there were insufficient net revenues to justify the Service Fees paid in 2008.  Accordingly, Traditions rescinded the payments by reclassifying them as distributions of loan proceeds.  Although Bernard contends that there were insufficient loan proceeds available to perform the "true-up," Bernard points to no evidence of any other distributions to the Principals that decreased the amount of loan proceeds available, or that otherwise undermines Traditions' accounting for the loan proceeds.

Bernard speculates that had it not raised the issue of the 2008 Service Fees during this litigation, the "true-up" would never have been performed and the Principals would have kept the $300,000 in violation of the LPS Agreement.  Although this may have been the case, it is not the reality.  The Service Fees were properly reclassified as distributions of loan proceeds to the Principals.

Moreover, Bernard has failed to prove that it suffered any damages due to the payment Service Fees in 2006 or 2008. Bernard cannot show that these Service Fees had any impact whatsoever on the amounts payable to it under the LPS Agreement. As such, Bernard has not shown that the defendants breached Sections 3(d), 5(l), or 5(s) of the LPS Agreement because of the Service Fees paid to the Principals in 2006 or 2008.


c.   Failure to Collect Two Commissions

The defendants did not breach Sections 3(d), 5(l) or 5(s) of the LPS Agreement by not collecting commissions on the sale of properties at the Kukui'ula development to Sirois and Yarborough.  First and foremost, Bernard cannot prove that it suffered any damages due to Traditions' failure to collect these commissions.  Had Traditions collected the commissions, it would have realized an additional $52,304 in net revenues, which would have increased the minimum principal payment due Bernard in 2007

to $821,898.  In 2007, however, Traditions made $1,600,000 in principal payments to Bernard, which far exceeds the minimum payment due under the Use of Revenues formula even when the uncollected commissions are added to the Waterfall.

Furthermore, Bernard's claim that Traditions "waived" the commission on the Sirois sale is factually incorrect.  Under the terms of Sirois' Contracting Services Agreement -- which predates the LPS Agreement and was made available to Bernard -- Traditions was not entitled to collect a commission from the sale of one home/cottage to Sirois.  As such, Traditions did not "waive" its commission on the Sirois sale because it had no right to collect the commission in the first place.[13]

With respect to the Yarborough sale, the LPS Agreement and Kukui'ula Sales Agreement are silent with regard to whether Traditions could waive its commission on the purchase of a second homesite by Yarborough.  While the Kukui'ula Sales Agreement permits the waiver of commissions for certain insiders, it is not clear that this provision applies to Yarborough.  There is no other provision in either agreement that expressly permits or prohibits Traditions from waiving its commission on sales to insiders or repeat buyers like Yarborough.  Defendants argue, however, that Traditions had no

---

[13] By the time of trial, Bernard had largely abandoned its waived commission claim with respect to the Sirois sale.

reasonable expectation of collecting a commission on the Yarborough sale because there is an industry practice of waiving commissions on sales to insiders and repeat buyers.

Under New York law, where a contract is ambiguous, industry custom and practice may be considered as an interpretive aid. See Stolt-Nielsen SA v. AnimalFeeds Intern. Corp., 548 F.3d 85, 99 (2d Cir. 2008) (noting that New York state law follows a "custom and practice" canon of construction where the terms of a contract are ambiguous); see also Evans v. Famous Music Corp., 807 N.E.2d 869, 873 (N.Y. 2004). "Under New York law, custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 84 (2d Cir. 2003) (citation omitted). "Moreover, the advocate of the trade usage must establish either that the party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." Id. (citation omitted).

Defendants have failed to meet their burden of showing that there was an industry practice of waiving commissions on sales to insiders and repeat buyers like Yarborough. Although defendants introduced convincing evidence that commissions are often waived for insiders in the real estate development industry, they failed to prove that the practice is "fixed and

invariable" or that the custom is "so notorious" that Bernard
would have been aware of its existence.

Nevertheless, the evidence demonstrates that the defendants
held a good faith belief in the existence of such an industry
practice such that the waiver of the commission on the
Yarborough sale did not constitute a "knowing" misappropriation
of revenues in violation of Section 5(s) of the LPS Agreement.
The defendants' belief that the waiver was permitted under the
LPS Agreement was reasonable given that Traditions did not have
to expend any effort or expense to identify Yarborough as a
potential purchaser or to market the property to him as it would
an ordinary first-time purchaser.

Furthermore, even if defendants breached Section 5(s) by
waiving the commission on the Yarborough sale, the breach was
not material.  It cannot be said that the waiver constitutes a
breach that goes "to the root or essence" of the LPS Agreement,
or one that "touches the fundamental purpose of the contract and
defeats the object of the parties in entering into the
contract." New Windsor Volunteer Ambulance Corps, 442 F.3d at
117.  Bernard has not shown that Yarborough's purchase of this
property foreclosed the sale of the homesite to a customer who
would have paid a commission to Traditions.  Further, if
Yarborough had paid a commission, it would have yielded
additional revenue to Bernard of less than $50,000, in a year in

which Traditions repaid Bernard $1,600,000 in loan principal. As such, the waiver of the commission on the Yarborough sale does not qualify as an Event of Default under Section 10 of the LPS Agreement that would render the entire Loan immediately due and payable to Bernard.

### d.   Budget Overruns

The defendants did not breach Section 5(t) of the LPS Agreement due to the budget overruns identified by Bernard. Section 5(t) prohibits Traditions from incurring "any expense materially in excess of that which is reflected on the then-current Approved Budget." In 2007, Traditions incurred expenses in five categories that were "materially in excess" of the amounts reflected in the 2007 Approved Budget. In the categories of consulting fees, office supplies, postage, professional fees, and excise taxes, Traditions incurred expenses that exceeded the budgeted amounts by roughly fifty percent or more.[14] None of these budget overruns, however, constituted a material breach of the LPS Agreement.[15]

---

[14] Although Bernard identifies overruns in the line items for airfare, meals and entertainment, and travel, Traditions' financial statements reflect that it received more than $925,000 in travel-related reimbursements from developers in 2007. These reimbursements were more than sufficient to cover the approximately $500,000 in overruns identified by Bernard in these three categories. The reimbursements also benefited

Most significantly, the budget overruns had no impact on the amount of principal payable to Bernard under the Use of Revenues provision in 2007.  As Bernard's own expert testified, actual expenses, as opposed to budgeted expenses, play no role in the calculation of the amount of principal that Traditions must pay Bernard pursuant to the Use of Revenues formula.[16] Thus, the budget overruns had no impact on the amount of principal payments to which Bernard was entitled in 2007.

Nor did the budget overruns have any impact on Traditions' practical ability to make the required interest or principal payments under the LPS Agreement.  In addition to making all required interest payments on the Loan for 2007, Traditions also paid down $1,600,000 of the outstanding principal -- over $800,000 more than required under the Use of Revenues provision. Bernard has thus failed to prove a material breach of Section 5(t).

---

Bernard by augmenting the net revenues that flowed through the Waterfall in 2007.

[15] Many of the budget overruns were due, at least in part, to five new development contracts signed by Traditions in 2007 that were not included in the 2007 Approved Budget.  These new contracts generated additional net revenues in 2007 that flowed through the Waterfall to the benefit of Bernard.

[16] Bernard does not allege any breach of Section 5(t) based on Traditions' total expenses for 2007, nor could it.  Traditions' total expenses were lower than the amount budgeted in the 2007 Approved Budget.

e.   Failure to Provide Requested Information

The defendants did not breach Section 5(c) of the LPS Agreement by refusing to provide the additional financial information requested by Bernard.  To the contrary, by supplying Bernard with the November 2007 and February 2008 financial reporting packages, the defendants went above and beyond their contractual obligations.  The LPS Agreement imposes no reporting obligations on the defendants other than the requirement in Section 7 that Traditions provide Bernard with a proposed annual budget at least 60 days prior to the close of the prior fiscal year.  In fact, Charles Mathews and Driss Benkirane admitted that the LPS Agreement contains no express reporting requirements other than in Section 7.[17]

Bernard's claim that Section 5(c) obligated the defendants to provide the requested information is without merit.  There is nothing in the text of Section 5(c) that could be interpreted as requiring the defendants to turn over the types of financial information requested by Bernard.  Section 5(c) is of limited

---

[17] Bernard suggests that even if there is no express requirement in the LPS Agreement that Traditions provide it with the additional information requested, such a requirement should be read into the contract based on New York law and customary practices in lending relationships.  Bernard's attempt to impose reporting obligations on Traditions beyond those called for in the LPS Agreement is unavailing.  There is no dispute that the LPS Agreement is an integrated contract that contains the full and complete terms of the parties' agreement.  Nor is there any ambiguity in the LPS Agreement which might be interpreted by reference to industry practice or custom.

scope and application.  Other than "instruments and documents"
reasonably requested by Bernard for the purposes of "creating,
perfecting, validating, or preserving" its security interest in
the Collateral, Section 5(c) does not require defendants to
provide any additional information to Bernard.  Thus, Bernard
has not shown that defendants breached Section 5(c) by refusing
to provide the additional information requested by Bernard.


2.  Breach of the Covenant of Good Faith and Fair Dealing

     Bernard's attempt to invoke the implied covenant of good
faith and fair dealing cannot save its breach of contract
claims.  New York law implies a covenant of good faith and fair
dealing "pursuant to which neither party to a contract shall do
anything which has the effect of destroying or injuring the
right of the other party to receive the fruits of the contract."
Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir.
2006) (citation omitted).  The covenant "only applies where an
implied promise is so interwoven into the contract as to be
necessary for effectuation of the purposes of the contract."
Id. (citation omitted).  Thus, the covenant "can only impose an
obligation consistent with other mutually agreed upon terms in
the contract.  It does not add to the contract a substantive
provision not included by the parties."  Broder v. Cablevision

41

Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (citation omitted).

Bernard argues that "[t]o the extent this Court perceives that the conduct sued upon is not covered by the express terms of the LPS Agreement, liability may still be imposed because of the breach of the implied covenant of good faith." This argument is without merit. Bernard has failed to identify any implied promise integral to the purpose of the LPS Agreement that was breached by the defendants. Nor has Bernard demonstrated that the defendants' conduct in connection with the LPS Agreement interfered with its rights to receive the "fruits of the contract" or otherwise caused it any damages. To the contrary, the evidence demonstrates that defendants have made all required interest and principal payments under the LPS Agreement and have satisfied their obligations in good faith.

3.   Indemnification

Bernard's claim for indemnification fails. Under Section 19(a)(iv) of the LPS Agreement, AEY only has a duty to indemnify Bernard for losses arising from "any failure on the part of [AEY] to perform or be in compliance with any of the terms of the Agreement." Because Bernard has failed to prove any material breach of the LPS Agreement or any failure to perform by AEY, its claim for indemnification must be denied.

42

CONCLUSION

Bernard's claims for breach of contract, breach of the covenant of good faith and fair dealing, and indemnification are denied.  The Clerk of Court shall enter judgment in favor of defendants on all claims and shall close the case.


SO ORDERED:

Dated:     New York, New York
           March 1, 2010

_____
DENISE COTE
United States District Judge

43